# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| **Eric Michael Clark,**<br>Petitioner<br>-vs-<br>**Charles L. Ryan, et al.,**<br>Respondents | CV-09-8006-PCT-JAT (JRI)<br><br>**REPORT & RECOMMENDATION**<br>**On Petition for Writ of Habeas Corpus**<br>**Pursuant to 28 U.S.C. § 2254** |

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison, filed through counsel an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on June 8, 2009 (Doc. 17). On September 16, 2009 Respondents filed their Answer (Docs. 31, 32, 33, 34, 35, 36 and 39). Petitioner filed a Reply on February 25, 2010 (Doc. 48 ).

The Petitioner's Petition is now ripe for consideration. Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

In disposing of Petitioner's petition for writ of certiorari, the United States Supreme Court summarized the facts of the case as follows:

> In the early hours of June 21, 2000, Officer Jeffrey Moritz of the Flagstaff Police responded in uniform to complaints that a pickup truck with loud music blaring was circling a residential block. When he located the truck, the officer turned on the emergency lights and siren of his marked patrol car, which prompted petitioner Eric Clark, the truck's driver (then 17), to pull over. Officer Moritz got out of the patrol

car and told Clark to stay where he was. Less than a minute later, Clark shot the officer, who died soon after but not before calling the police dispatcher for help. Clark ran away on foot but was arrested later that day with gunpowder residue on his hands; the gun that killed the officer was found nearby, stuffed into a knit cap.

*Clark v. Arizona*, 548 U.S. 735, 743 (2006).

## B. PROCEEDINGS AT TRIAL

"The state charged [Petitioner] with one count of first degree murder, for intentionally or knowingly killing a law enforcement officer who is in the line of duty. A.R.S. § 13-1105(3). The state did not seek the death penalty." (Exhibit RR, Mem. Dec. 1/25/05 at 5.)  (Exhibits to the Answer, Docs. 32, 33, 34, 35, 36 and 39, are referenced herein as "Exhibit ___.")

The issue of Petitioner's competency was raised, and on March 28, 2001, the parties entered into a Stipulation (Exhibit D) that Petitioner was incompetent to stand trial. Petitioner was admitted to the Arizona State Hospital for restoration to competency. His competency was revisited in the summer and fall of 2002, and again in the spring of 2003. (Exhibit H, M.E. 7/11/02; Exhibit K, M.E. 9/16/02; and Exhibit O, M.E. 4/25/03.) Petitioner eventually moved to submit the issue of his competency to stand trial on the basis of the submitted reports. (Exhibit P, Motion.)  On May 8, 2003, Petitioner was found competent to stand trial.  (Exhibit Q, M.E. 5/8/03.)

On July 8, 2003, Petitioner appeared and entered a waiver of his right to a jury trial, which the trial court accepted. (Exhibit T. R.T. 7/8/03 at 3-11.)  In exchange for that waiver, the state stipulated that the maximum possible sentence was life, with the possibility for parole after 25 years. (*Id.* at 9.)  Without that stipulation, Petitioner faced the potential of a sentence for "natural life," e.g. life without the possibility of parole or commutation.  Ariz. Rev. Stat. § 13-703(A) (2002).  (*See also* Exhibit YY-1, R.T. 2/9/07 at 63 (def. Counsel Goldberg testifying waiver of jury guaranteed no natural life sentence).)

Petitioner proceeded to a bench trial on August 5, 2003.  "At trial, Clark did not contest the shooting and death, but relied on his undisputed paranoid schizophrenia at the

time of the incident in denying that he had the specific intent to shoot a law enforcement officer or knowledge that he was doing so, as required by the statute." *Clark*, 548 U.S. at 742. The trial court ruled that it could not consider such evidence for that purposes, relying on the Arizona Supreme Court's decision in *State v. Mott* 187 Ariz. 536, 931 P.2d 1046 (1997).[1] Petitioner relied upon the same evidence, as well as testimony of an expert, to assert that he was guilty except insane.

After eleven days of trial, Petitioner was found guilty, with the court specifically rejecting Petitioner's plea of guilty except insane on the basis that (despite finding he suffered from paranoid schizophrenia and paranoid delusions on the day of the killing) he was not prevented from knowing "his actions were wrong." (Exhibit II, R.T. 9/3/03 at 6.) (*See* Exhibits V, W, X, Y, Z, BB, CC, DD, EE, FF, GG and HH, R.T. 8/5/03 to 8/27/03.)

On October 2, 2003, Petitioner was sentenced to life in prison without possibility of release for 25 years. (Exhibit LL, R.T. 10/2/03 at 73.)

Petitioner filed a Motion to Vacate (Exhibit MM), arguing that: (1) Arizona's version (or lack thereof) of an insanity defense was a violation of federal rights to due process; (2) the trial court's failure to consider the absence of the requisite *mens rea* was violation of federal rights to due process; (3) the clear and convincing evidence standard  for proving insanity was a violation of federal rights to equal protection; and (4) incarcerating Petitioner in prison was cruel and unusual punishment, under the Eighth Amendment. The motion was summarily denied (Exhibit NN. M.E. 11/19/03).

## C. PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a Notice of Appeal (Exhibit LL.)  In his Opening Brief, Petitioner argued *inter alia* that: (1) his federal due process rights were violated because his conviction

---

[1]  *Mott* held that evidence of a mental defect could not be admitted to refute intent. In *Mott v. Stewart*, 2002 WL 31017646 (D.Ariz. Aug 30, 2002), Judge Collins ruled that this restriction on the evidence was a violation of due process, and granted habeas relief.  As discussed hereinafter, the U.S. Supreme Court ruled that the *Mott* restriction only excluded expert testimony, and not "observation evidence" by lay and expert witnesses.

was not supported by substantial evidence; (2) Arizona's insanity statute violated the Fifth and Fourteenth Amendments of the U.S. Constitution; (3) due process was violated when he was precluded upon relying upon evidence of his mental condition to negate the *mens rea*; and (4) his life sentence was cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution. (Exhibit OO, Opening Brief.) The Arizona Court of Appeals affirmed Petitioner's conviction and sentence. (Exhibit RR, Mem. Dec. 1/25/05.)

Petitioner filed a Petition for Review (Exhibit SS), which the Arizona Supreme Court summarily denied (Exhibit TT, Order 5/25/05).

Petitioner filed a Petition for Writ of Certiorari with the U.S. Supreme Court. The Court granted review to decide:

> whether due process prohibits Arizona's use of an insanity test stated solely in terms of the capacity to tell whether an act charged as a crime was right or wrong; and whether Arizona violates due process in restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the issue of the mental element of the crime charged (known in legal shorthand as the *mens rea*, or guilty mind)

*Clark*, 548 U.S. at 742. The Court held there was "no violation of due process in either instance." *Id.* The Court also found that the *Mott* decision did not preclude consideration of "observation evidence" on the issue of *mens rea*, but counsel had failed to make an offer of proof to preserve the claim that such evidence had been excluded. The judgment of the Arizona Court of Appeals was affirmed. *Id.* at 779.


## D.  PROCEEDINGS ON POST-CONVICTION RELIEF

On July 29, 2006, Petitioner filed a Notice of Post Conviction Relief (Exhibit UU). Counsel was appointed and filed a PCR Petition (Exhibit VV), arguing *inter alia* that under the Sixth Amendment to the U.S. Constitution, trial counsel was ineffective: (1)  in failing to seek a redetermination of Petitioner's competence to stand trial based upon an evaluation by Dr. Parish received after the final competency determination; (2) in failing to seek a separate determination of Petitioner's competency to waive his right to a jury trial; (3) in allowing Petitioner to waive the right to a jury trial; (4) in failing to call Dr. DiBacco as a

defense witness; and (5) in failing to preserve for review by the United States Supreme Court the issue of "observation evidence" on Petitioner's *mens rea*.

In the course of the evidentiary hearing, Petitioner moved to amend (Exhibit OOO) his PCR petition to add claims: (1) that Petitioner was incompetent during trial, (2) his competence deteriorated during trial, (3) that trial counsel was ineffective for failing to seek new competency determinations, and (4) that lead trial counsel had a conflict of interest preventing him from testifying at trial about his failures in assisting Petitioner's family to have Petitioner involuntarily committed for mental health treatment just prior to the killing of officer Moritz. The PCR court denied the motion to amend as belatedly asserted. (Exhibit RRR-1 R.T. 2/20/07 at 4-5.)

After completion of the evidentiary hearing, the PCR Court denied the Petition.(Exhibit AAAA, M.E. 3/15/07.)

Petitioner filed a Petition for Review (Exhibit CCCC), arguing *inter alia* Petitioner's competency, counsel's ineffectiveness and conflict of interest. The state filed a cross-petition for review. The Arizona Court of appeals denied both petitions. (Exhibit DDDD, Amended Order 4/2/08.)

Petitioner filed a Petition for Review (Exhibit EEEE) by the Arizona Supreme Court, which was summarily denied. (Exhibit FFFF, Order 8/4/08.)

**E. PRESENT FEDERAL HABEAS PROCEEDINGS**

**Petition** - Petitioner commenced the current case by filing, through his mother, Tersa M. Clark, a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on January 13, 2009 (#1). Counsel was appointed and filed an Amended Petition (Doc. 17) on June 8, 2009. Petitioner's Amended Petition asserts the following seven grounds for relief:

> (1)  "Substantial evidence did not support the conviction for first degree murder of a police officer";
> (2)  "The trial court did not correctly apply well established United States Supreme Court case law by holding that Mr. Clark was sane and that decision was an unreasonable determination of the facts in light of the evidence";
> (3)  "The sentence imposed in this case constitutes cruel and unusual

punishment";

(4) "Mr. Clark was not competent to stand trial or to waive his constitutional rights to a jury trial, to present a defense, or to a full and fair hearing";

(5) "Trial counsel was ineffective because he failed to disclose Dr. Parrish's report regarding competency to co-counsel and to the court prior to requesting to waive a jury; counsel failed to request a re-evaluation of Mr. Clark during the trial when Mr. Clark started to deteriorate; when trial counsel waived the jury; when trial counsel limited the use of experts; when trial counsel failed to preserve observational evidence; and because trial counsel had a conflict of interest";

(6) "Prosecutorial misconduct occurred in this case because the prosecutor, just like defense counsel, failed to advise the trial court of the need for a competency hearing regarding waiving a jury and because the prosecutor expressed concerns about defense counsel's decision" and

(7) "Appellate counsel was ineffective because he failed to raise the competency and insanity issues on the direct appeal and failed to preserve the observational evidence."

(Order 7/1/09 at 2.)

**Response** - On September 16, 2009 Respondents filed their Response ("Answer") (Doc. 31), arguing that Petitioner's state remedies on his claims were unexhausted and procedurally defaulted, or the claims are without merit. In addition to the exhibits filed with the Answer (Docs. 32, 33, 34, 35, and 36), Respondents were granted leave to and filed under seal various psychological evaluations as Exhibit GGGG (Doc. 39).

**Reply** - On February 25, 2010 Petitioner filed a Reply (Doc. 48), arguing that his claims are meritorious and either were properly exhausted, or Arizona Rule of Criminal Procedure 32.6(d) (amendment of PCR petitions) was not adequate to bar habeas review.

### III. APPLICATION OF LAW TO FACTS

### A. EXHAUSTION & PROCEDURAL DEFAULT

Respondents argue that Petitioner failed to properly exhaust his state remedies on the following claims:

(1) the portions of Ground One based upon "observation evidence" which negated the finding of *mens rea* (Answer, Doc. 31 at 11);

(2) the claims in Ground Two (sanity determination) (*id.* at 30);

(3)     the portions of Ground Five based upon trial counsel's conflict of interest (*id.* at 85-86);

(4)     the claims in Ground Six (prosecutorial misconduct) (*id.* at 96); and

(5)     the claims in Ground Seven (ineffectiveness of appellate counsel) (*id.* at 101). Respondent argues that these claims are now procedurally defaulted, and thus must be dismissed with prejudice.

## 1. Exhaustion Requirement

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim. *Cartwright v. Cupp,* 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied,* 455 U.S. 1023 (1982).

### a.  Proper Proceeding

Ordinarily,  "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*,  33 F.3d 36, 38 (9th Cir. 1994).   Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court.   This is true even where alternative avenues of reviewing constitutional issues are still available in state court. *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).

### b.  Proper Forum

Ordinarily, a petitioner has not satisfied the exhaustion requirement unless he has fairly presented his claim to the highest state court. *Roettgen v. Copeland*,  33 F.3d 36, 38 (9th Cir. 1994).  Nonetheless, in *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) the Supreme Court recognized that it is only "available" remedies that must be exhausted, and that

requiring prisoners to pursue discretionary review by state courts may result in an unwelcome increase in filings with state courts. 526 U.S. at 847. Thus, the Court instructed that habeas courts are not to ignore state rules or law making a given procedure "unavailable." *Id.* In his concurrence in *O'Sullivan*, Justice Souter noted: "I understand that we leave open the possibility that a state prisoner is likewise free to skip a procedure even when a state court has occasionally employed it to provide relief, so long as the State has identified the procedure as outside the standard review process and has plainly said that it need not be sought for the purpose of exhaustion." *Id.* at 1735 (Souter, J. concurring).

In *O'Sullivan*, the Supreme Court specifically cited *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989). In *Sandon*, the Arizona Supreme Court noted that there was no right to appeal to the Arizona Supreme Court except in cases where the death sentence or life imprisonment was imposed, citing Ariz. Rev. Stat. § 12-120.21(A)(1). *Sandon*, 161 Ariz. at 158, 777 P.2d at 221. Thus, the Arizona Supreme Court held that a petition for review to the Arizona Supreme Court was not required to exhaust state remedies for federal habeas purposes.

In *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999), the Ninth Circuit relied on *O'Sullivan* and *Sandon* to conclude that absent a death penalty or life sentence, Arizona state prisoners have exhausted claims presented in habeas petitions if they have been ruled upon by the Arizona Court of Appeals. In so doing, the Swoopes court cited Justice Souter's concurrence. *Id.* at 1009-10.

<u>Effect of Life Sentence</u> - It is true that the *Swoopes* decision refers to there being no right of appeal to the Arizona Supreme Court "except in capital cases or when a life sentence is imposed." *Swoopes*, 196 F.3d at 1009. Indeed, the decision concludes that "except in habeas petitions in life-sentence or capital cases, claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." *Id.* at 1010. Here Petitioner received a life sentence.

However, in reaching its decision, the Ninth Circuit was faced with a habeas petitioner whose appeal to the Arizona Court of Appeals was denied in 1988, prior to the

1989 amendments eliminating life-sentences from the exceptions to Arizona Court of Appeals' jurisdiction. *See State v. Swoopes*, 155 Ariz. 432, 747 P.2d 593 (App. 1988). Similarly, the Ninth Circuit was required to draw on decisions applying the pre-1989 amendments law. In *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989), the Arizona Supreme Court considered the review rights of a defendant whose appeal was denied in 1986. *Sandon*, 161 Ariz. at 157, 777 P.2d at 220. Although the Sandon court noted the adoption of the 1989 amendments in a footnote, they were not applying that law. *Id.* at 158 n. 1, 777 P.2d at 221 n.1.

Similarly, the decision in *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), also relied on in *Swoopes*, predated the 1989 amendments. Indeed, the only Arizona decision relied upon in *Swoopes* and made after the 1989 amendments was *Moreno v. Gonzalez*, 192 Ariz. 131, 962 P.2d 205 (1998). *Moreno* did not, however rely upon Ariz. Rev. Stat. §§ 12-120.21 or 13-4031, or specifically discuss the death/life sentence limitation. Rather, *Moreno* focused on the "nature and scope of discretionary review by petition for review," *Moreno*, 192 Ariz. at 134, 962 P.2d at 133, and was concerned with whether such discretionary review was an "appeal" within the meaning of the exceptions to Arizona's timeliness bar for claims not presented on "appeal" for good cause.

Moreover, the import of *Sandon* was the Arizona Supreme Court's apparent desire to stop the flood of "large numbers of prisoner petitions seeking to exhaust state remedies." *Sandon*, 161 Ariz. at 157, 777 P.2d at 220. The *Sandon* court concluded that "'[o]nce the defendant has been given the appeal to which he has a right, state remedies have been exhausted." *Id.* at 158, 777 P.2d at 221, quoting *Shattuck*, 140 Ariz. at 585, 684 P.2d at 157. Thus, their recitation of the death/life sentence limitation is not properly read as the limit of their holding, but as a reiteration of the pre-1989 holding of *Shattuck*. Thus *Sandon* may only be reasonably read as an attempt by the Arizona Supreme Court to remove their discretionary review from the cycle of review required for exhaustion of Arizona's state remedies. While a given respondent may desire to require its Arizona prisoner to file a petition for review with the Arizona Supreme Court, it is not the respondents' desire,

- 9 -

however, but that of the Arizona court that is controlling.

Finally, *Swoopes* itself did not hinge on any reading of Ariz. Rev. Stat. §§ 12-120.21 or 13-4031 themselves, but upon the question "whether Arizona has identified discretionary Supreme Court review 'as outside the standard review process and has plainly said that it need not be sought for purpose of exhaustion.' " *Swoopes*, 196 F.3d at 1010, quoting *O'Sullivan*, 526 U.S. 838, 850 (1999).   The only basis for identifying that  discretionary review as being tied to death/life sentences was the language of *Shattuck* and *Sandon*, and their reliance upon the then applicable pre-1989 versions of Ariz. Rev. Stat. § § 12-120.21 and 13-4031.

Thus, until this issue is resolved by the Ninth Circuit, the Arizona District Courts are faced with either applying the exact language of *Swoopes*, or applying the principle of *Swoopes* to the facts as they exist in this case.  The latter holds truer to the function of a trial court in attempting to apply appellate court precedent.

> Using the techniques developed at common law, a court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced. Insofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis.

*Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001).

Applying the rule of *Swoopes*, the undersigned concludes that in light of the 1989 amendments,  claims fairly presented by Petitioner to the Arizona Court of Appeals in his are exhausted notwithstanding any failure to fairly present them to the Arizona Supreme Court. Respondents do not argue otherwise.

Effect of Skipping Intermediate Courts - While presentation to the Arizona Supreme Court was not necessary, neither was it sufficient to properly exhaust Petitioner's state remedies.

In *Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004), the court reiterated that to properly exhaust a claim, "a petitioner must properly raise it on every level of direct review."

Academic treatment accords: The leading treatise on federal habeas

corpus states, "Generally, a petitioner satisfies the exhaustion requirement if he properly pursues a claim (1) throughout the entire direct appellate process of the state, or (2) throughout one entire judicial postconviction process available in the state."

*Casey*, 386 F.3d at 916 (quoting Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure*, § 23.3b (4th ed. 1998).

Similarly, presentation to the Arizona Supreme Court for the first time in a PCR proceeding is not fair presentation. In Arizona, review of a petition for post-conviction relief by the Arizona Court of Appeals is governed by Rule 32.9, Arizona Rules of Criminal Procedure, which clarifies that review is available for "issues which were decided by the trial court." Ariz. R. Crim. P. 32.9(c)(1)(ii). *See also State v. Ramirez*, 126 Ariz. 464, 468, 616 P.2d 924, 928 (Ariz.App., 1980) (issues first presented in petition for review and not presented to trial court not subject to review). Accordingly, PCR claims presented for the first time to the Arizona Court of Appeals are not fairly presented.

Similarly, the Arizona Supreme Court does not grant review of claims not raised below, absent special considerations. *See State v. Logan*, 200 Ariz. 564, 565, 20 P.3d 631, 632, n.2 (2001). Presentation to the Arizona Supreme Court for the first time is not sufficient to exhaust an Arizona state prisoner's remedies. "Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

On the other hand, in a direct appeal, failure to present to the trial court does not necessarily prevent exhaustion; all that is required is presentation "at all appellate stages." *Casey*, 386 F.3d at 916 (emphasis added). "If the petitioner fails to raise a federal claim at trial (or if the claim was not cognizable at all or did not arise until after trial), the petitioner satisfies the exhaustion requirement by raising the claim on appeal, on a motion for rehearing of the appeal, or even in a delayed appeal." Liebman & Hertz, *Federal Habeas Corpus*

*Practice and Procedure*, § 23.3b (5th ed. 2001).[2]  However, failure to present a claim to the trial court in a PCR proceeding may result in a finding that the claim has not been fairly presented, *id.* at n. 26, *i.e.* if the failure to present to the trial court results in the appellate court applying a procedural bar which qualifies as an "independent and adequate state ground." *See Harris v. Reed*, 489 U.S. 255, 260 (1989).

### d.  Fair Presentment

To result in exhaustion, claims must not only be presented in the proper forum, but must be "fairly presented."  That is, the petitioner must provide the state courts with a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim.  28 U.S.C. § 2254;  *Picard v. Connor,* 404 U.S. 270, 276-277 (1971).  A claim has been fairly presented to the state's highest court if the petitioner has described both the operative facts and the federal legal theory on which the claim is based.  *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003) (overruled on other grounds, *Robbins v. Carey*, 481 F.3d 1143, 1149 (9th Cir. 2007)).

While the petitioner need not recite "book and verse on the federal constitution," *Picard v. Connor*, 404 U.S. 270, 277-78 (1971) (quoting *Daugherty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958)), it is not enough that all the facts necessary to support the federal claim were before the state courts or that a "somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam).

On the other hand, both the federal and state courts are tasked with enforcement of the federal constitution.  *See Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003).  Thus, "a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue." *Id.*

---

[2]  Nonetheless, the failure to present to the trial court might prevent habeas review if it results in the appellate court applying a procedural bar which qualifies as an "independent and adequate state ground".

**e.  Application to Petitioner's Claims**

**(1)  Ground One (observational evidence)** - In his Ground One, Petitioner argues that his due process rights were violated because substantial evidence did not support the conviction for first degree murder of a police officer.  Petitioner incorporates two arguments in this claim for relief.  The first is that the affirmative evidence of intent, *i.e.* the prosecution's case in chief, was inadequate.  The second is that upon consideration of the defense's case, *i.e.* "observation evidence" about Petitioner's mental condition and ability to form the *mens rea* of the crime, the evidence was insubstantial.  (Amend. Petition, Doc. 17 at 8-22.)

Respondents assert that Petitioner's substantial evidence claim to the Arizona Court of Appeals was limited to the first argument, based upon the prosecution's case, *e.g.* the lack of evidence of events at the time of the shooting, and evidence suggesting a struggle and hence that he was guilty of manslaughter rather than a murder.  (Answer, Doc. 31 at 11-12.)

In his reply, Petitioner acknowledges this defense (Reply, Doc. 48 at 16), but fails to respond to it (*id.* at 16-17).  In his Petition, Petitioner argued that his claims in Ground One were "raised on the direct appeal and re-raised in the Petition for Review to the Arizona Supreme Court."  (Doc. 17 at 8.)

Petitioner clearly raised on direct appeal a substantial evidence claim, citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  (Exhibit OO, Opening Brief at 26.)  However, in his Opening Brief, the facts argued in support of this theory were limited to arguing about the prosecution's case, *i.e.* that "the evidence showed at most a struggle leading to a gun fight, not that [Petitioner] intentionally or knowingly shot and killed a police officer."  (*Id.* at 28.)  Petitioner raised no argument in this claim as to the defense's case, *i.e.* his ability to form the requisite *mens rea,* or the mental condition evidence to which he now points.[3]  (*See id.* at 26-

_____

[3] Petitioner did challenge the exclusion of this mental condition evidence under *Mott*, but did not do so as part of his claim of sufficiency of the evidence claim (Exhibit OO, Opening Brief at 26-28), but as a separate due process challenge to the exclusion (*id.* at 46-52.)

- 13 -

28.)

Similarly, Petitioner's Reply Brief focused solely upon arguments that the shooting was not premeditated, but "during a sudden quarrel." (Exhibit QQ at 4-6.)

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals did not *sua sponte* consider the defense case argument, *i.e.* whether the mental condition evidence rendered the evidence insubstantial. Rather it limited its consideration of the sufficiency of the evidence to the prosecution's case argument, *i.e.* whether the circumstances of Petitioner's conduct, and the other evidence surrounding the course of events at the shooting, established that Petitioner intended to kill a police officer. (Exhibit RR, Mem. Dec. 1/25/05 at 6-10.) Thus, Petitioner failed to fairly present to the Arizona Court of Appeals a substantial evidence claim based on the defense's case argument.

In his Petition for Review to the Arizona Supreme Court, Petitioner repeated his same challenges to the evidence, citing evidence showing a "sudden heat of passion exchange." (Exhibit SS, at 3-5) The only reference to Petitioner's mental capacity in the substantial evidence claim was the single remark that the incident was such an exchange "between the officer and delusional Appellant." (*Id.* at 5.) Petitioner did not argue that those delusions led to a conclusion that Petitioner did not understand the facts sufficiently to form the requisite *mens rea*.

Although a federal habeas petitioner may reformulate somewhat the claims made in state court, *Tamapua v. Shimoda*, 796 F.2d 261, 262 (9th Cir. 1986), *rev'd in part on other grounds by Duncan v. Henry*, 513 U.S. 364 1995), the substance of the federal claim must have been "fairly presented" in state court. *Id.* at 262. Thus, a petitioner may not broaden the scope of a constitutional claim in the federal courts by asserting additional operative facts that have not yet been fairly presented to the state courts. Expanded claims not presented in the highest state court are not considered in a federal habeas petition. *Brown v. Easter*, 68 F.3d 1209 (9th Cir. 1995); *see also, Pappageorge v. Sumner*, 688 F.2d 1294 (9th Cir. 1982), *cert. denied*, 459 U.S. 1219 (1983); *Chacon v. Wood,* 36 F.3d 1459, 1468 (9th Cir.1994).

As observed by the Supreme Court in *Clark*, the species of "observation evidence"

at the heart of Petitioner's challenge, and its use to refute the existence of *mens rea* is a unique species of evidence. Raising a separate challenge to *mens rea*, based solely upon the lack of affirmative evidence of intent would not provide a fair opportunity for the state court to pass upon an "observation evidence" claim refuting an ability to form the requisite *mens rea*. .

Even if the single reference to Petitioner being delusional was somehow a presentation of the instant "observational evidence" claim, Petitioner's brief to the Arizona Supreme Court failed to cite any federal law (or any law) in connection with this claim. (Beyond four corners). While he did so in making the claim to the Arizona Court of Appeals, he "must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing." *Castillo v. McFadden*, 370 F.3d 882, 887 (9th Cir. 2004). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Further, that would have been Petitioner's first presentation of the claim, Petitioner having failed to assert the claim to the Arizona Court of Appeals, as discussed herein above it would not be considered by the Arizona Supreme Court absent special circumstances, and thus was not fairly presented. Petitioner simply failed to raise his claim "on every level of direct review." *Casey*, 386 F.3d at 916.

Based upon the foregoing, the undersigned finds that Petitioner never fairly presented to the state courts the instant claim of a lack of substantial evidence of the required *mens rea*, based upon a failure to consider the defense's observational evidence on Petitioner's mental condition. Consequently, the undersigned concludes that this portion of Petitioner's Ground One was not properly exhausted.

### (2) Ground Two (Sanity Determination)

For his Ground Two, Petitioner argues that the state courts violated his due process

rights by making an unreasonable determination of the facts in determining he was sane, and thus criminally culpable. (Amend. Pet. Doc. 17 at 22-29.) Respondents concede that the facts of this claim were asserted under a state law claim on direct appeal, but argue Petitioner's federal claim is unexhausted and procedurally defaulted. (Answer, Doc. 31 at 30-32.) Petitioner argues in his Petition that this federal claim was fairly presented by arguing state law cases citing to the "*M'Naghten* Case" (Amend. Pet. Doc. 17 at 22), and replies that his "opening brief [on direct appeal] relied on *McNaugten* [sic], clearly established federal law, which relied on a due process argument." (Reply, Co. 48 at 18.)

To the contrary, Petitioner's Opening Brief contains a single reference on page 38 to the English case, *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843), addressed by the Supreme Court in Petitioner's case, *Clark*, 548 U.S. at 746. (*See* Exhibit OO, Opening Brief at viii.) That portion of his Opening Brief was dedicated to Petitioner's third issue on appeal, a challenge to the constitutionality of Arizona's insanity statute. (*Id.* at 37 to 51.) Moreover, *M'Naghten* merely established a principal of English common law on the insanity defense. While *M'Naghten* is a landmark common law case, Petitioner's own case before the Supreme Court identifies that *M'Naghten* itself is not a feature of federal or constitutional law. While "[s]eventeen States and the Federal Government have adopted a recognizable version of the *M'Naghten* test with both its cognitive incapacity and moral incapacity components...due process imposes no single canonical formulation of legal insanity." *Clark*, 548 U.S. at 753.

More importantly, Petitioner's challenge to the state court's factual findings, contained in his second issue on appeal (*id.* at 28-37) included no reference to *M'Naghten*, due process, or any federal authorities, but instead uniformly relied upon state authorities addressing when a trial court's determination of failure to prove insanity is an abuse of discretion, or its jury instructions deficient. (*Id.* (citing *State v. Zmich*, 160 Ariz. 108, 111, 770 P.2d 776, 779 (1989) (state law abuse of discretion); *State v. King*, 158 Ariz. 419, 426, 763 P.2d 239, 246 (1988) (1988) (state law on jury instruction); and *State v. Tamplin*, 195 Ariz. 246, 986 P.2d 914 (App. 1999) (state law on jury instruction)).

Accordingly, Petitioner failed to present the federal claims in his Ground Two to the state courts, and the claim was not properly exhausted.

**(3) Ground Five (Conflict of Interest of Trial Counsel** - As an alternative to asserting an independent and adequate state bar, as discussed hereinafter, Respondents argue that Petitioner's conflict of interest claim in Ground Five was not fairly presented because it was raised for the first time on the motion to amend, and that motion did not plainly rely upon federal law. (Answer, Doc. 31 at 84-85.) Indeed, the Motion to Amend cited no authority in support of the claim of a conflict of interest. (*See* Exhibit OOO, Motion to Amend at 5.) Petitioner replies that the Motion to Amend raised an "ineffective assistance of counsel" claim, and that "ineffective assistance of counsel" "is a term of art and is sufficient to raise a 6th Amendment argument." (Reply, Doc, 48 at 28.)

However, a simple reference to ineffective assistance of counsel is not sufficient to fairly present a federal claim under the Sixth Amendment. *Lyons v. Crawford*, 232 F.3d 666, 668-69 (9th Cir.2000), *as amended*, 247 F.3d 904 (9th Cir.2001). *See also Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (discussing sufficiency of mere reference to "ineffective assistance" absent evidence that the state court utilized the term to refer solely to a federal law claim); *Casey*, 386 F.3d at 914 (declining to treat claims as identical where petitioner "failed to demonstrate that the [state] courts would apply a federal constitutional analysis to the claims he presented").

Petitioner presents no authority for his proposition that "ineffective assistance" is a term of art within the Arizona courts that refers solely to a claim founded upon federal law. Arizona's own constitution guarantees effective assistance of counsel. *See* Ariz. Rev. Stat. Const. Art. 2 § 24. It is true that Arizona's standards for ineffective assistance of counsel parallel those adopted by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984) (adopting the prejudice prong of Strickland standard); *State v. Nash*, 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985) (adopting the deficient performance of the Strickland standard); *State v. Valdez*, 167 Ariz.

328, 330, 806 P.2d 1376, 1378 (1991) ("This court has adopted the Strickland test."). However, the Arizona right to effective counsel is not equivalent to the federal right. *See e.g. State v. Krum*, 182 Ariz. 108, 110, 893 P.2d 759, 761 (.App. Div. 1 1995), *overturned on statutory grounds*, 183 Ariz. 288, 903 P.2d 596 (1995) (finding right to effective counsel in PCR proceeding, notwithstanding federal law's denial of right to PCR counsel). "[R]aising a state claim that is merely similar to a federal claim does not exhaust state remedies." *Fields v. Waddington*, 401 F.3d 1018, 1022 (9th Cir. 2005).

The burden of proving that the state and federal claims are identical is on the habeas petitioner. *Casey*, 386 F.3d at 914 (declining to treat claims as identical where petitioner "failed to demonstrate that the [state] courts would apply a federal constitutional analysis to the claims he presented"). In *Fields*, the Ninth Circuit refused to deem federal claims exhausted when the petitioner's claims appeared to have been asserted as analogous state law claims. "In the absence of an affirmative statement by the Washington Supreme Court that it considers a particular state and federal constitutional claim to be identical, rather than analogous, or an affirmative statement by the Washington Supreme Court that [the circumstances of the claim] serves to raise federal claims for the purposes of exhaustion, Petitioner was required to raise his federal claims affirmatively; we will not infer that federal claims have been exhausted." *Fields*, 401 F.3d at 1024.

According, the undersigned concludes that Petitioner failed to fairly present the federal claim in Ground Five based upon trial counsel's conflict of interest.

**(4) Ground Six (Prosecutorial Misconduct)** - For his Ground Six, Petitioner argues that the prosecutor committed misconduct by failing to seek a competency hearing prior to Petitioner's waiver of a jury trial, and by failing to express concerns about defense counsel's decision to waive the jury trial. (Amend. Pet. Doc. 17 at 63-66.) Presumably, Petitioner intends to argue that this resulted in a denial of due process. Petitioner argues this claim "was raised in the Petition for Post-Conviction Relief in an around about way" through references to the state's failure to call for " a special competency determination regarding the

waiver of the right to trial by jury." (*Id.* at 63 (quoting Exhibit VV, PCR Pet. at 6).)

Respondents argue that Petitioner failed to fairly present this argument. (Answer, Doc. 31 at 96-98.) Petitioner replies that he "candidly admitted that this claim was not clearly raised in the PCR; however it was alluded to and all parties were on notice of the competency issue and concerns." (Reply, Doc. 48 at 29.)

> Briefing a case is not like writing a poem, where the message may be conveyed entirely through allusions and connotations. Poets may use ambiguity, but lawyers use clarity. If a party wants a state court to decide whether she was deprived of a federal constitutional right, she has to say so. It has to be clear from the petition filed at each level in the state court system that the petitioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition.

*Galvan v. Alaska Dept. of Corrections,* 397 F.3d 1198, 1204 (9th Cir. 2005). Petitioner points to no portion of his state briefs in which he said he had been denied his federal due process rights as a result of prosecutorial misconduct of any kind, nor even any portion wherein he asserted a claim of prosecutorial misconduct. The portion of his PCR Petition to which he points made no reference to any misfeasance on the part of the prosecution, and was plainly ensconced in an argument on ineffective assistance of counsel. The PCR court would had to have been clairvoyant to deduce a prosecutorial misconduct claim from that discussion.

Moreover, Petitioner points to no portion of his Petition for Review to the Arizona Court of Appeals to show that the claim was fairly presented to that court.

This claim was not properly exhausted.


**(5) Ground Seven (Ineffectiveness of Appellate Counsel)** - For his Ground Seven, Petitioner argues that he was denied effective assistance of appellate counsel as a result of counsel's failure to raise the (a) competency, (b) insanity, and (c) observational evidence issues.[4] (Amend. Pet. Doc. 17 at 66-69.) Petitioner contends that these issues were raised

---

[4] "Competency" generally refers to issues concerning Petitioner's mental status at the time of trial. "Insanity" generally refers to Petitioner's mental status at the time of commission of the offense.

in his motions to amend his PCR petition. (*Id.* at 66.) Respondents argue *inter alia* that presenting the claim in a motion to amend was not fair presentation, and Petitioner never presented the factual basis of his claim in the motion to amend.[5] (Answer, Doc. 31 at 101-103.) Petitioner points out that the same counsel was trial and appellate counsel, and replies that he could not bring the claim on direct appeal, and attempted to do so in his PCR proceeding. (Reply, Doc. 48 at 30.)

The undersigned presumes *arguendo* that a federal claim may be fairly presented to an Arizona PCR court by its presentation in a motion to amend the petition. Even with that assumption, Petitioner's Motion to Amend failed to fairly present two of the three claims in his Ground Seven.

The only reference Petitioner made to appellate counsel in his Motion to Amend was his introductory statement that "appellate counsel was ineffective in failing to raise the competency issue on appeal." (Exhibit OOO, Mot. Amend at 1-2.) While the same attorney that was one of Petitioner's attorneys at trial (Goldberg), also represented him on appeal, it is generally a different claim to assert a failure on appeal versus one at trial. Moreover, the facts argued by Petitioner in his Motion to Amend were limited to attorney Middlebrook's impairment at trial (*id.* at 3-4), Petitioner's competency to stand trial (*id.* at 4-5), counsel Middlebrook's conflict of interest in presenting his insanity defense as a result of his deficiencies in assisting Petitioner's families attempt to secure involuntary treatment (*id.* at 5). Petitioner's motion did not otherwise discuss any counsel's handling of the insanity defense or discuss at all the "observational evidence" issues. Thus, the only portion of Petitioner's Ground Seven which was discussed in his Motion to Amend was the bald

---

[5] Respondents also argue that the denial of the motion to amend was a procedural bar on independent and adequate state grounds which bars federal habeas relief. (Answer, Doc. 31 at 101.) Assuming the federal claims in Ground Seven were not fairly presented in the motion to amend, the application of a procedural bar to deny the motion to amend would be irrelevant for habeas purposes. The procedural bar issues are addressed hereinafter on the assumption that the claims in Ground Seven were fairly presented.

statement that appellate counsel was ineffective for failing to raise the competency issue.[6]

Further, Petitioner's motion to amend makes no reference whatsoever to any federal claim. He cites no federal authority or constitutional provision. He makes unadorned references to counsel being "ineffective" or "deficient" and purports to seek the amendment "to preserve Defendant's constitutional rights." (*Id.* at 1-2.) Petitioner argues that his references to an "IAC claim" was sufficient to invoke federal law on effective assistance of counsel. (Reply, Doc. 48 at 27-28.) However, as discussed above, a simple reference to ineffective assistance of counsel is not sufficient to fairly present a federal claim under the Sixth Amendment.

Moreover, Petitioner must also have presented this claim to the Arizona Court of Appeals. Petitioner plainly relied upon federal law in his Petition for Review, citing *Strickland v. Washington*, 466 U.S. 668 (1984). (Exhibit CCCC, PCR Pet. Rev. at 10.) However, Petitioner's only reference, explicit or implicit, to appellate processes in his Petition for Review, was the following:

> 6. The trial court erred in determining that counsel provided ineffective assistance of counsel concerning an issue that was not addressed by the Unite States Supreme Court on appeal for the reason that the issue was not properly preserved for appellate review.

(Exhibit CCCC, PCR Pet. Rev. at 3.) Petitioner explained that this related to trial counsel's failure to raise the "observational evidence" issue.

> On September 15, 2006, Goldberg signed an affidavit in which he stated in part: "I believed at the time of trial and direct appeal in the State system that *State v. Mott*, 187 Ariz. 536, 931 P.2d 1046 (1997) precluded the court's consideration of the observation evidence. However, I never raised this point on the record with the court nor specifically asked the court to consider the lay testimony on the issue of *mens rea*.

(Exhibit CCCC, PCR Pet. Rev. at 5-6.) Even if this claim amounted to an assertion of ineffectiveness of appellate counsel, that claim had not been presented in Petitioner's motion

---

[6] The PCR court did address Petitioner's claim that trial counsel was ineffective for failing to assert (or affirmatively hiding) Petitioner's incompetency at trial and on the waiver of a jury. (Exhibit AAAA, M.E. 3/15/07 at 5-10.)

to amend, or his original PCR petition.

Petitioner did argue that counsel was ineffective for failing to pursue the competency issue, but that was limited to events at trial, including the claim of counsel "withholding from the trial judge a doctor's report", failing to "address the competency issue when Defendant's mental condition deteriorated during trial," "having Defendant waive the right to trial by jury," and "limiting the evidence...on the issue of insanity." (*Id.* at 2-3.)

In sum, at best, Petitioner raised to the PCR Court the portion of Ground Seven based on appellate counsel's failure to raise the competency issues, and raised to the Arizona Court of Appeals the portion based on appellate counsel's failure to raise the observation evidence issue. Neither was, alone, sufficient. *Casey*, 386 F.3d at 916.

Accordingly, the undersigned concludes that Petitioner's Ground Seven was not fairly presented to the state courts, and was not properly exhausted.

**(6) Summary Re Presentation of Claims** - Based upon the foregoing, the undersigned concludes that Petitioner failed to fairly present the following claims:

(a)     the portions of Ground One based upon "observation evidence" which negated the finding of *mens rea*;

(b)     the claims in Ground Two (sanity determination);

(c)     the portions of Ground Five based upon trial counsel's conflict of interest;

(d)     the claims in Ground Six (prosecutorial misconduct); and

(e)     the claims in Ground Seven (ineffectiveness of appellate counsel).

**2. Procedural Default**

Ordinarily, unexhausted claims are dismissed *without prejudice*. *Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991). However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief. Dismissal *with prejudice* of a

procedurally barred or procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts. Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a), and its timeliness bar in Ariz. R. Crim. P. 32.4. (Answer, Doc. 16 at 14-15.)

**Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence. The Arizona Rules of Criminal Procedure do not provide for a successive direct appeal. *See generally* Ariz.R.Crim.P. 31. Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims.

**Remedies by Post-Conviction Relief** - Petitioner can no longer seek review by a subsequent PCR Petition.

Waiver Bar - Under the rules applicable to Arizona's post-conviction process, a claim may not ordinarily be brought in a petition for post conviction relief that "has been waived at trial, on appeal, or in any previous collateral proceeding." Ariz.R.Crim.P. 32.2(a)(3). Under this rule, some claims may be deemed waived if the State simply shows "that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding." *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting Ariz.R.Crim.P. 32.2, Comments). For others of "sufficient constitutional magnitude," the State "must show that the defendant personally, "knowingly, voluntarily and intelligently' [did] not raise' the ground or denial of a right." *Id.* That requirement is limited to those constitutional rights "that can only be waived by a defendant personally." *State v. Swoopes* 216 Ariz. 390, 399, 166 P.3d 945, 954 (App.Div. 2, 2007). Indeed, in coming to its prescription in *Stewart v. Smith*, the Arizona Supreme Court identified: (1) waiver of the right to counsel, (2) waiver of the right to a jury trial, and (3) waiver of the right to a twelve-person jury under the Arizona Constitution, as among those rights which require a personal waiver. 202 Ariz. at

450, 46 P.3d at 1071.[7]  None of Petitioner's unexhausted claims fit within those categories.[8]

Timeliness Bar - Even if not barred by preclusion, Petitioner would now be barred from raising his claims by Arizona's time bars.  Ariz.R.Crim.P. 32.4 requires that petitions for post-conviction relief (other than those which are "of-right") be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is the later."  *See State v. Pruett*, 185 Ariz. 128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that first petition of pleading defendant deemed direct appeal for purposes of the rule).  That time has long since passed.

Exceptions - Rules 32.2 and 32.4(a) do not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h).  *See* Ariz. R. Crim. P. 32.2(b) (exceptions to preclusion bar); Ariz. R. Crim. P. 32.4(a) (exceptions to timeliness bar).  Petitioner has not asserted that any of these exceptions are applicable to his claims.  Nor, with one exception, does it appears that such exceptions would apply.  The rule defines the excepted claims as follows:

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
> (1) The newly discovered material facts were discovered after the trial.
> (2) The defendant exercised due diligence in securing the newly discovered material facts.
> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence

---

[7] Some other types of claims addressed by the Arizona Courts in resolving the type of waiver required include: ineffective assistance (waived by omission), *Stewart,* 202 Ariz. at 450, 46 P.3d at 1071; right to be present at non-critical stages (waived by omission), *Swoopes*, 216 Ariz. at 403, 166 P.3d at 958; improper withdrawal of plea offer (waived by omission), *State v. Spinosa*, 200 Ariz. 503, 29 P.3d 278 (App. 2001); double jeopardy (waived by omission), *State v. Stokes*, 2007 WL 5596552 (App. 10/16/07); illegal sentence (waived by omission), *State v. Brashier*, 2009 WL 794501 (App. 2009); judge conflict of interest (waived by omission), *State v. Westmiller*, 2008 WL 2651659 (App. 2008).

[8] Petitioner concedes that his claim of ineffectiveness of appellate counsel is now procedurally barred under Rule 32.2(a).  (Reply, Doc. 48 at 30.)

- 24 -

substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.

f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or

g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or

h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence. Where a claim is based on "newly discovered evidence" that has previously been presented to the state courts, the evidence is no longer "newly discovered" and paragraph (e) has no application. Here, Petitioner has long ago asserted the facts underlying his unexhausted claims. Paragraph (f) has no application where the petitioner filed a timely notice of appeal. Paragraph (g) has no application because Petitioner has not asserted a change in the law since his last PCR proceeding. Finally, paragraph (h), concerning claims of actual innocence, has no application to Petitioner's procedural claims, and Petitioner, at best, asserts in his Ground One that the trial court erred in precluding his "observational evidence", but does not here assert that such evidence establishes his actual innocence. *See State v. Swoopes*, 216 Ariz. 390, 404, 166 P.3d 945, 959 (App. 2007) (32.1(h) did not apply where petitioner had " not established that trial error ...amounts to a claim of actual innocence").

Summary - Accordingly, the undersigned must conclude that review through Arizona's direct appeal and post-conviction relief process is no longer possible for Petitioner's unexhausted claims.

**Summary re Procedural Default** - Petitioner failed to exhaust his federal claims in part of his Ground One ("observation evidence"), part of his Ground Five (conflict of interest) and in all of Grounds Two, Six and Seven, and is now procedurally barred from

doing so. Accordingly, these unexhausted claims are procedurally defaulted, and absent a showing of cause and prejudice or actual innocence, must be dismissed with prejudice.

## D. INDEPENDENT AND ADEQUATE STATE GROUNDS

Respondents argue that the following claims were procedurally barred in the state courts upon an independent and adequate state ground, and thus are not subject to habeas review:

(1) the claims in Ground Four (Competence) (Answer, Doc. 31 at 44);

(2) the claims in Ground Five that trial counsel was ineffective for failing to seek a competency redetermination during trial (*id.* at 65), and had a conflict of interest that prevented him from testifying and compromised his performance (*id.* at 84); and

(3) the claims in Ground Seven (ineffective assistance of appellate counsel (*id.* at 101).

"[A]bsent showings of 'cause' and 'prejudice,' federal habeas relief will be unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.' " *Walker v. Martin*, - - - U.S. - - -, 2011 WL 611627, 6 (2011).

**Ground Four (Competency)** - In his Ground Four, Petitioner argues that he was not competent to stand trial, or to waive his rights to a jury trial.[9] (Amend. Pet. Doc. 17 at 33.) Petitioner contends that as a result of the acceptance of his wavier and the prosecution of his trial his due process rights were denied. (*Id.* at 40.) *See e.g. Maxwell v. Roe,* 606 F.3d 561, 568 (9th Cir. 2010) ("undisputed" that conviction of an accused person while he is legally incompetent violates due process.)

---

[9] Petitioner adds that he was not competent to "present a defense, or to a full and fair hearing." (Amend. Pet. Doc. 17 at 33.) Petitioner does not explain how these are different from his claim that he was incompetent to stand trial. Accordingly, the Court treats them as surplusage to Petitioner's claim of incompetence to stand trial.

Petitioner argues he raised these claims in his Ground Four "in the Petition for Post-Conviction Relief and in the Motion to Amend the Petition." (*Id.* at 33-34.) He also argues they were raised in his PCR Reply. (*Id.* at 34-35.) Respondents argue that Petitioner raised these claims in his unsuccessful motion to amend, but the PCR court found them waived under Ariz. R. Crim. P. 32.2(d) by failure to present them on direct appeal. (Answer, Doc. 31 at 45.)

These claims were raised in Petitioner's PCR Petition.[10] "Defendant submits that he was not competent to stand trial nor competent to waive constitutional rights...[in violation of] Defendant's rights as guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States." (Exhibit VV, PCR Pet. At 2.) The claims were addressed in the PCR Court's order. The PCR court noted that it had addressed the substance of the claims in addressing Petitioner's related ineffective assistance claims. The court concluded:

> In order to assist appellate review, this Court finds that Arizona Rules of Criminal Procedure Rule 32.2 does not allow these claims as set forth above as they could have been raised on direct appeal. Finally, this Court finds that even if the competency claims were reviewable on their own, the entire record of this case...show defendant was competent to stand trial and waive his right to a jury trial.

(Exhibit AAAA, M.E. 3/15/07 at 14.) Accordingly, the undersigned finds that this claim wa disposed of by the PCR Court as waived under Rule 32.2.

Petitioner replies that: (1) appellate counsel admitted he should have raised the claim, but believed it to be without merit; (2) he attempted to raise the claim in his motion to amend

---

[10] On the other hand, before the Arizona Court of Appeals, Petitioner merely contended that the "trial court erred in determining that Defendant was competent to stand trial and waive constitutional rights including the right to trial by jury." (Exhibit EEEE, PFR at 2.) This claim was submitted as a sub issue of an ineffective of assistance of counsel claim. Petitioner never asserted or discussed any authority on competency to stand trial, beyond a state court case (*Bishop v. Superior Court*, 150 Ariz. 404, 724 P.2d 23 (1986)) in connection with arguments that trial counsel was ineffective with regard to Petitioner's competency. *See Rose v. Palmateer*, 395 F.3d 1108, 1110-11 (9th Cir. 2005) (holding that a petitioner does not fairly present a Fifth Amendment claim to the state courts when it is merely discussed as one of several issues handled ineffectively by counsel). Thus, if not procedurally barred, the undersigned would find that this claim was procedurally defaulted by failure to fairly present it to the Arizona Court of Appeals.

his PCR petition; (3) it would have been futile to raise because the Arizona Court of Appeals had already rejected the claim; (4) the opinions of the United States Supreme Court differed on whether the claim had been preserved; and (5) in any event, the PCR Court went on to consider the claims.  (Reply, Doc. 48 at 20-21.)

To the extent that Petitioner contends that ineffective assistance of appellate counsel shows cause to excuse the procedural bar, that will be addressed in the section on Cause and Prejudice hereinafter.  It is irrelevant that Petitioner's Ground Four claims were also presented in his Motion to Amend his PCR petition.  The PCR Court addressed them though as raised in the Petition.

Petitioner asserts it would have been futile to present the claims because they had already been rejected by the Arizona Court of Appeals by its decision "that *Mott* did not allow this evidence to be considered."  (Reply, Doc. 48 at 20.)  Petitioner seems to be confusing his insanity and/or lack of *mens rea* defenses with his competency to stand trial claim.  Petitioner's direct appeal dealt solely with his insanity defense, and did not address his competency to stand trial.  The referenced  case, *State v. Mott*, 187 Ariz. 536, 931 P.2d 1046 (1997) dealt not with  a defendant's competency to stand trial, but with diminished capacity in the context of a battered woman defense.  *See Clark*, 548 U.S. at 756 (discussing *Mott*).

Petitioner argues that the U.S. Supreme Court justices differed on whether the competency claim had been preserved.  (Reply Doc. 48 at 20.)  Petitioner does not elaborate.  Again, however, this appears to refer to Petitioner's lack of *mens rea* claim rather than his competency claim.  *See Clark*, 548 U.S. at 761-765 (discussing dispute between the majority and dissent as to preservation of claims concerning exclusion of observation evidence on *mens rea*).

Finally, Petitioner's contention that the merits were nonetheless reached is true but inapposite.  The state court may reach "the merits of a federal claim in an alternative holding" and still avoid habeas review, "as long as the state court explicitly invokes a state procedural bar rule."  *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989).  The PCR Court clearly invoked

Rule 32.2 to dispose of Petitioner's competency claims. Accordingly, the undersigned concludes that the claims in Petitioner's Ground Four were disposed on the basis of Rule 32.2's waiver rule, which Respondents plead is an independent and adequate procedural ground.

Although, as discussed hereinafter, Petitioner challenges the adequacy of Arizona's amendment rule (Rule 32.6(d)) (Amend. Pet. Doc. 17 at 37), Petitioner does not argue that the waiver rule of Rule 32.2 is not independent and adequate.

Petitioner does argue that a competency claim can never be waived (given the potential that the defendant was incompetent when the claim was allegedly waived), citing *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir. 1985), and *Commonwealth v. Santiago*, 855 A.2d 682, 692, n. 9 (Pa. 2004). (Amend Pet. Doc. 17 at 35.) However, neither of these cases concern the application of Arizona's Rule 32.2. Further, what was at issue in the PCR Court was not Petitioner's competence to waive at trial a claim of incompetency, but the effectiveness of his waiver of the claim on direct appeal.

Moreover, Petitioner's argument ignores the holding of the Ninth Circuit in *Martinez-Villareal v. Lewis*, 80 F.3d 1301 (9th Cir. 1996), which explicitly rejected the Eleventh Circuit's analysis in *Adams* as "untenable when applied to a case in which the State has raised the defense of procedural default, rather than waiver." *Id.* at 1307. Whatever logic this Court might find in Petitioner's arguments and the reasoning of the Eleventh Circuit, the decision in *Martinez-Villareal* is controlling in this circuit.

Finally, the undersigned notes that Rule 32.2 does require for some types of claims of "sufficient constitutional magnitude" an intentional "personal waiver", rather than a mere waiver by failure to raise it in an earlier proceeding. However, Petitioner points to no Arizona case applying this to appellate claims of incompetency. Nor does Petitioner point to any other case doing so. The parties do discuss *Pate v. Robinson*, 383 U.S. 375 (1966), in which the Supreme Court found that the defendant had not waived a claim of incompetency at trial by failing to raise the claim at trial. The Court did observe that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have

the court determine his capacity to stand trial." *Id.* at 384. However, the Court did not hold that such a waiver could not be made, and it explicitly found that the defendant's counsel had put his present competency at issue. In *Drope v. Missouri*, the Court characterized *Pate* as simply "express[ing] doubt that the right to further inquiry upon the question [of incompetency] can be waived." 420 U.S. 162, 176 (1975).

Based upon the foregoing, the undersigned finds Petitioner's competency claims to be procedurally barred from habeas review, absent a showing of a cognizable excuse.

**Ground Five (Ineffective Assistance of Trial Counsel** - In his Ground Five, Petitioner argues that trial counsel was ineffective for, *inter alia*, failing to seek a competency redetermination during trial, and because trial counsel Middlebrook had a conflict of interest that prevented him from testifying and compromised his performance. Respondents argue that these claims were not raised in the original PCR Petition, and that the Motion to Amend which sought to assert them was denied pursuant to Arizona Rule of Criminal Procedure 32.6(d) on the basis of Petitioner's failure to show good cause to amend. (Answer, Doc. 31 at 65, 84.) Petitioner replies that Rule 32.6(d) is not "adequate" because it is not consistently applied in Arizona.[11] (Reply, Doc. 48 at 12.) (*See also* Amend. Pet., Doc. 17 at 44 (citing *Scott v. Schriro*, 567 F.2d 573, 586 (9th Cir. 2009)).

Application of Procedural Bar - The PCR court did deny Petitioner's Motion to Amend. (Exhibit SSS, M.E. 2/20/07.) In doing so, however, the court went to some lengths to identify related claims that it found had been adequately raised in the PCR Petition, distinguishing the ineffectiveness claims based upon failure to raise competency to stand trial as compared to a loss of competency during trial:

> THE COURT: All right. I'm going to stand by my ruling to not allow the Motion to Amend. I will allow Mr. Gerhardt to bring the claim as set forth in the - - that on the basis of Dr. Parrish's report, Mr. Middlebrook was ineffective because he did not raise the issue of competency to Judge Coker with respect to his right to - - - his ability to

---

[11] Petitioner argues without explanation that Respondents concede the exhaustion of all portions of Ground 5 other than the conflict of interest issue. (Reply, Doc. 48 at 21.) Respondents clearly assert a procedural bar as to the competency during trial issue. (Answer, Doc. 31 at 65.)

waive constitutional rights which includes the right to waive a jury trial, and that he was not competent to stand trial.

Now, to the extent that you can tie in his competency during trial to the issue that he was not competent to stand trial, I'll give you that leeway, but I see the competency during trial, that he was not competent during trial - - while it is somewhat related, I still see that as somewhat of a separate issue, because I don't have anything in front of me that says during this phase of the trial there was an evaluation that was done and Mr. Clark was determined not be competent.

* * *

THE COURT: I'm going to deny the Motion to Amend, but I will find that in your initial Petition you did raise the issue, and that issue has been raised as to whether or not Mr. Clark was competent to waive his Constitutional rights, competent to stand trial, and that relates to the issue of Dr. Parrish's report and her findings and whether or not Mr. Middlebrook was ineffective for failing to bring this to [the trial judge's] attention.

(Exhibit RRR-1, R.T. 2/20/07 at 28-29, 33.)

Notwithstanding that ruling, the PCR Court nonetheless reached at least portions of the competency-during-trial issue, considering whether trial counsel was ineffective for "failing to raise another competency claim during trial due to petitioner's falling asleep during trial." (Exhibit AAAA M.E. 3/15/07 at 10.) Petitioner's current claim concerning a reassertion of incompetency during trial does not appear to extend beyond that claim.

Thus, it appears that despite denying the motion to amend, the PCR court did address the portion of Petitioner's Ground Five based upon trial counsel's failure to urge Petitioner's incompetency during trial. It is true that a state court may reach "the merits of a federal claim in an alternative holding" and still avoid habeas review, "as long as the state court explicitly invokes a state procedural bar rule." *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989). Here, however, the state court did not address the merits as an alternative holding in the same order in which it applied a procedural bar, but in ruling on a motion to amend prior to the hearing. Rather, the state court appears to have either reversed or clarified its earlier decision that the ineffectiveness-on-competency-during-trial issue was not properly raised.[12] Thus, in its final

---

[12] In contrast, when addressing the direct challenges to competency, the PCR Court explicitly found the claims precluded under Ariz. R. Crim. P. 32.2, but alternatively held "that even if the competency claims were reviewable on their own, the entire record...show defendant was competent to stand trial and waive his right ot a jury trial." (Exhibit AAAA,

order on the PCR petition, the merits of this claim were explicitly addressed without reference to any procedural bar.

Accordingly, the undersigned finds that only that portion of Ground Five related to trial counsel's conflict of interest was barred by denial of the motion to amend.

Claim Actually Barred - Alternatively to their procedural bar argument, Respondents argue that Petitioner's conflict of interest claim was not fairly presented because it was raised for the first time on the motion to amend, and that motion did not plainly rely upon federal law. (Answer, Doc. 31 at 84-85.) Because the undersigned has herein above agreed with that proposition, the lack of presentation of the present federal claim in the motion to amend mandates a conclusion that the ruling on that motion could not be a procedural bar to the federal claim.

Nonetheless, the undersigned will assume *arguendo* that the Motion to Amend did adequately assert the federal claim, and will address whether the denial of the motion was on an independent and adequate state ground sufficient to bar habeas review.

Adequacy of Amendment Rule - As last amended in 2000, Rule 32.6(d) provides: "After the filing of a post-conviction relief petition, no amendments shall be permitted except by leave of court upon a showing of good cause."   Petitioner contends that Arizona's rule on amendments to PCR petitions, Ariz. R. Crim. P. 32.6(d), is not adequate because the PCR court engrafted a novel time limitations on amendments.

Federal habeas review of a defaulted federal claim is precluded only when the state court has disposed of the claim on a procedural ground "that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989).   *But see Stewart v. Smith*, 536 U.S. 856, 860 (2002) ("assum[ing]" independence standard applies on habeas).   A state's application of the bar is not adequate unless it is " 'strictly or regularly followed.' " *Johnson v. Mississippi*, 486 U.S. 578 (1988) (citation omitted) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982)).   Further, to be

_____

M.E. 3/15/07 at 13.)

"adequate," the state law or rule upon which the state court's ruling rests must be "firmly established" and "regularly applied" at the time of its application. *Harris v. Reed*, 489 U.S. 255 (1989). *See also Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999) ("firmly established and regularly followed at the time it was applied by the state court").

> To qualify as an adequate procedural ground, a state rule must be "firmly established and regularly followed. A discretionary state procedural rule...can serve as an adequate ground to bar federal habeas review." A rule can be "firmly established" and "regularly followed," ...even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.

*Walker v. Martin,* - - - U.S. - - -, 2011 WL 611627, 7 (2011).

Petitioner cites *Insyxiengmay v. Morgan*, 403 F.3d 657, 665 (9th Cir. 2005) for the proposition that Respondents, rather than he, have the burden of showing the state bar is an adequate and independent ground. (Reply, Doc. 48 at 13) While Respondents may bear the "ultimate burden," *Insyxiengmay*, 403 F.3d at 666, Petitioner must first make a *prima facie* showing that the rule is not adequate. In *Bennett v. Mueller*, 322 F.3d 573 (9th Cir.2003), the Ninth Circuit specifically addressed the burden of proving the adequacy of a state procedural bar.

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

*Bennett*, 322 F.3d at 584, 585. .

Petitioner has met his initial burden here. Petitioner argues that Rule 32.6(d) is inadequate because the PCR court in this case ignored the good cause standard within the rule and instead engrafted into that standard a novel timeliness requirement. (Reply, Doc. 48 at 12-13.) Nothing in Rule 32.6(d) explicitly imposes a timeliness limitation.

Respondents argue that the PCR court did not apply a timeliness requirement, but simply considered delay as part of its finding of an absence of good cause. The PCR judge opined:

THE COURT: You know, I was here over the weekend, and as I reviewed the Motion to Amend and the cases cited by both counsel, as well as going back over what I could glean from the trial, as well as the interviews, I'm going to deny the Motion to Amend the petition.

I think these issues were apparent and known prior to the hearing, and certainly some of them were known during trial and are apparent from the record in this case, and I understand Mr. Gerhardt's [Petitioner's PCR counsel] position that litigation is a search for the truth and that the issues in this case are great and very, very significant and very serious, but even under our system of criminal justice, there is an end that has to be contemplated in this case, and I find that the Defendant's failed to show good cause for amending the petition.

We're in the middle of the evidentiary hearing, and I think these issues were known prior to - - at least with Mr. Middlebrook's interview, January 7th or January 8th. I think they were at the very latest apparent at that time and could have been - - could have been the subject of an amendment at that time.

So it is the decision of this Court that the Motion to Amend the petition for post-conviction relief is denied.

(Exhibit RRR-1, R.T. 2/20/07 at 4-5.)

Respondents point to no state authority recognizing that the rule incorporates a timeliness limitation such as that applied to Petitioner.[13]  The Arizona Supreme Court has continuously maintained that amendments are to be liberally allowed:

> Rule 32.6(d), which permits a defendant to amend his petition "upon a showing of good cause," adopts a liberal policy toward amendment of PCR pleadings. If [the petitioner] uncovers new evidence or exculpatory evidence as a result of his [post-petition] discovery requests, the trial court may allow amendment of the petition.

*Canion v. Cole,* 210 Ariz. 598, 601, 115 P.3d 1261, 1264 (2005) (citations omitted).

In *Scott v. Schriro*, the Ninth Circuit found that the PCR court had incorrectly relied on authorities under the pre-1992 version of Rule 32.6(d) to enforce a time limit on

---

[13] The only explicit time limitation on amendments recognized prior to the rulings on Petitioner's PCR petition was under the pre-1992 amendment version of the rule which only directed liberal amendments "prior to the entry of judgment." *See Scott v. Schriro*, 567 F.3d 573, 586 (9th Cir. 1009) (reviewing amendments to Rule 32.6(d)); Ariz. R. Crim. P.  32.6(d) (1991) ("prior to entry of judgment"); *State v. Ramirez,* 126 Ariz. 464, 468, 616 P.2d 924, 928 (Ariz.App., 1980) ("We hold that Rule 32.6(d) requires that amendments to the pleadings be made prior to the trial court's ruling dismissing the petition or prior to the trial court's order granting or denying relief on the merits after a hearing on the petition pursuant to Rule 32.8(d)."); *State v. Rogers,* 113 Ariz. 6, 8, 545 P.2d 930, 932 (1976) ("Rule 32.6(d) adopts a liberal policy toward amendments of post-conviction pleadings at all stages prior to the entry of judgment.").

- 34 -

amendments, and that the post-1992 version contained no such limits.

> Thus, given that neither the text of the 1992 version of Rule 32.6(d) nor any case construing that version of the rule state that a post-conviction court cannot grant a motion to amend the petition after the original petition has been dismissed, the state has not met its burden of proving Rule 32.6(d) is consistently interpreted as it was interpreted here. Accordingly, the district court erred in holding that Rule 32.6(d) constitutes an adequate and independent state procedural bar to federal review on the merits and failing to rule on the merits of the proposed claims.

*Scott*, 567 F.3d at 582.

However, Respondents argue that *Scott* is inapposite because there the PCR court relied upon an explicit (though non-existent) time limitation, while here, the PCR Court simply made a finding that Petitioner had failed to show good cause, and considered in the course of finding a lack of good cause the timeliness of the request to amend. However, Respondents point to no pre-existing authority which engrafted a timeliness determination into good cause.

That is not to suggest that timeliness is irrelevant to good cause determinations. For example, in the context of amendments to civil pleadings, delay is a consideration. However, the requirement of liberality in amendments is overcome only where delay has resulted in prejudice. In the federal courts, "[d]elay alone does not provide sufficient grounds for denying leave to amend: 'Where there is lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion.' " *Hurn v. Retirement Fund Trust of Plumbing, Heating and Piping Industry of Southern California*, 648 F.2d 1252, 1254 (9th Cir. 1981). Similarly, in the Arizona courts " '[m]ere delay'-the mere fact that the attempt to amend comes late-is not justification for denial of leave to amend." *Owen v. Superior Court of State of Ariz., In and For Maricopa County,* 133 Ariz. 75, 79, 649 P.2d 278, 282 (1982) (quoting *Hageman v. Signal L. P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)).

In *Greenway v. Schriro,* - - - F.3d - - -, 2011 WL 3195310 (9th Cir. 2011), the Ninth Circuit again considered the adequacy of Arizona law on amendments, in that case the bar on amendments where there has been a prior PCR proceeding, pursuant to Ariz. R. Crim. Proc.

32.2(a)(3).  The court found the rule inadequate to bar a habeas claim because "the state court held that the new claims were brought too late without considering whether there was good cause to amend the petition." 2011 WL 3195310, *8.

Here, the PCR court made no finding of any prejudice to the State, nor any bad faith on the part of Petitioner.  The Motion to Amend argued that the amendment was necessary only because the PCR court had made a ruling, surprising to Petitioner, that the newly asserted claims were not sufficiently raised in the original PCR petition.  (Exhibit OOO, Mot. Amend at 2.)  Rather, the court simply found that the amendments could have been made at an earlier time, rather than during the hearing.  Similarly, the State did not argue any prejudice, but simply argued delay, at best pointing to the victim's family's right to a "prompt and final conclusion."  (Exhibit PPP, Resp. M. Amend at 4; Exhibit YY, R.T. 2/9/07 at 56-57; Exhibit RRR-1, R.T. 2/20/07 at 3.)

Further, the PCR court pointed to no circumstance or factor other than the presence of delay upon which it found a lack of good cause.

That is not to suggest that the PCR court's decision was wrong under Arizona law.  Indeed, Respondents correctly note that this federal habeas Court is not free to second guess the state courts upon the application of state law.  (Answer, Doc. 31 at 66, n. 35.)  *See Bains v. Cambra*, 204 F.3d 964, 971 (9th Cir. 2000) ("federal court is bound by the state court's interpretations of state law").

But the adequacy of a state procedural rule is not established by the mere fact that it was properly applied under state law, but whether the rule as applied was sufficiently established at the time of its application to permit it to defeat a defendant's federal rights.

> A state ground, no doubt, may be found inadequate when "discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law ... ." 16B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4026, p. 386 (2d ed.1996) (hereinafter Wright & Miller); *see Prihoda*, 910 F.2d, at 1383 (state ground "applied infrequently, unexpectedly, or freakishly" may "discriminat[e] against the federal rights asserted" and therefore rank as "inadequate").

*Walker,* 2011 WL 611627, 9 (citing *Prihoda v. McCaughtry,* 910 F.2d 1379 (7th Cir. 1990)).

Given the complete absence of any Arizona authority upholding a denial of an amendment prior to judgment based solely upon a finding of delay, this Court must conclude that Rule 32.6(d), as applied to Petitioner, was not firmly established. *See Richey v. Mitchell*, 395 F.3d 660, 679-680 (6th Cir. 2005) (finding Ohio's "good cause" exception to timeliness rule inadequate because the state court had not achieved consensus on what constituted "good cause"), *overruled on other grounds sub nom Bradshaw v. Richey*, 546 U.S. 74 (2005).

**Ground Seven (Ineffectiveness of Appellate Counsel)** - Finally, Respondents argue that Petitioner's claims of ineffective assistance of appellate counsel, asserted in his Ground Seven, were first presented in his Motion to Amend his PCR Petition, and that the denial of his Motion to Amend for lack of good cause constitutes a procedural bar. As with Petitioner's claim of a conflict of interest in Ground Five, the undersigned has determined herein above that Petitioner's federal claim in Ground Seven was not fairly presented to the state courts as a federal claim, and thus could not be procedurally barred.

However, if deemed fairly presented by the Motion to Amend, the undersigned would also conclude (as with the conflict of interest claim) that the "good cause" standard of Rule 32.6(d), as applied to Petitioner, was not adequate to bar federal habeas review.

**Summary re Procedural Bar** - Based upon the foregoing, the undersigned concludes that only Petitioner's claims in Ground Four were disposed of on an independent and adequate state procedural bar sufficient to bar habeas review.


**E.  CAUSE AND PREJUDICE**

The undersigned has determined herein above that Petitioner has procedurally defaulted part of his Ground One ("observation evidence"), the portion of Ground Five founded on trial counsel's conflict of interest, and all of Grounds Two, Six and Seven.  In addition, the undersigned has concluded that Petitioner's claims in Ground Four (Competence) were disposed of on independent and adequate state grounds.  Further, Respondents argue (but the undersigned has rejected the argument) that Petitioner's claims in Ground Five (ineffectiveness of trial counsel concerning competency during trial and

conflict of interest) and Ground Seven (ineffective assistance of appellate counsel) were disposed of on independent and adequate grounds.

If a habeas petitioner has procedurally defaulted on a claim, or it has been procedurally barred on independent and adequate state grounds, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984). Although both "cause" and "prejudice" must be shown to excuse a procedural default, a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).

**Cause** - "Cause" is the legitimate excuse for the default. *Thomas*, 945 F.2d at 1123. "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting *Reed*, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990). The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Here, Petitioner argues a miscarriage of justice will result if the denial of his Motion to Amend results in the barring of his claims, because of the disparity of resources between appointed counsel and the State. (Reply, Doc. 48 at 4, 15.)

The mere loss of a claim cannot constitute cause. To permit it to do so would at best subsume cause into prejudice, and at worst effectively vitiate the exhaustion requirement and the independent and adequate state grounds rule.

The fact that there are disparate resources between the state and a defendant similarly cannot constitute cause, at least not without vitiating these principals for all but defendant with privately retained counsel and legal budgets that at least extended beyond the budget of

the prosecutor's office.

Moreover, in arguing on the basis of resources, Petitioner focuses on the time pressure on counsel to file the PCR petition, and thus the unfairness of the denial of the motion to amend. (Reply, Doc. 48 at 4, 15.) That would be relevant only if this Court relies upon the procedural bar from that denial as urged by Respondents. However, as discussed herein above, the undersigned has not found Petitioner's claims barred because of the denial of the motion to amend, but because Petitioner's appellate brief, PCR petition and motion to amend that petition all failed to fairly present his procedurally defaulted federal claims.

Further, such matters are not "external" to Petitioner's defense. Rather, they are tantamount to arguing that Petitioner was denied effective assistance of PCR counsel (either through counsel's misfeasance or the state's failure to adequately fund PCR counsel). Ineffective assistance of counsel may constitute cause for failing to properly exhaust claims in state courts and excuse procedural default. *Ortiz v. Stewart*, 149 F.3d 923, 932, (9th Cir. 1998). However, to meet the "cause" requirement, the ineffective assistance of counsel must amount to an independent constitutional violation. *Id.* Accordingly, where no constitutional right to an attorney exists, ineffective assistance will not amount to cause excusing the state procedural default. *Id.* In *Patrick Poland v. Stewart*, 169 F. 3d 573 (9th Cir. 1999), the Ninth Circuit held that "[b]ecause there is no right to an attorney in state post-conviction proceedings, there cannot be constitutionally ineffective assistance of counsel in such proceedings." *Id.* at 588 (quoting Coleman v. Thompson, 501 U.S. 722, 752 (1991)).

Moreover, a claim of ineffective assistance of counsel showing "cause" is itself subject to the exhaustion requirements. *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Edwards v. Carpenter*, 529 U.S. 446 (2000). Accordingly, "[t]o the extent that petitioner is alleging ineffective assistance of appellate counsel as cause for the default, the exhaustion doctrine requires him to first raise this ineffectiveness claim as a separate claim in state court." *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988). Petitioner has not raised a claim of ineffective assistance of PCR counsel in the state courts.

Accordingly, the undersigned concludes that Petitioner has failed to show "cause" to

excuse his procedural default.

**Actual Innocence** - The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances. *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986). Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).

This standard for "actual innocence" is the same as that applied in evaluating whether to allow successive habeas petitions. *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992). That standard was articulated in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986) as follows:

> [T]he prisoner must "show a fair probability that, in the light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt."

*Id.*, 477 U.S., at 455, n. 17, quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970).

Petitioner makes no pretension of establishing his actual innocence. Petitioner does argue in Ground One that there was insubstantial evidence to support his conviction because of the lack of evidence on the requisite *mens rea,* and that the trial court wrongly excluded observational evidence that would tend to show a lack of the *mens rea*, (Amend. Pet. Doc. 17 at 11-22.) For the reasons discussed hereinafter in disposing of Ground One, the undersigned cannot find that a reasonable trier of fact must have entertained a reasonable doubt of Petitioner's guilt on the basis of the evidence other than the "observation evidence."[14]

Even when considering that observation evidence, the undersigned cannot find that Petitioner has affirmatively shown his actual innocence. Petitioner asserts the state courts failed to consider evidence from family members and other witnesses such as: (1) threats

---

[14] The "observation evidence" is not considered in connection with Petitioner's Ground One based upon Petitioner's procedural default of that portion of Ground One.

against family members; (2) angry and aggressive behavior; (3) admissions of mental instability; (4) bizarre behavior when confronted by police after the crime; (5) obsessive behaviors, emotional regression; (6) paranoid behaviors; (7) violent outbursts (8) rambling diatribes against the police; (9) fear of aliens and a belief that his parents were aliens, (Amend. Pet., Doc. 17 at 14-20.)

In contrast, as noted by the Arizona Court of Appeals there was significant evidence indicating Petitioner did possess the requisite *mens rea*, including evidence of: (1) Petitioner's professed anger with police officers, and fantasies of retaliating; (2) Petitioner's efforts to attract a police officer the night of the killing; (3) the use of a weapon at close range; (4) the victim's evasive movements as shown by the bullet trajectory and witness statements; (5) obvious indications of the victim's status as a police officer, including his uniform and marked patrol car and Petitioner having pulled over in response to the emergency lights and siren; and (6) Petitioner's flight from the scene. (Exhibit RR, Mem. Dec. 1/25/05 at 8-10.) Thus, if faced with these two sets of conflicting circumstantial evidence, a reasonable fact-finder could have rejected all of Petitioner's "observation evidence," and relied instead upon the evidence indicating Petitioner's intent to kill a police officer.

Therefore, the undersigned concludes that Petitioner has failed to establish his actual innocence.

**<u>Summary re Procedurally Defaulted Claims</u>** - Respondents have shown that Plaintiff failed to properly exhaust, and has procedurally defaulted on part of his Ground One ("observation evidence"), the portion of Ground Five based upon trial counsel's conflict of interest, and all of Grounds Two, Six and Seven. Moreover, Respondents have show that Petitioner's Ground Four was procedurally barred under an independent and adequate state ground. Petitioner has failed to show cause to excuse his procedural default and/or the procedural bar, and has failed to show his actual innocence to avoid them Accordingly, these claims must be dismissed with prejudice.

//

//

## G.  GROUND ONE: SUFFICIENCY OF THE EVIDENCE

For his Ground One for relief, Petitioner argues that he was denied due process under the Federal Constitution because there was not sufficient evidence at trial as to his *mens rea*. The charge required proof that Petitioner "(1) intentionally or knowingly caused a death and/or (2) that he intended or knew that he was killing a police officer."  (Exhibit RR, Mem. Dec. 1/25/05 at 6-7.)

The Due Process Clause of the Fourteenth Amendment protects a defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." *Carella v. California*, 491 U.S. 263, 265 (1989) (citation omitted).

Accordingly, in the face of a sufficiency of the evidence claim, the habeas court must determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *Wright v. West*, 505 U.S. 277, 290 (1992); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).   Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  In making this evaluation, the court must view the evidence in the light most favorable to the prosecution, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution.  *Wright*, 505 U.S. at 295-296; *Jackson*, 443 U.S. at 319, 326; *Taylor v. Stainer*, 31 F.3d 907, 908-09 (9th Cir. 1994).

The application of these principles has been modified by the adoption of the AEDPA.  Under the standard set forth in 28 U.S.C. § 2254(d), to overturn a state court conviction for insufficient evidence, the habeas court must not only determine for itself that no rational trier of fact could have convicted the petitioner, but also that an opposite conclusion by the state court was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(e)(1) and (2).

Petitioner argues that the Arizona courts' rejection of his sufficiency of the evidence claim was both an unreasonable application of federal law and an unreasonable determination of the facts.

In *Sarasud v. Porter*, the Ninth Circuit considered the application of AEDPA deference to a sufficiency of the evidence claim. 479 F.3d 671 (9th Cir. 2007), *reversed on other grounds sub nom Waddington v. Sarasud,* 555 U.S. 179 (2009). Because "a court under *Jackson* makes no 'determination of the facts' in the ordinary sense of resolving factual disputes," *id.* at 678, a section 2254(d)(2) analysis on an unreasonable determination of the facts should not be applied, but instead the habeas court should apply section 2254(d)(1)'s unreasonable application of federal law standard.

> Our task under AEDPA in reviewing a state court's holding applying *Jackson* is not to decide whether that court unreasonably determined disputed facts. It is, rather, to decide whether the state court unreasonably applied the *Jackson* test of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

479 F.3d at 678.

That is not to say that the federal habeas court is not required to evaluate the evidence at all. The *Sarasud* court went on to note with approval the following guidelines adopted by the First Circuit for evaluating such claims:

> (1) The focus of the inquiry is on the state court decision;
>
> (2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;
>
> (3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;
>
> (4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and
>
> (5) The absence of cases of conviction precisely parallel on their facts

1    does not, by itself, establish objective unreasonableness.

2  *Sarausad*, 479 F.3d at 678 (quoting *Hurtado v. Tucker*, 245 F.3d 7, 18 (1ˢᵗ Cir. 2001)).

3    As summarized by the Arizona Court of Appeals in denying Petitioner's sufficiency

4  of the evidence claim, there was evidence of Petitioner's *mens rea*, including: (1) Petitioner's

5  pre-existing anger at police; (2) actions that indicated an intention to attract a police officer

6  (e.g. repeatedly driving in circles with music blaring); (3) the anti-police music played by

7  Petitioner at the time; (4) the close range of the shot; (5) the angle of the shot (from behind

8  the victim); (6) witness statements indicating the victim's attempt to evade Petitioner's shots;

9  (7) Petitioner's flight from the scene; (8) and the uniform worn by the victim and his marked

10  patrol car, and engaged siren and emergency lights.   (Exhibit RR, Mem. Dec. 1/25/05 at 8-

11  10.)

12    Petitioner contends that the Arizona Court of Appeals' analysis of the evidence was

13  flawed because they: (1) failed to recognize the absence of evidence on the exact sequence

14  of events (e.g. who shot first, *etc*.) (Amend. Pet. Doc. 17 at 12-13); (2) had no support for the

15  contention that Petitioner had been plotting an encounter with police (*id.* at 14);[15] (3) failed

16  to recognize the prosecution's admission that the relative positions of Petitioner and the victim

17  at the time of the shots could not be ascertained (*id.* at 18-19). Petitioner fails to support these

18  contentions.

19    The lack of evidence on the exact sequence of shots would not be determinative of

20  Petitioner's *mens rea*.   The Arizona court cited to a variety of evidence suggesting that

21  Petitioner had plotted an interaction with police to act upon his hostility towards them.  Short

22  of evidence suggesting that Petitioner was unjustifiably attacked by the victim, and thus acted

23  in self-defense, the mere possibility that once caught in Petitioner's trap the officer ultimately

_____

24      [15]  Petitioner asserts in this section of his brief a laundry of list of facts in the record
25  intended to show that Petitioner was suffering from diminished capacity, *e.g.* his bizarre
    behaviors prior to and following the crime.  (Amend. Pet. Doc. 17 at 14-18.)  All of this is
26  the "observational evidence" that the undersigned has already determined constitutes a
    separate, procedurally defaulted "substantial evidence" claim.  Consequently, that evidence
27  is not considered in evaluating the state court's rejection of Petitioner's sufficiency of the
28  evidence claim.

managed to fire first would not, in light of the other evidence of Petitioner's actions and intent, serve to preclude a finding of the requisite intent to kill a police officer.

Petitioner fails to offer an explanation (beyond his "observation evidence" of his diminished capacity) for his postulation that there was no evidence of a plan to engage the police. Petitioner admits there was testimony that he had expressed an interest in shooting police officers. (Amend. Pet. Doc, 17 at 16-17.) Petitioner offers nothing to invalidate the Arizona court's description of his actions prior to and at time of the shooting, e.g. his driving in circles with music blaring, approaching the officer with a loaded weapon, fleeing from the scene, etc. At best, Petitioner offers a plausible alterative explanation.

Finally, Respondents point out that while the medical examiner had denied an ability to place the location of Petitioner or the victim, or to fix the absolute position of their bodies, he could establish their relative positions at the time of the shot from the trajectory of the bullet.

> Q. [Mr. Powell, Prosecution] With regard to determining the position of the victim of a gunshot wound, that cannot be determined without knowing the position of the gun, can it?
> A. [Dr. Keen, Medical Examiner] All I can establish from my examination because all I have is the decedent and his wound path, is what's the trajectory and where does the gun have to be to fire that weapon. It's off the end of that trajectory.
> Q. So, we can't say what position the officer was, we just know how the bullet ended?
> A. We know the relationship of where the shot is coming from, the shooter is to his left and behind him, and then you can put the[m] in that same relationship hundreds of locations.

(Exhibit X, R.T. 8/6/03 at 34-35.) It is only the relative position of Petitioner and the victim, not their absolute positions, which is relevant to the Arizona courts' conclusion that the position created an inference that the victim was "attempting to move away from [Petitioner] when he shot" (Exhibit RR, Mem. Dec. 1/25/05 at 9), and thus that Petitioner "intended or knew that we would kill" the victim (*id.* at 8).

Petitioner points to no other deficiencies in the decision of the Arizona Court of Appeals. Thus, the undersigned finds that "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Thus, there is not basis to find that the Arizona Court of Appeals acted contrary to or unreasonably applied federal due process law when it rejected Petitioner's exhausted sufficiency of the evidence claim.

## H.  GROUND THREE: CRUEL AND UNUSUAL PUNISHMENT

For his Ground Three for relief, Petitioner argues that the sentence imposed in this case constitutes cruel and unusual punishment in violation of the Eight Amendment, because he is confined in the mental health unit of ADOC, rather than in the state hospital where he can be provided "the proper and necessary medical attention that he requires, and the the Eighth Amendment mandates consideration of Petitioner's unique characteristics, e.g. his serious mental illness, necessary in evaluating such disproportionality. (*Id.* at 30, 32-33.)

Respondents counter that the Arizona Court of Appeals properly determined that Petitioner's life sentence, with parole available in 25 years, is not disproportionate to his crime of first degree murder.[16]  (Answer, Doc, 31 at 40-41.) Respondents argue that consideration of individual characteristics has only been mandated by the U.S. Supreme Court in death penalty cases. (*Id.* at 42-43.)

Petitioner replies that the cases relied upon by Respondents do not address cases involving serious mental illness. (Reply, Doc. 48 at 19.)

In rejecting Petitioner's Eighth Amendment claim, the Arizona Court of Appeals concluded that "even given Clark's mental condition" they could not find there was "an inference of gross disproportionality between Clark's crime and his sentence." (Exhibit RR, Mem. Dec. 1/25/05 at 20.)

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. XIII. The Eighth Amendment "forbids...extreme sentences that are 'grossly disproportionate'

---

[16]  Respondents spend some time analyzing the proportionality of a life sentence without parole for 25 years for the murder of a police officer. (Answer, Doc. 31 at 41.)  The undersigned does not understand Petitioner to present such a bare assault on proportionality, but to instead suggest that his mental illness should have been the determining factor.

to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment). This narrow proportionality principle applies to noncapital sentences. *Id.* at 997. *See also Lockyer v. Andrade,* 538 U.S. 63, 72 (2003) ("A gross disproportionality principle is applicable to sentences for terms of years.").

Nonetheless, outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare. *See Ewing v. California*, 538 U.S. 11(2003) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).

And, the Court's jurisprudence is conflicting. Indeed, in *Ewing,* Justices Scalia and Thomas both concurred in the judgment of the Court, but both separately wrote that the Eighth Amendment was limited to prohibiting certain modes of punishment, and did not encompass a proportionality test. *Id.* at 31-32. In *Harmelin v. Michigan*, 510 U.S. 957 (1991), the controlling proportionality case, the only opinion to attract a majority of the justices was a portion of Justice Kennedy's concurrence in the judgment. Justice Kennedy observed: "Though our decisions recognize a proportionality principle, its precise contours are unclear." 501 U.S. at 998. In *Lockyer*, decided in 2003, the Court described its jurisprudence in this area as a "thicket," and admitted that "in determining whether a particular sentence for a term of years can violate the Eighth Amendment, we have not established a clear or consistent path for courts to follow." *Lockyer*, 538 U.S. at 72.

> Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality.
> * * *
> Thus, in this [AEDPA governed] case, the only relevant clearly established law amenable to the "contrary to" or "unreasonable application of" framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the "exceedingly rare" and "extreme" case.

*Id.* at 72-73.

Petitioner points to no Supreme Court decision which mandates consideration of the health care services available to an inmate in prison in applying a disproportionality review. The undersigned has found none.

Petitioner complains that his seriously mentally ill condition should have been

considered. Assuming *arguendo* that Supreme Court jurisprudence mandates consideration of such factors, the Arizona Court of Appeals expressly considered Petitioner's "mental condition." (Exhibit RR, Mem. Dec. 1/25/05 at 20.) Petitioner fails to suggest how the state court's analysis on this point was inadequate.

Although for purposes of applying the limitations of 28 U.S.C. § 2254(d), the pertinent legal landscape is that which existed when the Arizona Supreme Court denied review of the Arizona Court of Appeals' decision, *Williams v. Taylor* 529 U.S. 362, 412 (2000) ("decisions as of the time of the relevant state-court decision"), a recent U.S. Supreme Court case is instructive on that historical landscape. In *Graham v. Florida*, --- U.S. ---, 130 S.Ct. 2011 (2010), the Court reviewed the history of Eight Amendment jurisprudence. The Court noted that its proportionality cases fell into two categories.

The first category involves sentences for a term of years, in which the Court considered "all of the circumstances *of the case* to determine whether the sentence is unconstitutionally excessive." *Id.* at 2021 (emphasis added). The Court denoted *Harmelin v. Michigan*, 501 U.S. 957 (1991) as the "controlling opinion," and described its two step process of "comparing the gravity of the offense and the severity of the sentence," and then comparing the sentence to other offenders and other jurisdictions. *Graham*, 130 S.C.t. at 2022.

The second category of cases involved "categorical rules" based upon the "nature of the offense" and the "characteristics *of the offender*." *Graham*, 130 S.C.t. at 2022 (emphasis added). The Court observed that the "previous cases in this classification involved the death penalty." *Id.* Indeed, the Supreme Court cases to which Petitioner points (as mandating consideration of his mental illness) are limited to death penalty cases, including *Atkins v. Virginia,* 536 U.S. 304 (2002) (categorical rejection of death penalty for mentally retarded criminals), *Thompson v. Coleman*, 487 U.S. 815, 838 (1988)(categorical rejection of death penalty for juveniles under 16 at time of offense), and *Stanford v. Kentucky*, 492 U.S. 361, 393 (1983) (categorical approval of death penalty for juveniles 16 or 17 at time of offense). Although the Court in *Graham* extended this categorical approach outside the death penalty arena, it did so for the first time, noting that the "case involve an issue the Court has not

considered previously: a categorical challenge to term-of-years sentence." *Graham*, 130 S.Ct. at 2022. Thus, in 2005, this second category had no application to Petitioner's term-of-years sentence.

Nonetheless, Petitioner argues, in essence, that a *Harmelin* analysis of a non-death penalty sentence requires consideration of the unique characteristics of a defendant. Justice Kennedy's controlling concurrence in that case rejected such an approach in non-capital cases.

> Petitioner would have us hold that any severe penalty scheme requires individualized sentencing so that a judicial official may consider mitigating circumstances. Our precedents do not support this proposition, and petitioner presents no convincing reason to fashion an exception or adopt a new rule in the case before us. The Court demonstrates that our Eighth Amendment capital decisions reject any requirement of individualized sentencing in noncapital cases.

501 U.S. 957, 1006 (Kennedy, J. concurring). In *Solem v. Helm*, 463 U.S. 277 (1983), the Court counseled that "[w]hen sentences are reviewed under the Eighth Amendment, courts should be guided by *objective* factors that our cases have recognized." *Id.* at 290 (emphasis added). *See also Harmelin*, 501 U.S. at 1000 (Kennedy, J. concurring) ("The fourth principle at work in our cases is that proportionality review by federal courts should be informed by *objective factors* to the maximum possible extent." emphasis added) Those factors, as identified in *Graham*, consist of "the gravity of the offense and the severity of the sentence," and a comparison to other sentences. *Graham*, 130 S.Ct. at 2022. No provision is made for a full blown resentencing by consideration of all the factors relevant to formulating a sentence in the first place. Indeed, significant discourse of the Court has been committed to insuring that disproportionality claims would not require such expansive determinations. *See e.g. Harmelin*, 501 U.S. at 1015-1016 (White, J. dissenting).

Where the Court has been willing to look to such individual characteristics, it has done so only under the "categorical rules" which *Graham* for the first time in 2010 extended to non-death penalty cases. Petitioner points to no pre-2006 Supreme Court case where individual characteristics were made relevant considerations in performing a disproportionality determination.

Petitioner does point to the decision in *Solem,* where the Court indicated that

consideration of the offense (for purposes of comparing it to the sentence) required consideration of the harm from the crime "and the culpability of the offender." 463 U.S. at 292. However, the types of culpability characteristics identified by the Court all focused on the general nature of the defendant's crime, e.g. negligent versus intentional acts, motive such as for pecuniary gain, etc. *Id.* at 293-294. There was no suggestion in *Solem* that this would extend to consideration of the individual characteristics of the defendant himself which might be considered at a trial court's sentencing, such as mental or physical illness, troubled or disadvantaged up-bringing, etc.

Petitioner also argues that the Court's decision in *Ewing v. California* rendered "the facts of the crime and the background of the offender" relevant to a proportionality determination. (Amend. Pet. Doc. 17 at 33.) While the *Ewing* Court certainly went to some lengths to review the defendant's criminal history, 538 U.S. at 18-20, in applying the *Harmelin* analysis it looked only to the objective nature of the offense and his recidivist record.

> We first address the gravity of the offense compared to the harshness of the penalty. At the threshold, we note that Ewing incorrectly frames the issue. The gravity of his offense was not merely "shoplifting three golf clubs." Rather, Ewing was convicted of felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of at least two "violent" or "serious" felonies.

538 U.S. at 28. Moreover, the defendant's recidivist record was only relevant because the sentence he attacked was under a "three strikes" law. Nothing in the Court's opinion in *Ewing* suggests that the Court intended to impose an obligation on reviewing courts to consider the individual characteristics of defendants claiming disproportionality.

Given the absence of any pre-existent Supreme Court holding calling for consideration of a defendant's mental illness (or any other individual characteristic), the undersigned cannot find that the Arizona Court of Appeals' decision was contrary to nor an unreasonable application of federal law, as required by 28 U.S.C. § 2254(d)(1). Therefore, Petitioner 's Ground Three must be denied.

**J. GROUND FIVE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

In the properly exhausted portions of his Ground Five, Petitioner argues that his trial counsel was ineffective because he: (1) failed to disclose Dr. Parrish's report regarding competency to co-counsel and to the court prior to requesting to waive a jury; (2) failed to request a re-evaluation of Petitioner during the trial when Petitioner started to deteriorate; (3) waived the jury; (4) limited the use of experts; and (5) failed to preserve the observational evidence claim.

**1. Standards for Ineffective Assistance of Counsel Claims**

Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on such a claim, petitioner must show: (1) deficient performance - counsel's representation fell below the objective standard for reasonableness; and (2) prejudice - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88, 694. Although the petitioner must prove both elements, a court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Id.* at 697.

**2. Failure to Disclose Parrish Report**

**Background on Parrish Report on Competency** - On March 28, 2001, Petitioner and the prosecution entered into a stipulation that Petitioner was incompetent to stand trial. (Exhibit D.) Petitioner was committed to the Arizona State Hospital for restoration to competency.

Some 15 months later, the trial court conducted a competency hearing at which testimony was presented by Dr. Di'Bacco that Petitioner understood the proceedings and that the ability to assist in his own defense[17] was a matter of Petitioner's volition, and thus that he

---

[17] When interviewed during PCR proceedings, attorney Middlebrook described his working relationship with Petitioner: " He would talk to me about certain things but I could

was competent to stand trial. (Exhibit E-1, R.T. 6/26/02 at 28-30.) Testimony was also presented from Dr. Kassell and Dr. Jasinski, both of whom opined that Petitioner was competent and that any troubles in communication that he faced were volitional. (Exhibit F-1, R.T.7/10/02 at 28, 31 (Kassell), 70 (Jasinksi).) In contrast Dr. Parrish testified that Petitioner was incompetent, and that his failure to participate in his defense was the result of his schizophrenia, not a volitional choice. (Exhibit F-2, R.T. 7/10/02 at 177, 180-181.) Petitioner's treating psychiatrist, Dr. Franzetti was precluded from opining on Petitioner's competence to stand trial, but testified that Petitioner's refusal to cooperate was not volitional, but as a result of his schizophrenia. (Exhibit G-2, R.T. 7/11/02 at 117-118.) Petitioner's treating psychologist, Dr. Perry, testified that Petitioner was not competent to stand trial because of his inability to appreciate the consequences of his decisions. (Exhibit G-2, R.T. 7/11/02 at 182-183.) The counselor at the jail testified that Petitioner's mental condition deteriorated after he transferred from the Arizona State Hospital to the jail. (Exhibit G-2, R.T. 7/11/02 at 222-233.)

The trial court postponed ruling on Petitioner's competency, and in September, 2002, returned him to the Arizona State Hospital. (Exhibit K, M.E. 9/16/02.) The matter was eventually set for a new hearing in April, 2003. On April 25, 2003, Petitioner's trial counsel filed a Motion to Submit (Exhibit O), asking to submit Petitioner's competency determination to the Court on the basis of the reports of Dr. Kassell, Dr. DiBacco, and Dr. Morenz. Dr. Kassell and Dr. Dibacco's reports continued to opine that Petitioner was competent, and his difficulties were volitional. Dr. Morenz, who had been retained by the defense, opined that it was unclear whether Petitioner was incompetent or malingering, and thus recommended alternative therapies and with the hope of thereby clarifying his competence. (Exhibit O,

---

never, ever, ever talk to him about anything meaningful beyond this is the trial, this is the judge, this is the prosecutor, yes, they are out to - -- I mean, you know, there was never any discussions with Eric that I could ever get him to open up with me, even when Dr. Morenz was present, Dr. Parrish was present." (Exhibit OOO, Exhibit A, Interview 1/8/07 at 48-49. *See also id.* at 68-69.) (*See also* Exhibit RRR-2, R.T. 2/20/07 at 102-103 ("That's why we had nothing to present in the case in chief, because there was nothing for us to discuss because Eric never talked to me about the case.").)

Motion to Submit at Attachments.)

On May 8, 2003, the trial court noted that the State had concurred in the defenses's Motion to Submit, and based upon the "records submitted of Dr. Kassel [sic], Dr. DiBacco, Dr. Morenz, and Dr. Jazinksi, and all other information filed in his matter" the court found Petitioner competent to stand trial. (Exhibit Q, M.E. 5/8/03 at 1.) The court found that Petitioner's "status at this point is one of volition; in other words, he is choosing not to cooperate with his attorney at this time as opposed to being unable to do so." (Exhibit R, R.T. 5/8/03 at 4.)

On July 7, 2003, Dr. Parrish issued a report (Exhibit LLL), based upon evaluations done June 19, 2003 and July 7, 2003, again finding that Petitioner was not competent to stand trial. (*Id.* at 10.) Dr. Parrish reviewed the other reports and their conclusions that Petitioner was malingering. (*Id.* at 4-7.) Rather than focusing on Petitioner's ability to assist in his defense, and whether that was volitional, her findings focused upon a determination that Petitioner's reasoning and appreciation skills were indicative of his incompetence. (*Id.* at 10-11).

On July 8, 2003, Petitioner appeared and waived his right to a jury trial. (Exhibit T, R.T. 7/8/03.) Attorney Middlebrook specifically advised the Court at that hearing that he had just received a report from Dr. Parrish. (*Id.* at 16.)

On July 17, 2003, Dr. Parrish issued an addendum (Exhibit MMM) based upon intervening interviews of Petitioner, and opining that these served to "strengthen" her prior conclusions.[18] (*Id.* at 2.)

On July 25, 2003, the prosecution conducted a transcribed interview of Dr. Parrish, which included questioning about her July 2003 report and addendum. (Exhibit NNN, Interview 7/25/03.) Defendant attorney Middlebrook was present during that interview. (*Id.*

---

[18] In addition, defense counsel had reports from other professionals in July, 2003, opining that Petitioner was competent to stand trial, including Dr. DiBacco's July 25, 2003 report (Exhibit FFF at 3) and Dr. LaWall's July 7, 2003 report (Exhibit KKK at 11.) Dr. DiBacco has previously opined that Petitioner was incompetent. (Exhibit D, Stip. Re Competency.)

1  at 3.) The report had been disclosed to the prosecution at the time of her interview on July 25,

2  2003.  (Exhibit NNN, R.T. 7/25/03 at 34.)

3      **Claims and Defenses** - Petitioner argues that trial counsel Middlebrook performed

4  deficiently when, after receiving Dr. Parrish's July 7, 2003 report, he did not seek a

5  subsequent redetermination of Petitioner's competency and did not disclose the report to co-

6  counsel.[19]  (Amend Pet. Doc. 17 at 47-48.)  Respondents argue that the PCR correctly rejected

7  this claim because Dr. Parrish's report did not counter the determinative factual finding: *i.e.*

8  that Petitioner's failure to cooperate with counsel was volitional and not the result of his

9  mental illness.  Respondents argue that: (1) Dr. Parrish did not evaluate the volitional issue,

10  (2) her evaluations of Petitioner's testing responses was highly subjective and many answers

11  reflected Petitioner's competence; and (3) the trial court had other substantial evidence upon

12  which to make its determination both before and after Dr. Parrish's report.  (Answer, Doc. 31

13  at 48-65.)  Petitioner replies that: (1) the expert opninions finding Petitioner competent were

14  marginal enough that Parrish's report could have made the difference; (2) not only Parrish's

15  evaluation of Petitioner's responses to the testing, but the actual answers, demonstrated

16  Petitioner's incompetence.  (Reply, Doc. 48 at 22-23.)

17      **Analysis re Failure to Disclose to Court** - The PCR court rejected the claim

18  concerning the waiver of the jury trial based upon the conclusions that the evidence failed to

19  show prejudice, *i.e* that "had Mr. Middlebrook disclosed Dr. Parrish's opinion regarding

20  petitioner's competency to the trial court, Judge Coker would have vacated the finding of

21  competency and/or granting of the waiver of a jury trial, and ordered petitioner back into

22  restorative treatment."  (Exhibit AAAA, M.E. 3/15/07 at 5-6.)  The PCR court further found

23  no deficient performance:

> The Court does not find that Mr. Middlebrooks' performance failed to
> meet minimal competence standards by not raising a competency claim
> at or shortly after the trial court accepted petitioner's waiver of jury trial
> on the basis of Dr. Parrish's July report.  Mr. Middlebrook testified as
> to his concerns over the reliability of the methodology and testing

[19] Petitioner suggests that attorney Middlebrook actively hid the report from the court
and co-counsel.  Petitioner points to no portion of the record to support that contention.

conducted by Dr. Parrish. The July 7th written report was based on tests that were not widely recognized or generally accepted by the scientific community.

(*Id.* at 6-7.) The PCR court observed that Mr. Middlebrook "relied on the experts opinions even though personally he disagreed with them and proceeded to trial." (*Id.* at 7.)

To succeed on his claim concerning seeking a redetermination of competency based upon the Parrish report, Petitioner bears an extremely heavy burden. He must establish both that the state court got it wrong on prejudice and that it got it wrong on deficient performance. Further, Petitioner must show that both of these determinations were contrary to or an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). Petitioner fails to do so.

As to prejudice, there was substantial evidence in the record that Petitioner was competent, including multiple expert opinions. Moreover, the trial court had heard Dr. Parrish's earlier opinion that Petitioner was incompetent, and her latest reports and evaluations were subject to impeachment as being based on testing which was not generally accepted. (*See* Exhibit RRR-2, R.T. 2/20/07 at 164-165.) This was not some huge new revelation that Petitioner had been discovered to be incompetent. Rather, it was incremental evidence that was not without its problems.

The parties discuss at length their opposing views upon how reliable or persuasive Dr. Parrish and her report could have been. The undersigned might be inclined to find that there was a possibility that the Parrish report could have made a difference in the outcome. But, the undersigned would find it far more difficult to conclude that it is more likely than not that the trial judge would have been swayed. The undersigned finds it impossible to conclude that the PCR Court unreasonably applied *Strickland* and its progeny when it concluded that the evidence failed to show that the outcome would have been different.

As to deficient performance, the undersigned finds it even harder to imagine how the PCR court's decision was unreasonable. Trial counsel was certainly faced with a difficult, albeit common quandary: whether to pursue problematic evidence. Moreover, the issue of Petitioner's competence had been determined by the court and trial counsel made a tactical decision to refocus Dr. Parrish from challenging that decided issue and to focus instead on the

- 55 -

insanity defense.  Trial counsel testified:

> Q.  How about raising the issue of competency after you got Dr. Parrish's report?
>
> A.  You know, after the interview I thought about that as to why that happened, and I can tell you that I think what happened -- and I'm giving you an intellectual version, as opposed to something that I consciously went through, but I believe at that time we had established his competency in May -- May or June, and we had submitted the reports, and shortly after that, I had contacted Dr. Parrish and the other doctors to look at, again, all of the medical evidence, because by then we had new records from the Arizona State Hospital, we had additional records from the Maricopa County Jail, and we had other observational evidence from various health care providers, et cetera.
>
> So I wanted my expert in particular to go back and look at everything one more time, and so when that occurred with Dr. Parrish and she wrote the July 7th report . . . I got that and I started thinking about what happened with that report, and I think what happened in my mind was that issue is past as far as competency and that now the issue is insanity, and so I -- I know I must have had some kind of discussion with her about, "No, I need you to focus on insanity at this time because he's already been determined to be competent," and like I said, he was deteriorating, but at the time we started trial, and I'm talking day one, day two, I thought he was competent to stand trial.
>
> And so, again I was exercising my - - I don't want to say discretion, but it was discretion, I suppose, looking back, about whether it should be raised again simply because Dr. Parrish had authored that report. I didn't think it should at that point. Later in trial, obviously, I should have, and that's that transcript part of it I talked about.

(Exhibit RRR-2, R.T. 2/20/07 at 98-100.)  Under these circumstances, the undersigned cannot conclude that any reasonable attorney must have sought a new competency hearing on the basis of Dr. Parrish's July 7, 2003 report.

**Analysis as to Disclosure to Co-Counsel** - The PCR Court rejected the claim concerning disclosure to co-counsel based upon a finding that the report had in fact been disclosed to the trial court and prosecution, and as a result there was no prejudice.  (*Id.* at 10.)

Co-counsel for the defense, David Goldberg, testified that generally attorney Middlebrook sent him everything he received in the case, but he had never seen Dr. Parrish's July 7, 2003 report prior to his deposition.  (Exhibit YY, R.T. 2/9/07 at 46.)  Middlebrook testified that he routinely sent everything to Goldberg.  (Exhibit RRR-1, R.T. 2/20/07 at 91-92.)  However, Goldberg testified that as trial approached, due to the press of time and volume, things were not being regularly forwarded.  (*Id.* at 67.)  He also admitted that he had discussed the Parrish report with Middlebrook, and that it had been a competency evaluation

- 56 -

rather than a mental state evaluation.[20]  (*Id.* at 68-69.)  He asserted, however, that he was certain he had not seen the report prior to the waiver of the jury trial.  (*Id.* at 69-70.)

Attorney Middlebrook specifically advised the Court on July 8, 2003 that he had just received a report from Dr. Parrish.  (Exhibit T, R.T. 7/8/03 at 16.)  Attorney Goldberg was present at that hearing.  (*Id.* at 2, 31.)

Moreover, the report was disclosed to the prosecution at the time of Dr. Parrish's interview on July 25, 2003.  (Exhibit NNN, R.T. 7/25/03 at 34.)

Finally, Middlebrook and Goldberg testified that Middlebrook was the lead attorney and that the mental health issues were Middlebrook's responsibility.  (Exhibit RRR-1, R.T. 2/20/07 at 84; Exhibit YY R.T. 2/9/07 at 16-17.)  Nonetheless, Goldberg testified that had he seen the Parrish report at the time it was authored he would have insisted on submitting the report to the Court, renewing a request for competency evaluation, and reevaluated various trial strategies including the waiver of jury trial and calling Parrish as a witness. (Exhibit YY R.T. 2/9/07 at 46-47.)

Based upon the foregoing, the undersigned cannot find deficient performance.  There is no basis for the assertion that Middlebrook hid the report.  It was provided to the trial court and the prosecution.  Moreover, the undersigned finds that it was also made available to Goldberg.

Even if the Parrish report was not provided to Goldberg, the undersigned cannot find that the failure to do so was deficient performance.  As between counsel, Middlebrook had been assigned responsibility for mental health issues and was lead counsel.  Under those circumstances, failing to separately forward the report to Goldberg would not be "outside the wide range of professionally competent assistance."  *United States v. Houtcens*, 926 F.2d 824, 828 (9th  Cir. 1991)(citing *Strickland*, 466 U.S. at 687-90)).

Moreover, the undersigned concludes that, assuming the report was not disclosed, there

---

[20]  Middlebrook claimed in his interview that he and Goldberg discussed the testing done by Parrish (Exhibit OOO, R.T. 1/8/07 at 58), which was reflected in the July 7, 2003 report by Parrish.

was no prejudice because Goldberg admitted eventually learning the contents of the report, and took none of the actions he asserts he would have taken had he received the report immediately.

Finally, for the reasons discussed above, the undersigned cannot find that a request for redetermination of competency based upon the Parrish report would have been successful.

Accordingly, the undersigned finds this portion of the claim to be without merit.

### 3. Competency Re-Determination

Petitioner also argues that trial counsel was ineffective for failing to seek a renewed determination of competency based upon deterioration of his condition at trial. (Amend. Pet. Doc. 17 at 41.) Respondents argue that Middlebrook did raise the issue during trial, expressing concern to the trial court about Petitioner's mental condition and medication, Petitioner's participation at various points indicated his continuing competence, trial counsel's misgivings about Petitioner's condition do not establish his incompetence, and a request for a redetermination would have been unsuccessful and futile. (Answer, Doc. 31 at 68-72.) In reply, Petitioner points to counsel's own misgivings about Petitioner's competency and inability to justify his failure to seek a redetermination. (Reply, Doc. 48 at 24-25.)

The PCR Court rejected as biased and thus not "legally credible" attorney Middlebrooks' self-admissions of deficient performance. It found counsel "competently represented and undertook to ensure petitioner's competency claims and mental health were protected at all stages of the proceedings including raising petitioner's mental health on at least two significant occasions resulting in petitioner's commitment and re-commitment to the Arizona State Hospital." (Exhibit AAAA M.E. 3/15/07 at 8.) The court specifically found counsel's representation to have been adequate on the competency issue during the competency proceedings, at the waiver of a jury trial, and during trial. (*Id.* at 9.)

The undersigned finds nothing unreasonable about the PCR court's determination. Attorney Middlebrook made it clear that he believed Petitioner never fully understood what was occurring. While the PCR court observed that Middlebrook alternatively stated that he

did or did not believe Petitioner was ever credible, the undersigned finds Middlebrook to have simply been wrestling with the dichotomy between his client's legal competence as found by the trial court and the degree of competence that counsel would hope for in a client or even that counsel personally believed was necessary to assure a fair trial.

As pointed out by Respondents, the degree of competence mandated by due process does not dictate that a defendant's mental state leave them acting in what would seem objectively to be their best interest. "To the extent that Williams's dazed or inattentive demeanor was before the trial judge, we agree with the Eleventh Circuit that 'there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court-whether out of indifference, fear, confusion, boredom, or sleepiness-unless that defendant cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense.' " *Williams v. Woodford,* 384 F.3d 567, 606 (9th Cir. 2004) (quoting *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir.1996)). Rather, the competency requirement of due process has the more modest aim of "ascertaining whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.' " *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)).

The fact that Petitioner was persistently unwilling to discuss the events of the crime with counsel, remained detached from much of the proceedings, doodled, laid his head on the table, or even slept, do not of themselves establish his incompetence. Moreover, Petitioner points to nothing (other than the Parrish report discussed herein above) between the trial court's final competency determination and the conclusion of trial that would suggest success would have come from efforts by trial counsel to re-urge incompetency.

The trial court had been made well aware of Petitioner's detachment and refusal to fully participate in his defense, and yet had found Petitioner's competent. There was nothing significantly different in character or degree between Petitioner's lack of participation at trial, and his conduct reflected in the mental health evaluations already before the trial court. Dr.

Kassall had observed in March, 2003 that Petitioner "talks with his attorney only when he has to" and that he "continues to be very selective about what he will do, with whom he will interact, and what he will discuss." (Exhibit P, Mot. Submit, Exhibit 1.) Dr. DiBacco observed that Petitioner "selectively chooses not to respond when anyone else broaches legal or quasi legal issues with him." (*Id.* at Exhibit 2 at 4.) Dr. Morenz observed Petitioner "has yet to discuss his case in a meaningful fashion with his attorney." (*Id.* at Exhibit 3 at 6.)

The only new factor during trial pointed to by Petitioner is the issue concerning his medications. Attorney Middlebrook testified:

> A. So the question I though you asked me was, was my professional judgment impaired as to me recognizing his incompetency, and my answer would have been no, it wasn't but was my professional judgment impaired because I did not raise that issue, my answer is yes, it was because - -
> MR. O'TOOLE [Prosecution]: Judge, could we have a time frame, please. I'm sorry.
> THE WITNESS: And that would have been in trial. At that time when we were in the middle of the trial, and I think you're the one that told me during the interview -- it was either right before Dr. Morenz testified -- I can't remember who testified at that point, but during the trial transcript -- someone showed me something during my interview that indicated that there was an issue where I indicated that Eric had slipped or that we had let something slip and he wasn't getting the proper medication and that I should have raised his competency at that point.
> There is no doubt in my mind that I should have done it. I knew better. I knew the facts. There is no doubt -- I have no doubt, zero doubt, that a reasonable attorney under the circumstances should have raised that issue at that moment in time, and the moment I'm talking about is the one in trial where we -- I believe we were in a conference with Judge Coker, and we're telling him – or, I'm telling him that we've let Eric's condition slip, because I can tell you, to even the extent that I know I should have done something, because I thought about it.
> I thought about bringing -- having Dr. Morenz reevaluate Eric and look at him at the Coconino County Jail. I thought about talking to Dr. Linsky about the medications. I mean, there is no doubt in my mind that that should have been done at that moment in time, and the moment I'm talking about is the one in trial.

(Exhibit RRR-1, R.T. 2/20/07 at 96-97.)

However, on day seven of the trial, Middlebrook raised his concerns about Petitioner's medications and mental condition to the trial court:

> MR. MIDDLEBROOK: Judge, Dave Goldberg and I have some concerns that Eric may not be following what's occurring in court. And I know that last week or week before, I'm a little unclear now, but there was some concern about making sure that Eric gets medicated and stuff.

And I will be the first to admit that we have kind of let that drop off. But I think that -- and I think that Mr. Goldberg agrees with me, we need we probably need to get him medicated. We're getting a little concerned that he's not following, he's starting to kind of go back, and we've explained things to him three or four times. And I'm not sure that he's following everything that's occurring.

THE COURT: Would you check with his doctor at lunch hour and/or the nurse at the jail and find out, and I will try to do the same thing.

MR. MIDDLEBROOK: I can tell you now we're going to need a court order because after he got released from the Arizona State Hospital, there is no present court order that requires him to be medicated.

THE COURT: I ordered that he -- when he returned, that he continue his medications. Yeah.

MR. MIDDLEBROOK: Is there a court order?

THE COURT: Yeah. Absolutely.

MR. MIDDLEBROOK: Then if there is, then we're in good shape. Then I will get probably call Chris Linsky, Dr. Linsky, and make sure he's aware.

THE COURT: If you will, and I'll have Lucy call the jail.

MR. GOLDBERG: That should have already happened, though.

MR. MIDDLEBROOK: Thank you.

THE COURT: I will have her call the jail and get a report from the nurse as to whether he is taking it. I'm concerned he might be cheeking it. Any indication?

MR. MIDDLEBROOK: No. No. The Haldol is an injection.

THE COURT: That's what I thought. Okay.

(Exhibit DD, R.T. 8/20/03 at 68-69.) There is no other indication in the record to suggest that Petitioner's medications actually had been stopped or otherwise had been altered to significantly reduce his level of mental functioning.

Petitioner complains that the PCR court failed to allow the presentation of evidence on this claim. (Amend. Pet. Doc. 17 at 58.) Petitioner fails to point, however, to any additional evidence available then or now to support the claim that Petitioner's condition had detriorated.

In sum, the record indicates that Petitioner's condition at trial was not significantly different that it had been since his competency determination six months earlier. Thus, despite counsel's protestations to the contrary, the undersigned cannot find that counsel performed deficiently in failing to again raise Petitioner's competency at trial. Doubtless, any good attorney with a bad result will, with hindsight, find matters that they believe they would and should have done differently. Hindsight is not the proper vantage point for deciding

ineffective assistance of counsel. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 690.

Nor can the undersigned find a significant likelihood, had counsel done so, that the trial court would have retreated from its earlier finding and found Petitioner incompetent to stand trial.

Therefore, neither can the undersigned find that the PCR court's rejection of this claim was contrary to or an unreasonable application of federal law.

## 4. Waiver of Jury

Petitioner argues that trial counsel was ineffective in waiving the jury trial. Petitioner argues that he was not competent to waive his jury trial rights. (Amend. Pet. Co. 17 at 51.) Petitioner also argues that Attorney Goldberg admits he did not consider the implication of waiving a trial by jury on the issue of *mens rea*. (*Id.* at 62.)

Respondents argue that the PCR court properly concluded that the decision to waive a jury was a reasonable trial strategy, given the limited likelihood of success before a jury, the agreement for a possibility of parole in exchange, the bad publicity on the trial and denial of a change of venue, the time already spent educating the judge on Petitioner's mental health condition, the other "bad act" evidence, the likely jury sympathy towards a police officer victim, and counsel's faith in the impartiality of the judge. Respondents also argue that Plaintiff cannot show prejudice because a jury would likely have rendered the same verdict as the judge. (Answer, Doc. 31 at 72-76.)

Petitioner replies that Attorney Goldberg would have reconsidered waiving a jury trial if he had known of the Parrish report. (Reply, Doc. 48 at 23.) Petitioner argues that the decision to waive was made without all the facts (e.g. the Parrish report and the deterioration in Petitioner's mental condition experienced at trial). (*Id.* at 26.) Petitioner argues that his personal waiver of the jury does not eliminate counsel's ineffectiveness. (*Id.*)

Several red herrings should be dismissed. It is irrelevant that Petitioner participated in the waiver. He did so upon the advice of counsel, and if that counsel was ineffective, then Petitioner's claim is made out.

It is also irrelevant that attorney Goldberg *might* have reconsidered waiving the jury had he known of the Parrish report. Goldberg's hindsight is not controlling, and unexplained it is not helpful in evaluating what reasonable counsel would have done. As discussed above, the Parrish report, while favorable, was not a game changer. It was cumulative and problematic evidence.

It is also irrelevant that Petitioner's mental condition deteriorated at trial. First, at the time that the waiver was given, those conditions had not yet occurred. Second, even if anticipated, Petitioner's decline at trial would not indicate that a jury was a better choice. A jury would have been without the benefit of the expansive background that the trial judge had in understanding the extent and nature of Petitioner's mental condition. That suggests that the judge may have, in fact, been more favorably impacted by a deterioration at trial than a jury. Moreover, if the deterioration reached a point that the trial court would alter its competency finding, it would seem to have little bearing whether the matter was before a judge or a jury.

It is also irrelevant that attorney Goldberg did not consider the impact of the waiver upon the *mens rea* portion of the case. First, that does not suggest that attorney Middlebrook, who bore responsibility for that portion of the case, did not consider its impact. Second, it is not controlling whether counsel actually considered a strategic reason for proceeding in a certain manner. It is sufficient that the approach would have been a reasonable strategic decision given the information available to counsel; this court "need not determine the actual explanation [for the attorney's actions], so long as the [action] falls within the range of reasonable representation. *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992). Third, Petitioner offers no reason to believe that a jury, in fact, would have been more sympathetic to a *mens rea* defense. Indeed, it seems likely that a jury may have been a poor choice for such a defense for all the same reasons that a jury may have

been a poor choice to resolve the insanity defense.

Finally, it is also irrelevant that Petitioner now contends that he was incompetent to waive his jury trial rights. In support of his argument, Petitioner cites *Miller v. Dormice*, 310 F.3d 600 (8th Cir. 2002). (Amend. Pet. Doc. 17 at 45.) In *Miller*, the trial judge "did not address [the defendant] directly," and the defendant was under the mistaken belief that counsel had the unilateral right to waive a jury trial. 310 F.3d at 602. In contrast, here the trial court conducted an extensive examination of Petitioner at the waiver hearing, including explicitly advising Petitioner of his right to insist on a jury. (Exhibit T, R.T. 7/8/03 at 4-11.) Moreover, counsel had diligently pursued the assertion that Petitioner was not competent to stand trial and the trial court had ruled against Petitioner on the issue. Faced with that reality, trial counsel could not fail to pursue sound trial strategy based upon his personal belief that the trial court had decided incorrectly, and thus Petitioner was not actually competent to waive a jury. Taken to its logical extreme, such a catch 22 would have required counsel to decline an offer for Petitioner to plead to a misdemeanor, had one been extended. While counsel may not be free to ignore his client's mental condition, neither is he free to ignore the court's ruling on the issue.

What is left is that trial counsel made a reasonable strategic calculation that a trial to the bench was more likely to have a favorable result than a jury trial, and obtained in exchange for the waiver a significant concession on sentencing. Doing so was not deficient performance.

Moreover, Petitioner fails to proffer any prejudice. Petitioner provides no reason to believe that a jury would have rendered a different result from the verdict reached by the trial judge. *See Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir. 1989) (no prejudice absent showing jury trial would have different result). Nor does Petitioner show that with different advice from counsel he would have spurned the sentencing stipulation obtained in exchange for his waiver and proceeded to a jury trial instead. *See Nelson v. Hvass,* 392 F.3d 320, 324 (8th Cir. 2004) (no prejudice in bargained for waiver of jury trial without showing defendant would have insisted on jury trial). *But see Miller v. Dormire,* 310 F.3d 600, 603 (8th Cir. 2002)

("When a defendant's right to a jury trial is denied as a result of his attorney's deficient performance, this circuit has determined that on the basis of Supreme Court precedent, *Strickland* prejudice is presumed because such misconduct is tantamount to a structural error."); and *U.S. v. Withers*, --- F.3d ---, 2011 WL 6184, 8 (9th Cir. 2011) ("The Ninth Circuit has not yet decided whether a trial counsel's failure to object to a structural error is presumptively prejudicial for purposes of the *Strickland* ineffective assistance of counsel inquiry.")

In sum, Petitioner points to nothing relevant which indicates that the PCR court made an unreasonable application of federal law when it rejected this claim.

## 5. Limitation on Use of Experts

Petitioner argues that trial counsel was ineffective when he stipulated to limit the expert trial testimony to one expert witness each. (Amend. Pet. Doc. 17 at 43.) Respondents argue that the PCR court properly found that the decision to limit experts was sound trial strategy, given the problematic nature of the other available expert testimony and the risks associated with having all the State's experts testify. (Answer, Doc. 31 at 76-78.) Petitioner argues this could not have been a reasonable tactical decision because it was made without consideration of the Parrish report. (Reply, Doc. 48 at 26.) Petitioner argues that the trial court had already heard all of the supposedly excluded testimony during the competency phase. (*Id.* at 26-27.)

The PCR court concluded: "The decision to limit expert testimony was also based upon specific, articulable and reasonable trial strategy." Attorney Middlebrook laid out the rationale for limiting the expert witnesses, including: (1) during pre-trial interviews, Dr. DiBacco (who had previously opined Petitioner was insane) "started backing away and second-guessing himself" (Exhibit RRR-2, R.T. 2/20/07 at 136-137); (2) counsel believed the prosecution's Dr. LaWall and the defense's Dr. Parrish "would essentially cancel each other out" and the prosecutor would be able to diminish Parrish's testimony on cross-examination (*id.* at 138); (3) Dr. DiBacco diagnosed Petitioner with "psychotic disorder not otherwise

specified" which would detract from what was otherwise an agreement on paranoid schizophrenia by the experts agreed upon (*id.* at 139-140); (4) the state's likely expert, Dr. Moran, was favorable except for his ultimate conclusion that Petitioner was legally sane (*id.* at 140); (5) Dr. Moran was consistently a prosecution witness, and Petitioner's expert Dr. Morenz testified equally for the prosecution and the defense and thus had some greater credibility (*id.* at 140-141); (6) given the judge's familiarity with the opinions and Petitioner, and the judge's apparent acceptance that Petitioner was mentally ill, if there were no dispute on the mental illness then the key issue at trial would simply be the effect on Petitioner's mental condition at the specific time of the shooting (*id.* at 141); (7) the judge had all the expert reports, including Dr. Kassall's report indicating not legally insane and being uncertain of Petitioner's mental disorder on the date of the shooting, and Dr. DiBacco's indicating legally insane (*id.* at 142-143);and (8) by limiting the experts at trial, Dr. Kassall's unfavorable opinion was less likely to be adopted by the trial court (*id.* at 143).

Thus, by limiting the expert opinions, trial counsel kept out negative testimony by:

(1)     Dr. Kassall:  no present mental illness and none on day of shooting (Exhibit HHH, Kassall Interv. 7/24/03 at 7-8);

(2)     Dr. Lawall: uncertain whether paranoid schizophrenia or just malingering, but no evidence of legal insanity on day of shooting (Exhibit KKK, Lawall Report 7/7/03 at 10-11; Exhibit GGG, Lawall Interv. 7/18/03  at 11-13));

(3)     Dr. Jasinksi: diagnosis of psychotic disorder not otherwise specified (Exhibit GGGG, Jasinski Evaluation 3/24/03 at 3); and

(4)     Dr. Qureshi: diagnosis of psychotic disorder not otherwise specified and a personality disorder (Exhibit GGGG, Discharge Summary 8/1/03 at 9).[21]

In addition, although Dr. DiBacco had opined that Petitioner was insane (Exhibit JJJ, DiBacco Interv. 7/31/03 at 48-49), he had also diagnosed Petitioner with psychosis not

---

[21]   In addition, the defense believed the prosecution would utilize Dr. Potts as a rebuttal witness.  (Exhibit OOO, Mot. Amend, Exhibit A, Middlebrook Interv. 1/8/07 at 53-54.)

otherwise specified (*id.* at 68).  Moreover, according to Middlebrook, as trial approached, Dr.

DiBacco had "started backing away and second-guessing himself" (Exhibit RRR-2, R.T.

2/20/07 at 136-137;Exhibit OOO, Mot. Amend, Exhibit A, Middlebrook Interv. 1/8/07 at 54-

55.)

On the other hand, the stipulation excluded testimony by Dr. Parrish that Petitioner

suffered from paranoid schizophrenia (Exhibit MMM, Parrish Report 7/17/03 at 1; Exhibit

NNN, Parrish Interv. 7/25/03 at 44) and that Petitioner was legally insane at the time of the

shooting (*id.* at 48).

Petitioner complains that the decision to limit the witnesses was made without benefit

of the Parrish report.  However, that report had been received on July 8, 2003, and reviewed

at least by Parrish's interview on July 25, 2003 (Exhibit NNN).  Petitioner offers nothing to

show that the stipulation to limit expert witnesses had been entered into prior to that time.  In

his interview, Middlebrook asserted the decision was made in the middle of trial.  (Exhibit

OOO, Mot. Amend, Exhibit A, Middlebrook Interv. 1/8/07 at 53.)  Although Petitioner

disputes whether attorney Goldberg had ever seen the report, Goldberg plainly indicated that

the decision to limit the expert witnesses was solely Middlebrook's.  (Exhibit YY-1, R.T.

2/9/07 at 33-34.)

Petitioner also points out that the trial court had already received reports from the

excluded witnesses.  (*See e.g.* Exhibit GGGG (psychological reports).)  That does not,

however, mean that the decision to limit the live testimony was unreasonable.  Rather, in a

war of conflicting experts, it is not unreasonable to assume that those testifying will be fresher

in the memory, and tend to bear greater weight in the fact finder's mind.  Further, many of

Petitioner's favorable reports were also before the court.  (*Id.*)  Moreover, Petitioner bore the

burden of proof on the insanity defense.  A tie would be a loss, and it would not be

unreasonable to expect a fact finder faced with a host of opposing experts to be tempted to

simply call the tie.  By focusing in on two of the most credible experts, who agreed on almost

everything but the ultimate conclusion, defense counsel could reasonably expect to improve

the odds of something better than a tie.

Based upon the foregoing, the undersigned cannot conclude that counsel was acting outside the broad scope of effective performance when he stipulated to limit the expert witnesses. Accordingly, neither can the undersigned say that the PCR court made an unreasonable application of *Strickland* in denying this claim.

## 6. Failure to Preserve Observational Evidence Claim

Petitioner next argues that trial counsel was ineffective for failing to preserve an observational evidence claim. (Amend. Pet. Doc. 17 at 50.) Respondents argue that the PCR court's decision that the claim on "observation evidence" was a new one and counsel was not ineffective for failing to predict the future change in the law. (Answer, Doc. 31 at 80.) Respondents further argue that at least three justices of the U.S. Supreme Court found that counsel had preserved the claim. (*Id.* at 81.) And, they argue that there was no prejudice because no court has held that observation evidence must be considered on the issue of *mens rea*, and the discussions of the issue by the U.S. Supreme Court in Petitioner's case were *dicta*. (*Id.* at 82-83.) Finally, Respondents argue that the trial court did not specifically exclude any observational evidence. (*Id.* at 83-84.)

Petitioner replies that the state courts misapplied their own law as it was defined by the U.S. Supreme Court, and the trial court's failure to consider the observation evidence caused prejudice. (Reply, Doc. 48 at 27.)

### a. Background

**Events at Trial** - In the middle of trial, the trial court addressed the applicability of observations evidence on *mens rea* and opined:

> THE COURT: What I have intended or what I'm going to do after reading all the Mott case is -- and recognizing that much of the evidence that you're going to be submitting, in fact all of it, as far as I know, that has to do with the insanity could also arguably be made along the lines of the Mott issues as to form and intent and his capacity for the intent. I'm going to let you go ahead and get all that stuff in because it goes to the insanity issue and because we're not in front of a jury. At the end, I'll let you make an offer of proof as to the intent, the Mott issues, but I still think the supreme court decision is the law of the land in this

1    state. The unpublished federal opinion, which gave a relief under writ
2    of habeas corpus, I don't think is the law of the land of the State of
     Arizona, but I will certainly allow you to preserve the issue; you can
3    argue or not argue, but you can make an offer of proof at the conclusion
     of the case, but I don't think it's the law of the land at this point. And
4    then at least that preserves it on appeal if something happens later on
     down the road. But right now I'm bound by the supreme court decision
5    in Mott and we will be focusing, as far as I'm concerned, strictly on the
     insanity defense.

6    (Exhibit CC, R.T. 8/19/03 at 5-6.)

7         In the Motion to Vacate Judgment and Sentence, trial counsel argued that the judgment

8    should be vacated because his due process rights were violated by the trial court's "failure to

9    consider whether as a result of Eric's mental illness he was unable to form the *mens rea*

10   necessary to commit an intentional or knowing murder." (Exhibit MM, Mot. Vacate at 1.)

11   That motion did not attempt to distinguish between observational evidence and expert

12   testimony. (*Id.* at 7-10.) The motion was summarily denied. (Exhibit NN, M.E. 11/19/03.)

13

14        **Events on Direct Appeal** - On direct appeal, counsel renewed the argument, this time

15   asserting that *Mott* did not apply to an insanity case and was wrongly decided, and that the

16   trial court's decision was contrary to *Mott* because it failed to differentiate between expert

17   testimony and other evidence including testimony by lay witnesses.

18        In *Mott* the Court precluded expert testimony on the battered woman
         syndrome offered to show that the defendant could not form the
19       applicable mens rea. In this case the trial court not only refused to
         consider the expert testimony on this issue, but refused to consider all
20       evidence indicative of Eric's mental illness and his inability to form the
         requisite mens rea. This blanket refusal was actually contrary to *Mott*
21       and violated Eric's due process right to present a defense. The trial court
         therefore violated Eric's right to present a defense because it court
22       refused to consider any evidence, including the multiple testimonials of
         lay witnesses that Eric did not know what he was doing when acting out
23       or that it was wrong, in deciding whether he could form the requisite
         *mens rea*.

24   (Exhibit OO, Opening Brief at 47-48 (citations omitted).) The Arizona Court of Appeals

25   rejected the claim on the basis of *Mott*. (Exhibit RR, Mem. Dec. 1/25/05 at 18-19.)

26        The issue was again raised before the U.S. Supreme Court. The Court's opinion was

27   authored by Justice Souter, and was joined in by Chief Justice Roberts and Justices Scalia and

28

Alito, and in part by Justice Breyer. *Clark*, 548 U.S. at 741. Section III of the opinion addressed the *Mott* issue. *Id.* at 756 *et seq.* Justice Breyer dissented from most of section III, leaving Justices Souter, Roberts, Scalia and Alito in agreement on this portion. *Id.* at 780.

The majority opinion distinguished between "observation evidence," "mental-disease evidence," and "capacity evidence." The court defined the latter two as pertaining to expert opinions, and described the first as follows:

> First, there is "observation evidence in the everyday sense, testimony from those who observed what Clark did and heard what he said; this category would also include testimony that an expert witness might give about Clark's tendency to think in a certain way and his behavioral characteristics. This evidence may support a professional diagnosis of mental disease and in any event is the kind of evidence that can be relevant to show what in fact was on Clark's mind when he fired the gun. Observation evidence in the record covers Clark's behavior at home and with friends, his expressions of belief around the time of the killing that "aliens" were inhabiting the bodies of local people (including government agents), his driving around the neighborhood before the police arrived, and so on. Contrary to the dissent's characterization, observation evidence can be presented by either lay or expert witnesses.

*Id.* at 757-758.

The Court then opined that the Arizona Supreme Court's decision in *Mott* did not require the exclusion of "observation evidence," but rather only the expert testimony within the other categories of "mental-disease evidence" and "capacity evidence." *Id.* at 760. "[T]he [Mott] court made it clear that this sort of testimony was perfectly admissible to rebut the prosecution's evidence of mens rea." *Id.*

The Court then concluded that in this case the state courts had misapplied *Mott* by extending it to the observation evidence.

> In this case, the trial court seems to have applied the Mott restriction to all evidence offered by Clark for the purpose of showing what he called his inability to form the required mens rea ...Thus, the trial court's restriction may have covered not only mental-disease and capacity evidence as just defined, but also observation evidence offered by lay (and expert) witnesses who described Clark's unusual behavior.

*Id.* at 760. The Court observed, however, that Petitioner's arguments did not "turn on the distinction between lay and expert witnesses or the kinds of testimony they were competent to present." *Id.* at 760-761.

Then, the Court sidestepped the whole issue by concluding that Petitioner had cast his claims before the Arizona courts too broadly and did not "apprise the Arizona courts that he believed the trial judge had erroneously limited the consideration of observation evidence, whether from lay witnesses like Clark's mother or (possibly) the expert witnesses who observed him." *Id.* at 762. This conclusion was based on two factors: (1) the trial judge did not specify any particular evidence being excluded; and (2) trial counsel did not specify particular evidence being excluded. The Court rejected the contention that the discussion in Petitioner's Opening Brief to the Arizona Court of Appeals adequately raised the issue because counsel "was no more specific" than highlighting the differences between Mott's applicability to expert testimony but not lay witnesses. *Id.* at 763.

The Court concluded:

> In sum, the trial court's ruling, with its uncertain edges, may have restricted observation evidence admissible on *mens rea* to the insanity defense alone, but we cannot be sure. But because a due process challenge to such a restriction of observation evidence was, by our measure, neither pressed nor passed upon in the Arizona Court of Appeals, we do not consider it.

*Id.* at 764-765. The Court conceded, however, that "nothing held here prevents Clark from raising this discrete claim when the case returns to the courts of Arizona, if consistent with the State's procedural rules." *Id.* at 765 n. 34.

**Events on PCR** - The claim was not reached upon return to the state courts. The state argued that the due process claim itself, apart from the connected ineffectiveness claim, was precluded under Arizona's waiver rule, holding claims raisable but not raised on direct appeal to be waived and thus barred on post-conviction review. (Exhibit WW, PCR Resp. at 4-5 (citing Ariz. R. Crim. P. 32.2).)

**Loss of Claim** - Thus, it appears that Petitioner's ability to raise his claim that the trial court improperly applied *Mott* to exclude all evidence was lost because trial counsel failed to make an offer of proof of specific observation evidence, thereby confirming that the trial court was excluding from consideration such evidence for purposes of finding the requisite *mens rea*. Indeed, the Arizona Court of Appeals noted: "Aside from the evidence offered to prove

his insanity generally, Clark specified no evidence in his offer of proof that demonstrated he was not capable of knowing he was killing a police officer." (Exhibit RR, Mem. Dec. 1/25/05 at 19.)

### b.  State Court's Decision

The PCR court rejected this claim, casting it as a claim that "Mr. Goldberg, *who* argued the appeal at both the state and federal level was ineffective in failing to preserve the issue of whether the trial court erred in not considering observational evidence bearing on petitioner's *mens rea*." (Exhibit AAAA, M.e. 3/15/07 at 11.)  The court went on to reason that the three dissenting justices had characterized the distinction between observational evidence and other evidence as "novel" and concluded that "Mr. Goldberg was not ineffective in failing to raise an observational evidence claim...[w]here arguably three of the best legal minds in our country ...[found] that petitioner preserved his claim." (*Id.* at 12.) The PCR court did not address the prejudice from the alleged deficient performance.

### c.  Analysis re Deficient Performance

The undersigned finds two difficulties with the PCR court's decision on deficient performance.

**(1) Effect of Supreme Court Disagreement** - First, the fact that three of the U.S. Supreme Court justices believed that the issue had been preserved for purposes of their review did not mean that counsel was effective in attempting to do so.  The law of the case is that counsel actually failed to preserve the claim.  An almost win is still a loss, and does not answer the question whether the attorney performed deficiently in pursuing a win.

Moreover, *Strickland* counsels against such a results oriented determination when deciding whether counsel performed deficiently.  "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689.

**(2) Novelty of Observational Evidence Distinction** - Second, the PCR court relied upon the dissenting opinions in *Clark* having cast the claim as "novel" because of the distinction between lay and expert testimony. While the justices may have found this distinction "novel," Goldberg plainly argued the distinction (albeit without raising sufficient particulars via an offer of proof to satisfy the majority in *Clark*, nor the Arizona Court of Appeals) in the Opening Brief on direct appeal. Thus, contrary to the State's closing argument in the PCR proceeding, trial counsel need not have been "prescient to preserve an 'observational evidence' claim." (Exhibit XXX, Closing Arg. at 20.) At least by the time of the direct appeal, attorney Goldberg had already perceived the limitations of *Mott* ultimately relied upon by the majority in *Clark*. Moreover, as discussed more fully hereinafter, if counsel believed *Mott* made no such distinctions, then counsel should have made the broader offer of proof which would have included observational evidence.

Here, trial counsel had been explicitly invited by the trial court to "make an offer of proof at the conclusion of the case. . .that preserves [the *Mott* issue] on appeal." (Exhibit CC, R.T. 8/19/03 at 5-6.) Doing so would not have required the fine distinctions between lay and expert testimony which Justices Kennedy, Stevens and Ginsberg believed made the claim "novel." *Clark*, 548 U.S. at 782 (Kennedy, J. dissenting). Indeed, Justice Breyer's dissent from the majority's analysis was based upon the foibles in attempting to draw such distinctions in the evidence, and his belief that *Mott's* exclusionary rule made no such distinctions. *Clark*, 548 U.S. at 782-783 (Breyer, J. dissenting). Indeed, attorney Goldberg avowed that he "believed at the time of trial and direct appeal in the State system that [*Mott*] precluded the court's consideration of the observation evidence." Before the Supreme Court he asserted the broader attack on *Mott*. "Clark's objection to the application of the Mott rule does not, however, turn on the distinction between lay and expert witnesses or the kinds of testimony they were competent to present." Clark, 548 U.S. at 760-761.

Had trial counsel done as suggested by the trial court, and made an offer of proof of the evidence believed to vitiate the *mens rea*, then the claim on observational evidence would have been preserved and it would be irrelevant that some of the evidence offered (e.g. the

"mental disease evidence" and "capacity evidence") would later have been deemed to be properly excludable. According to the dissent in *Clark*, "[t]here was no reason, though, for Clark's counsel to believe additional specificity was required, since there was no evident distinction in Arizona law between observation evidence and mental-disease testimony." 548 U.S. at 785-786 (Kennedy, J. dissenting).

This is not a case where counsel asserted argument A but an appellate court later said A is invalid, and a newly invented argument B would have been a winning argument but was not preserved. Rather, here counsel believed that argument ABC was the winner but made no offer of proof to support it, and the appellate court later broke ABC into its subparts and said A and B were losers, C was a winner, but C was not preserved. The happenstance that subparts A and B were ultimately rejected does not excuse the failure to make an offer of proof as to any part of the larger argument ABC. Trial counsel raised a challenge to *Mott*, without distinction as to the specific types of evidence, but failed to support it with an offer of proof on the evidence they believed wrongly excluded (which included the observational evidence). Had counsel made an offer of proof, based on their then belief about the breadth of the trial court's application of *Mott* and the wrongness of it, such offer would have included observational evidence, and the defect in preserving the claim perceived by the majority in *Clark* would have been avoided.

The PCR court's reasoning effectively short circuited the ineffectiveness-in-preserving claim by relying upon the novelty of the manner in which the Supreme Court would subsequently dissect the merits of the claim on appeal. The PCR court effectively mandated that Petitioner show that counsel was prescient (*i.e.* as to the majority's triune dissection of the merits) in order to show that counsel was ineffective in taking action which reasonable, non-prescient counsel would have taken (without knowing the ultimate decision in *Clark*), namely the preservation of all the evidence available on the issue of intent

*Strickland* dictates against applying that kind of hindsight in resolving ineffectiveness claims. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

By applying such hindsight, the decision of the PCR court was contrary to the plain holding of *Strickland.*

That does not, of course, resolve whether Petitioner has made out an ineffectiveness claim in both its dimensions: deficient performance and prejudice.

**(3) Conclusions re Deficient Performance** - Apart from the trial court's admonishment, making an offer of proof on excluded evidence is a plain prerequisite to appealing the exclusion of evidence. "One of the most fundamental principles in the law of evidence is that in order to challenge a trial court's exclusion of evidence, an attorney must preserve the issue for appeal by making an offer of proof." *Holst v. Countryside Enterprises, Inc.*, 14 F.3d 1319, 1323 (8th Cir. 1994). Indeed, the Arizona Rules of Evidence provide:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and...(2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Ariz. R. Evid. 103(a) (2002). *Cf.* Fed.R. Evid 103(a). *See also State v. Dickens,* 187 Ariz. 1, 13, 926 P.2d 468, 480 (1996) (evidentiary claim lost without "specific offer of proof"). *Cf. State v. Tread way*, 116 Ariz. 163, 168, 568 P.2d 1061, 1066 (1977) ("formal offer of proof was not necessary because there is no doubt what response Dr. Tuchler would have made to the defense counsel's questions").

Moreover, long before Petitioner's trial, Arizona had specifically applied the requirement for an offer of proof to psychiatric history, albeit with regard to a witness. "Nonetheless, a trial judge does not abuse his discretion when he excludes testimony about a witness' psychiatric history when the defendant fails to make an offer of proof that the witness' perception or memory was affected by his illness." *State v. Walton,* 159 Ariz. 571, 581-582, 769 P.2d 1017, 1027-1028 (1989). *See also State v. Zuck,*134 Ariz. 509, 513, 658

P.2d 162, 166 (1982)(same).

In Petitioner's case, there were only two defenses presented: insanity and the absence of the requisite intent.  Counsel had all but stipulated that Petitioner had killed the officer. The only evidence available to rebut intent was Petitioner's mental condition.  Counsel was aware of and pursued the introduction of evidence to demonstrate that Petitioner lacked that intent because of his mental illness.  However, despite being informed that the trial court was going to effectively exclude the evidence by refusing to consider it, and despite being invited to make on offer of proof, and despite the clear necessity of such an offer to preserve the issue for appeal, counsel failed to do so.  There has been no strategic reason for that failure ever proposed, and the undersigned can conceive of none.   At best, attorney Middlebrook attributed the failure to a belief that an offer of proof would have ben ineffective with the trial judge.

> A. . . . So it wasn't an issue of -- I know what the argument is: Well, you could have made a specific offer of proof. But it was kind of like, well, the evidence was there. It wasn't like we left out a piece of evidence. It was, it was there; it was just our, at least my feeling was Judge Coker was not going to let me argue, nor was he going to seriously consider that any.of this evidence was going to impact or allow us to --
> Q. Sure.
> A. -- create the defense.

(Exhibit OOO, Mot. Amend., Exh. A, Middlebrook Interv. at 52.)  The belief that it would not make a difference with the trial court would not justify a failure to make the offer of proof to preserve the issue for appeal.

In failing to make an offer of proof, trial counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. *See Collier v. Turpin*, 177 F.3d 1184, 1202 (11th Cir. 1999) (counsel ineffective for failing to make an offer of proof).

### (d) Analysis re Prejudice

 **(1) Required Showing** - "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  In assessing prejudice, the reviewing court

must apply "hindsight," and assess the prejudicial effect of counsel's deficient performance in light of subsequent events. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In assessing prejudice from deficient performance of counsel in preserving an issue for appeal (as opposed to raising the issue to the trial court in the first instance), the prejudice inquiry must focus on whether the outcome of the appeal would have been different. "Accordingly, when a defendant raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." *Davis v. Secretary for Dept. of Corrections,* 341 F.3d 1310, 1316 (11th Cir. 2003). *Cf. Smith v. Robbins*, 528 U.S. 259, 285-286 (2000) (prejudice from failure on appeal judged by whether defendant "would have prevailed on his appeal"); *Cockett v. Ray,* 333 F.3d 938, 944 (9th Cir. 2003) (same).

It should be noted that the PCR court did not reach the issue of prejudice on this claim. Consequently, there is no state court decision on the merits on this issue to which deference may be extended, and this Court applies *de novo* review. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (no AEDPA deference where pertinent portion of the claim not reached by state court).

And, it should be noted that in assessing prejudice (as in everything else pertaining to this case) this Court is, at a minimum, guided by the Supreme Court's analysis of the trial proceedings.

Based upon the foregoing, the undersigned concludes that to establish the requisite prejudice, Petitioner must show a reasonable probability that the outcome of his appeal would have been different had trial counsel made an offer of proof. That requires Petitioner to show that, had the claim been properly preserved, the Arizona Court of Appeals would have reversed his conviction. That requires Petitioner to show a reasonable probability that the Arizona Court of Appeals would have concluded that: (1) the trial court actually excluded consideration of the "observation evidence;" (2) that such exclusion was legal error; and (3) that such error justified reversal under state law.

**(2) Trial Court's Exclusion of Evidence** - Although disclaiming the ability to "be sure," the majority in *Clark* observed that "the trial court seems to have applied the *Mott* restriction to all evidence offered by Clark for the purpose of showing what he called his inability to form the required *mens rea*."[22] *Clark*, 548 U.S. at 760. The dissent was far more assertive, finding that the language of the trial court's ruling and the terms of its verdict led to the conclusion that the "most reasonable assumption, then, would seem to be that the trial court did not consider it, and the Court does not hold otherwise." *Id.* at 785 (Kennedy, J. dissenting).

The undersigned certainly has no greater clairvoyance than the Supreme Court, but this Court is equipped with the record from the PCR proceedings, which were not available to the U.S. Supreme Court.[23] Moreover, in determining prejudice from deficient performance of counsel, a reviewing court is not obligated to "be sure," but to determine matters to a "reasonable degree of probability." For the following reasons, the undersigned finds, to a reasonable degree of probability, that the Arizona Court of Appeals would have found that

---

[22] In his article *The Supreme Court's Bout with Insanity: Clark v. Arizona*, Mr. Westen asserts that "Clark was allowed to introduce all of the evidence he offered to show that he did not knowingly kill a policeman, and the trial judge fully considered Clark's evidence for its weight." 4 Ohio St. J. Crim. L. 143, 151 (2006). However, Mr. Westen's purported explication for that proposition makes no specific reference to the record, but simply argues that the courts have misunderstood the relationship between *mens rea* and the insanity defense. *Id.* at 152-156. In contrast, in her article *Rehabilitating Mental Disorder Evidence after Clark v. Arizona*, Ms. Klein opines that "it is quite clear that the trial judge in *Clark* interpreted Arizona state law as prohibiting Clark from presenting any kind of mental disorder evidence for the purpose of raising reasonable doubt about mens rea."60 Case W. Res. L. Rev. 645, 665 (2010). In support, Ms. Klein argues the language of the trial court's ruling and the absence of the distinction in observational evidence from then existing jurisprudence. *Cf. id.* at 654 (rejecting Westen's correlation between *mens rea* and insanity defenses because of the disparity of the burdens of proof - - reasonable doubt of no *mens rea* versus clear and convincing evidence of insanity).

[23] Unlike the PCR court's improper reliance on the Supreme Court decision in this case to find no deficient performance, there is no problem in relying on the post-state-appeal record, because prejudice (as opposed to deficient performance) is determined with the benefit of hindsight. *Lockhart*, 506 U.S. at 372. Indeed, the prejudice determination is based upon a fictitious past in which trial counsel did adequately preserve the issue for appeal (which would erase the need for the future PCR proceeding).

the trial court in fact did exclude consideration of any of the "observational evidence."

First, the record from the trial court was sufficient to conclude to a reasonable probability that the Arizona Court of Appeals would have found the trial court excluded the observational evidence. The defense's stated strategy from opening statements on was to show that the prosecution could not "prove that [Petitioner] knew that the officer was a police officer and knowingly and intentionally shot him." (Exhibit V, R.T. 8/5/03 at 22-23 (Def. Opening Statement.)

> MR. GOLDBERG: . . . Overall, your Honor, I'd ask you to consider this evidence over the next four days from not just the perspective of whether the state's proven what it's saying it's going to set out to prove here, but also in light of the fact that whether they can prove specifically that Eric knew that he was involved with a police officer at the time of this offense, because if he did not know that Officer Moritz was, in fact, a police officer but was acting under delusional or otherwise nonintentional thinking at that time, then he is not guilty of first degree murder. And the Court can find him guilty of a lesser offense, such as second degree murder or manslaughter.

(*Id.* at 17-18.)

The trial then proceeded with the state presenting its litany of prosecution witnesses, including:

(1)    officers Cooper, Mead, and Wright, who were the first responders at the scene (Exhibit V, R.T.8/5/03 at 24-140);

(2)    Randy and Tammy Cupp who had reported to police that someone was driving through their neighborhood with loud music the night of the shooting (*id.* at 141-167);

(3)    Cupp neighbor Michael Greenway who observed Petitioner driving with loud music (*id.* at 168-175);

(4)    Cupp neighbor Deborah Hill who heard the vehicle driving with loud music, the siren, and gunshots and saw the officer collapsing (*id.* at 176-199);

(5)    Gene Waldrip who discovered Petitioner's hat with the gun it (Exhibit W, R.T. 8/6/03 at 3-7);

(6)    officer Dale Young who investigated the scene of the shooting, the gun location

and Petitioner's residence and took DNA from Petitioner  (*id.* at 8-45);

(7)     Cupp neighbor Jaime Nyala who heard the exchange between Petitioner and the officer and the gunshots, and saw the scene afterward (*id.* at 4-64);

(8)     Cupp neighbor Mary Hartman who heard Petitioner driving with loud music, a siren, and gunshots (*id.* at 65-70);

(9)     Cupp neighbor Diana Wittenbreder who heard the siren, saw the police vehicle and another vehicle stopping, heard gunshots and saw the officer at the back of his vehicle, and saw someone walking away quickly (*id.* at 71-90);

(10)    Detective Mike Gray who investigated the scene and vehicles (*id.* at 91-112);

(11)    Officer Jeff James who searched the neighborhood and participated in apprehending Petitioner (*id.* at 113-129);

(12)    medical examiner Philip Keen (Exhibit X, R.T. 8/6/03 at 2-35);

(13)    Petitioner's school acquaintance Jason Hackett, a recovering drug addict, who was in a park with friends when Petitioner walked up and announced he wanted to shoot a police officer, and that some months before Petitioner had complained about the police arresting someone, and described Petitioner's unusual behavior at school (Exhibit Y, R.T. 8/7/03 at 5-38);

(14)    Mark Fields, a drug addict and homeless person at the time, who was at the park with Hackett, smoking marijuana, and claimed that Petitioner's threat against police stemmed from friends' objections to Petitioner having beer in a public park, that Petitioner appeared to be under the influence and Jason described him as crazy (*id.* at 39-59);

(15)    Detective Dale Eske who staked out Petitioner's residence, saw Petitioner coming to the home, chased him and participated in the apprehension (*id.* at 60-71);

(16)    Detective Thomas Boughner who responded to the scene and canvassed the neighborhood, and participated in apprehending Petitioner (*id.* at 71-81);

(17)    forensic scientist David Spence who performed gunshot residue tests (*id.* at 81-

- 80 -

100);

    (18)    Detective Frank Higgins who responded to the scene and participated in the search for Petitioner, his apprehension, recovery of the hat and weapon (*id.* at 100-121);

    (19)    Detective Paul Langston who responded to the scene, investigated the location where the weapon was found, and fingerprinted Petitioner (*id.* at 121-133);

    (20)    criminalist Terry Weaver who investigated the scene and the firearm evidence (Exhibit Z, R.T. 8/8/03 at 4-59); and

    (21)    criminalist Benito Bock who did DNA testing on the hat found with the weapon (*id.* at 59-71).

The only portions of all this testimony with any significant bearing on the *Mott* issue was the testimony from Hackett and Fields, and Detective Higgins depiction of Petitioner's responses upon being apprehended as "sarcastic...wasn't spontaneous, it seemed almost forced" (Exhibit Y, R.T. 8/7/03 at 120.)

At the conclusion of the prosecution's case, the defense moved for a directed verdict and "reserve[d] the right...to reurge this motion at the completion of the defense case based on the evidence you hear on whether there is sufficient evidence that Eric Clark in his state of mind at that moment knew that this was a police officer and intended to kill a police officer." (Exhibit Z, R.T. 8/8/03 at 78.) The trial court denied the motion. (Exhibit BB R.T. 8/12/03.)

The defense then presented the testimony of lay witnesses Victor Meza and Hillary Engelke, schoolmates of Petitioner, about Petitioner's history and behavior. (Exhibit CC, R.T. 8/12/03.) An off the record discussion was held between the court and counsel concerning the *Mott* issues, and the court directed counsel to brief the matter so the Court could issue a ruling after a recess. (*Id.* at 73-74.) When court reconvened the following week, the court issued its ruling on the *Mott* case, indicating that it had read the parties' memorandum. (Exhibit CC, R.T. 8/19/03 at 5-6.)

The defense then proceeded with the balance of its witnesses, including a host of lay

witnesses (Exhibit CC, R.T. 8/19/30; Exhibit DD, R.T. 8/20/03; Exhibit EE, R.T. 8/21/03) and its expert witnesses (Exhibit FF R.T. 8/22/03). The state then presented its expert witness (Exhibit GG, R.T. 8/26/03). Petitioner declined to testify, the defense reasserted its motion for directed verdict relying "on the arguments that Mr. Goldberg had made previously but now *in consideration of all the evidence that's been presented*." (Exhibit HH, R.T. 8/27/03 at 4 (emphasis added).) The state simply relied "upon the earlier arguments and our memorandum of law." (*Id.* at 5.) The trial court summarily denied the motion, with no indication that it would consider any portion of the evidence submitted during the insanity portion of the case. (*Id.*)

Perhaps most telling is counsel's closing argument. Counsel does not argue insanity plus a lack of intent based upon lay testimony of Petitioner's mental condition. There is absolutely no argument on Petitioner's intent. The words "intent" or "*mens rea*" are not even mentioned. Despite counsel's promises at the commencement of the trial that the mental status evidence would refute intent, no mention of it is made in closing. (*See* Exhibit HH, R.T. 8/27/03 at 7-29.) Indeed, counsel concluded by arguing "there is only one verdict, and it's an unfortunate one, he was guilty but insane because there's no other way to analyze the evidence." (*Id.* at 29.) Thus, defense counsel was either completely deficient in failing to argue the sole defense to the prosecution's case in chief, or counsel believed that the trial judge had already ruled that all the available evidence (lay or expert) would not be considered and thus there was no evidence on which he could argue a lack of *mens rea*. Given the overall fervency and competence demonstrated by defense counsel, the latter is far more probable.

Similarly, the trial court's pronouncement of the verdict on the prosecution's case suggests that the trial court made no consideration of any evidence refuting intent:

> The court finds beyond a reasonable doubt that the defendant, Eric Clark, shot and caused the death of police officer, Jeff Moritz.

(Exhibit II, R.T. 9/3/03 at 4.) The court's only discussion of the six days of mental status evidence was solely in connection with the verdict on the insanity defense, where the court went into depth to detail the evidence and its findings. (*Id.* at 4-6.)

As recognized by the majority in *Clark*, appellate counsel argued in his "brief in the Arizona Court of Appeals...that it was not inconsistent with *Mott* to consider nonexpert evidence indicating mental illness on the issue of mens rea, and argued that the trial judge had failed to do so." *Clark*, 548 U.S. at 763. (*See* Exhibit OO, Opening Brief at 47-49.) The State, on the other hand, argued that *Mott* was not limited to its facts and thus rejected Petitioner's argument that *Mott* should not be read to bar "'*any evidence* reflecting upon a mentally ill criminal defendant's ability to form the necessary *mens rea*'". (Exhibit PP, Ans. Brief at 36-37 (quoting Opening Brief at 47) (emphasis in original).) The State argued that the such testimony by lay witnesses "was not relevant to the issue of whether [Petitioner] knew Officer Moritz was a police officer." (*Id.* at 37.) The Arizona Court of Appeals complained that trial counsel had failed to specify evidence in an offer of proof to support his *mens rea* defense, but concluded that "[e]ven assuming such evidence was sufficient, the trial court was bound by the supreme court's decision in *Mott*." (Exhibit RR, Mem. Dec. At 19.)

The PCR proceeding goes even further to establish that the trial court had excluded all evidence on Petitioner's mental condition on intent. The state did not argue to the PCR court that the trial court had actually considered the observational evidence. Instead, the state argued that the record was not clear and, given the presumption that judges know and apply the law, the ruling in *Clark* that *Mott* did not extend to observational evidence should create a presumption that the trial court did not exclude the observational evidence. (Exhibit WW, PCR Resp. at 19-20.) Likewise, Respondents argue that this court must, under the *Strickland* standard, presume that the trial court acted within the law. (Answer, Doc. 31 at 83-84.)

However, the presumption relied upon by the State (e.g. that the trial judge knew and applied the law, particularly as subsequently explicated in *Clark*) is rebuttable. *See Townsend v. Sain*, 410 U.S. 690, 758 (1963) (presumption applicable on habeas review rebuttable).[24] As strongly argued by Respondents in asserting counsel's effectiveness, prior to *Clark* there was

_____

[24] It is important to remember that because it is the decision of the PCR court being considered, the AEDPA presumptions and limitations do not apply to the trial court's ruling on the *Mott* issue. Moreover, the PCR Court made no ruling on whether the trial court had actually excluded the observational evidence.

no case law differentiating between these types of evidence. Either *Clark* charted new territory, or it did not. Indeed, prior to *Clark* there was no jurisprudence holding that *Mott* was limited to expert testimony and did not include "observational evidence." The majority opinion in *Clark* concluded that it was "clear that *Mott* itself imposed no restriction on considering evidence of the first sort, the observation evidence," *Clark,* 548 U.S. at 760, However, Justice Breyer found in his partial concurrence that it was necessary to "remand this case so that Arizona's courts can determine whether Arizona law, as set forth in *Mott* and other cases, is consistent with the distinction the Court draws" *id.* at 780. Justices Kennedy, Stevens and Ginsberg agreed that "*Mott*'s holding was not restricted to mental-disease evidence." *Id.* at 786. For the reasons discussed herein, the undersigned finds that the presumption that the trial judge divined the law according to *Clark* and applied it has been overcome.

In opening statements at the PCR proceeding, the State's attorney made no argument that the trial court considered the observational evidence, and instead simply raised the hindsight assisted argument ultimately adopted by the PCR court:

> MR. O'TOOLE: Attorney Gerhardt said that first issue, the observational evidence issue, that was initially kind of thought about when this petition was being filed, was an easy issue. The state agrees. It's a very easy issue. Just because you don't win in the United States Supreme Court does not mean you're ineffective. You don't have to create new law and bring it all the way up to the United States Supreme Court to be effective. That's not the standard.

(Exhibit YY-1, R.T. 2/9/07 at 10-11). The state made no assertion that the trial court did not exclude consideration of the observational evidence.

Attorney Goldberg testified that he believed, based upon the contents of the special verdict, that the trial judge did not consider the observational evidence in deciding "whether there was a reasonable doubt of whether [Petitioner] intentionally and knowingly killed a police officer." (Exhibit YY-1, R.T. at 23.) Cross examination of Goldberg on the issue was limited to the novelty argument:

> Q. You never heard the word - - - the praise "observational evidence" before the United States Supreme Court issued their decision in the Clark case?

- 84 -

A.   Neither me nor Justice Kennedy and several of the other justices.

(*Id.* at 66.)   In its written Closing Argument (Exhibit ZZZ), the state made no assertion that the trial court had actually considered the observational evidence.  (*Id.* at 19-24.)

Finally, in his unsworn interview, attorney Middlebrook related his understanding that the trial judge had precluded the observational evidence:

> A. . . . The reason I brought those motions in limine with me is because it occurred to me under the State versus Bay case that a layperson's opinions and observations as to insanity was relevant. In all honesty, I thought I had preserved the issue as far as being able to bring in lay people to discuss mens rea and, in effect, to negate Eric's ability to premeditate and/or perceive that Officer Moritz was in fact a police officer versus an alien.
> I'll tell you, when Judge Coker ruled, the effect of Judge Coker's ruling on the Mott issue for me was that I could no longer make that argument. So I don't know if that directly answers your question or not. But I thought by filing the pretrial motions I had preserved the observational evidence issue. But when he ruled that we could not bring in or discuss Matt from the standpoint
> Q. Right.
> A. -- of negating premeditation –

(Exhibit OOO, Mot. Amend, Exh. A, Middlebrook Int. at 50.)

Thus, with the exception of the limited post-trial arguments by the state that the failure of counsel to make a record precluded knowing whether the trial court excluded the observational evidence, the balance of the record indicates that the trial court did exclude it. The post-appeal record adds to the information available to the Supreme Court, and thus bolster's the majority's observation that "the trial court seems to have applied the *Mott* restriction to all evidence offered by Clark for the purposes of showing his inability to from the required *mens rea*."  *Clark*, 548 U.S. at 760.

Accordingly, the undersigned finds at a minimum a reasonable probability that the trial court excluded consideration of the observational evidence under a mistaken belief that *Mott* precluded its consideration.

**(3) Appellate Determination Exclusion Was Error** - Because the relevant question is whether the outcome of the appeal would have been different, Petitioner must also show that the Arizona Court of Appeals would have found that the trial court's exclusion of the

observation evidence was error.

The majority opinion in *Clark* observed: "It is clear that *Mott* itself imposed no restriction on considering evidence of the first sort, the observation evidence." *Clark*, 548 U.S. at 760. Respondents make no suggestion that if presented with a properly preserved claim the Arizona Court of Appeals would not have deduced the correct application of *Mott*. The majority in *Clark* believed they would have.

> We therefore have no reason to believe that the courts of Arizona would have failed to restrict their application of *Mott* to the professional testimony the *Mott* opinion was stated to cover, if Clark's counsel had specified any observation evidence he claimed to be generally admissible and relevant to mens rea.

*Id.* at 765, n. 34. Thus, by relying on *Mott* to exclude the observational evidence, the trial court acted contrary to Arizona law, and the undersigned finds at the minimum a reasonable probability that but for trial counsel's deficient performance the Arizona Court of Appeals would have found the error.

Respondents argue that although it noted the concerns, *Clark* did not hold that states could not exclude observational evidence. (Answer, Doc. 31 at 83.) That would be relevant only to disposing of a direct due process attack on the exclusion of the observational evidence. Petitioner does not depend upon such an attack in this claim. Rather, Petitioner simply argues that trial counsel was ineffective in failing to properly preserve for appeal his argument that the trial court improperly applied *Mott* to lay testimony. That the application may (or may not) have also been a violation of due process is not necessary to a finding that the Arizona Court of Appeals would have found it to be error under Arizona law.

**(4) Appellate Determination Error Justified Reversal** - Finally, Petitioner must show that the Arizona Court of Appeals would not only have found error, but would have granted relief. Under Arizona law, evidentiary error does not call for reversal if the court can find that the error was harmless. "Error is harmless or non-prejudicial when it can be said beyond a reasonable doubt that the error did not affect the verdict." *State v. Lundstrom,* 161 Ariz. 141, 150, 776 P.2d 1067, 1076 (1989). For the following reasons, the undersigned finds, to a reasonable degree of probability, that the Arizona Court of Appeals would have

determined that it could not find beyond a reasonable doubt that the exclusion of the "observation evidence" did not affect the verdict.

**First**, Petitioner's contention has been that the state failed to show the requisite *mens rea* of intending to kill a police officer because Petitioner was acting under a paranoid delusion which caused him to believe that members of the community, and police officers in particular, were a danger to him. To sustain its burden on this point, the state was required to provide "proof beyond a reasonable doubt that a defendant's state of mind was in fact what the charge states." *Clark*, 548 U.S. at 766.

**Second**, there was substantial lay testimony, to indicate that Petitioner was indeed acting under his paranoid delusions at the time of the shooting.

Jason Tackett (a prosecution witness on the Thorpe Park incident) testified that Petitioner regularly talked to himself, that at school Petitioner wouldn't keep eye contact, always looked at his desk and twirled his pencil, and looked around paranoid. He seemed unusually fidgety and stressed out, and appeared scared, and yet seemed to be trying to intimidate others. He though Petitioner was creepy and that there was something wrong with him. (Exhibit Y, R.T. 8/7/03 at 18, 26-28.) Petitioner seemed calmer and happier when he was using marijuana. (*Id.* at 29.)

Victor Meza testified that he and Petitioner had been best friends through middle school until their junior year in high school, but at the beginning of their junior year, Petitioner began to undergo changes. (Exhibit BB, R.T. 8/12/03 at 32-42.) In January, he began keeping a bird in his car and arranging string throughout the car because he was afraid someone would break into the car and put something in it. (*Id.* at 43-44.) His relationship with his parents declined, and he rented a storage locker and filled it with water, canned food etc. because he was afraid something was going to happen. (*Id.* at 45-47.) Meza described an incident where Petitioner became angry because Meza had taken the front seat in a friend's car, making Petitioner sit in the back. As they drove down the road, Petitioner began choking Meza. The driver stopped and Meza got out to fight Petitioner. Petitioner got out and did not seem to remember choking Meza. (*Id.* at 49-51.)

1    Hillary Engelke testified that she had been friends with Petitioner since the seventh

2    grade, and noticed that his personality and appearance changed in his junior year, and he

3    became a "loner." (Exhibit BB, R.T. 8/12/03 at 62-72.)

4    Nancy Edmondson testified that she had been friends with Petitioner since junior high,

5    and she noticed changes in him in January, 2000. (Exhibit CC, R.T. 8/19/03 at 7-13.) In

6    April, 2000, when she was six and a half months pregnant, she was at Petitioner's house.

7    After Petitioner's sister left, she went with Petitioner to his room and he asked her a series

8    of strange and uncharacteristic questions about death, having sex with a pregnant woman, etc.

9    which scared her. She told him she needed to go home and he got angry. Before they left he

10    began running string around his room which he described as his "security system for his

11    parents." When they got to his car, he was acting normal again. (*Id.* at 13-16.) He had his

12    bird in his car. (*Id.* at 21-22.)

13    Stephen Carrillo testified that he had known Petitioner in high school and played

14    football against him, and Petitioner was popular. He noticed that in January, 2000 Petitioner

15    had become distant from people and they didn't want to be around him. (Exhibit CC, R.T.

16    8/19/03 at 23-26.) Petitioner kept a bird in his car. (*Id.* at 29-30.)

17    Adam Lozano testified that he knew Petitioner through Petitioner's older brother, and

18    was helping Petitioner work out to play college football. In 2000, Petitioner had stopped

19    lifting weights, and his appearance and voice changed. The day before the shooting,

20    Petitioner called and asked to lift weights with Lozano. Lozano did not recognize his voice,

21    and asked what was wrong. Petitioner said he was having mental problems. (Exhibit CC,

22    R.T. 8/19/03 at 41-50.)

23    Anthony Nelson testified that he had known Petitioner since junior high, and noticed

24    changes in him in their junior year in high school. Petitioner stopped socializing, let his

25    appearance go, lost weight, began keeping strings in his car. (Exhibit CC, R.T. 8/19/03 at 64-

26    73.)

27    Shane Palmer testified that he had known Petitioner since 5th grade, and noticed

28    changes in him between their sophomore and junior years, including his dress and withdrawal

from people. Petitioner would string fishing line around his car and kept a bird in the car and a stack of quarters balanced on the seat of the car. (Exhibit CC, R.T. 8/19/03 at 79-87.)

Arthur Salazar testified that he had been friends with Petitioner since junior high, and played sports with him. He noticed changes in Petitioner in their junior year, including a loss of interest in sports, change in appearance, change in his voice, always wearing a backpack, constantly playing with a pen, withdrawal from people, laughing and smiling inappropriately, etc. (Exhibit CC, R.T. 8/19/03 at 88- 105.)

Eric Escobedo testified that he played football at the high school at the same time as Petitioner. He noticed changes in Petitioner including becoming withdrawn. He saw a bird and strings in the back of Petitioner's car. (Exhibit CC, R.T. 8/19/03 at 110-122.)

Rosalind Trillo testified that she knew Petitioner in high school. Petitioner was withdrawn from other people. He would ask Trillo and her boyfriend to go to lunch with them. He would sit in the back seat without talking, and would not eat lunch. She saw his car with strings strung inside and asked Petitioner about it. He said it was not his car. He would talk to her in high pitched tone, but would talk to her boyfriend in a normal voice. (Exhibit CC, R.T. 8/19/03 at 123-143.)

Lois Wells testified that she was Petitioner's 5th grade teacher and high school counselor and her son was on the football team with Petitioner. In the fall of Petitioner's sophomore year, the football coach reported that Petitioner was "crazy." In the spring of that year, she confronted Petitioner about skipping class and going home and he "went ballistic" which she found unusual. In the summer of 1999, Petitioner's mother called and asked for a referral to a counselor for Petitioner. Petitioner had "went ballistic" when he couldn't get the car he wanted, got arrested, and when taken home had "went ballistic" with his dad. In the fall of 2000, Petitioner came to request a schedule change, and uncharacteristically and inappropriately argued with her repeatedly when told it couldn't be done. Petitioner came to get a schedule change for the spring semester, and was loud and demanding and then left when told to wait.

In the spring of 2000, the weight training teacher complained that Petitioner refused

to go swimming, and Petitioner's mother reported that the teacher had humiliated Petitioner and Petitioner was afraid of germs in the pool.

Petitioner had gone to her office and to the district office to take the final for a correspondence course, but just left when sent to get his book, or to put his backpack in his car and never took the final.

Petitioner's history teacher reported that Petitioner was behaving bizarrely, that he would sit in class flipping his pencil and zone out. The nurse reported to her that Petitioner had come in with a cut lip but refused to let her touch it because he was afraid she had germs.

After spring break, Petitioner's mother called her and reported that Petitioner had been in her office sobbing saying the voices would not leave him alone and he couldn't take it any more and he was ready to go to heaven. Wells volunteered to locate Petitioner, and found him in class. He told her he was fine. His parents tried to take him for treatment, but he refused.

Petitioner's mother reported to her that Petitioner was extremely paranoid, tied string all over his room, she would buy him new shoes and he would put them in the trash because they had germs on them, he couldn't eat in the same place because they were going to poison him, and that he thought they had taken his mom and replaced her with an alien. Petitioner's mother denied that Petitioner was taking drugs, and claimed she had been testing him for drugs. Petitioner's behavior was extremely odd but he did not act like other emotionally disturbed students. (Exhibit DD, R.T. 8/20/03 at 4-53.)

Gentry Clark testified that he is Petitioner's older brother and helped coach Petitioner's football teams. He left and went to UofA the fall of 1999. Petitioner's emotions began to vacillate quickly and unpredictably. His clothes and hair appearance changed, and he became reclusive, and his conversation regressed and he was unable to carry a conversation. Three or four months before the shooting, they got in an argument and Petitioner threatened to kill him and didn't seem to be himself. On May 16, 2000, he came home at 1:00 a.m. to find his parents in their front yard with flashlights looking for a gun that Petitioner had hidden. (Exhibit DD, R.T. 8/20/03 at 54-85.)

David Clark testified that he is Petitioner's father, that he observed changes in Petitioner in 1999. In June of 1999, Petitioner had purchased a motorcycle and when his mother objected Petitioner got a wild-eyed look and told her "maybe you've just threatened yourself." When they went to Prescott to buy him a car, Petitioner became agitated on the way, acted inappropriately with the sales person and insisted on a car over their price limit. Petitioner later told him he felt like he could go crazy.

That night Petitioner had abandoned his car in the road. The police officer came to the house. Petitioner saw the police officer and said "I'm not talking to you any more. I will see you in court." Petitioner then jumped out of his window and began walking away. When David got outside, the officer had Petitioner in the patrol car. When Petitioner got out of the patrol car, he led David to the side to tell him something and began whispering gibberish. Petitioner then laid down on the lawn saying he was going to take a nap. The police officer told David that while he talked to Petitioner, Petitioner had gone from upset to angry to crying. When David and Petitioner began walking into the house, Petitioner began to cuss at David and act in a scary way. David asked the police officer to take Petitioner to juvenile detention. They then decided to admit Petitioner to Aspen Hill. While he was there they searched his room and found marijuana and an anarchist book. He was drug tested and was positive for marijuana. David and Petitioner's mother disagreed about whether Petitioner should stay in Aspen Hill and after four days they took him out.

Petitioner's behavior became more bizarre after he came home. He began sleeping in a sleeping bag in the computer room and rigged the room with fishing line with beads and wind chimes, and asked for a baby monitor so he could monitor his bedroom from the computer room. Eventually he began sleeping in his bedroom and booby trapped it every night. Petitioner told him that it was because "they" were after him. He began fearing being poisoned and started drinking bottled water. He became reclusive, and wouldn't return calls from his friends. Petitioner dropped out of sports and did not return to school but began taking correspondence courses. His paranoia stayed constant through the end of the year. Then he began telling his mother that he was going to be elected president.

He became paranoid about Y2K and surreptitiously used David's debit card to buy survival things, which when confronted he admitted to be for Y2K. He had put them in a storage locker he had. After New Years, Petitioner was happy that the world had not ended and became more normal for several weeks, and then went back into his severe paranoia.

He would not eat food at home, but insisted on bottled water and food from gas stations and convenience stores and at the Sizzler buffet so he wouldn't be poisoned. He would laugh inexplicably, began wearing multiple layers of clothes, playing the TV loudly and would get a strange look in his eyes.

In April Petitioner had called his mother an alien, then called David an alien, and told him if he would got get some tools he would show him. He said he had special powers and keys to doors that "they" wanted.

On April 24, 2000, Petitioner was arrested for DUI. David went to the police station and Petitioner's eyes were dilated and he was acting very wildly and had alcohol on his breath, and he could or would not perform the breathalyser test. The DPS officer who had arrested Petitioner later asked to meet with David and told him he thought Petitioner was violent and a danger to the family and wanted to make sure that they slept with their bedroom locked, and removed any guns from the house, because they had found ammunition on Petitioner. David took his guns to his parents' house in Prescott.

In May, he and Petitioner's mother had gone to a movie. When they came home, Petitioner was laying on his bed with a large caliber pistol laying next to him. David grabbed the gun, ran upstairs and gave it to his wife and told her to hide it. Petitioner came upstairs and found the gun in the closet where she had hid it. David demanded the gun. Petitioner said the gun belonged to someone else and they couldn't have it. He took it outside and hid it. They told him he could not keep a gun. Hours later, David was searching for the gun outside and Petitioner agreed to take it back to its owner. He rode off on his bicycle, and came back without the gun.

They later tried to have Petitioner prosecuted on the DUI so that he could get help. They pursued having him admitted various places and to see a counselor but Petitioner would

not go. They considered provoking an incident with him so they could have him committed to juvenile detention.

The day before the shooting he took Petitioner to shower at the athletic club. Petitioner had stopped showering at home because he was didn't feel safe showering at home. They went to the movies with his mother. As usual, Petitioner did not really watch the movie, but appeared to be peering around him out of the corner of his eyes or staring at his hands. He seemed to be in his own world. Afterwards, Petitioner asked to stay and watch another movie. David waited up for him to call for a ride, but eventually went to bed, and was awoken early the next morning by the police.

On August 20th, while Petitioner was in jail,[25] he told his parents that "Aaron" lives in a mirage, it was Flagstaff and it was a platinum city. 50,000 people in Flagstaff were aliens. A thousand people were not aliens. They were after him because he had the keys to the doors and he knew things that they didn't know. He was being tortured and electrocuted. And the only thing that will stop aliens is bullets. Petitioner "slipped up" and supplanted his name for "Aaron" in telling the story.

Although Petitioner had not shown a particular fear of police officers, he had a fear of everybody because anybody could be the "they" or the aliens. (Exhibit DD, R.T. 8/20/03 at 86-163.)

<u>Lisa Oedekerk</u> testified that she had known Petitioner since the 4th grade, and noticed changes in him in their junior year of high school, including his withdrawal from people, and unwillingness to look people in the eye. He began rigging his car to see if it was disturbed. (Exhibit DD, R.T. 8/20/03 at 164-178.)

<u>Lauren Beach</u> testified that she had been friends with Petitioner since junior high, and noted that after his sophomore year he became withdrawn. At a party in the summer of 2000, he behaved strangely, unable to focus his eyes on things, repeatedly played with things from his pockets or playing with a pen, acting disconnected and asking people why they were

---

[25] The psychiatric evaluations indicate that Petitioner was still at the Coconino County Jail, and untreated, on this date. (*See e.g.* Exhibit GGGG, DiBacco Report 12/23/00 at 9;

talking to him.  Petitioner then got in a fight and hit the other person in the nose, and threatened to kill him if he told anyone.  Petitioner appeared to have a gun which he put in his waistband. (Exhibit DD, R.T. 8/20/03 at 179-190.)

Terry Clark [Petitioner's mother] testified that she was a school nurse, that Petitioner had been a loving child, good student, and good athlete.  In November, 1988 they moved into an apartment because of a house fire, and Petitioner began to refuse to drink tap water because of a fear of lead poisoning, even though told the pipes were made of PVC.  In the spring of 1999, he began to experience wide and rapid mood swings, and began to withdraw from interaction with the family. He started referring to her as "Terry" rather than "mom." She was uncertain at the time whether this resulted from normal teenage rebellion or illegal drug use.

In June of 1999, Petitioner came home and said he wanted to buy a motorcycle and asked her to cosign the loan.  She refused, Petitioner got a blank look and said "you may have just threatened yourself," walked away, and never brought up the motorcycle again. Later that month they went to Prescott to buy Petitioner a car.  She came separately, and when she arrived Petitioner was gone.  She was told that when told he couldn't get the car he wanted, Petitioner had gotten a blank look, started shaking and told his father he thought he could go crazy.

The next evening, a police officer came to their home because he had found their car abandoned in the middle of the road.  The officer had gone to another scene, and when he came back the car was gone.  He traced the plates to them.  When she came to the door, Petitioner was talking to the officer.  He said the officer was being rude and would have to talk to him in court, and slammed the door.  Petitioner then went down to his room and climbed out the window.  Petitioner's father went out to talk to the policeman.  When he got back he said he had had Petitioner arrested and understood what she had been telling him about Petitioner's changes in demeanor.

They searched his room and found marijuana seeds.  They told the people at juvenile detention to tell him they would not  agree to bring him home until he gave them the combination to the safe in his room.  He gave it to them and inside they found marijuana seeds

and paraphernalia, a copy of "An Anarchists Cookbook," and a notebook with illogical writings in it.

They decided to have Petitioner committed to Aspen Hill. She was unhappy with the care he was receiving, so they took him home against medical advice. He had tested positive for marijuana and promised not to use it any more and to go to counseling. She saw some improvement in him during the three days he was in Aspen Hill, and for 24 hours after coming home. Then he became more paranoid than ever.

Petitioner began closing all the blinds in the house, turning all the lights on, and locking the doors. If she went to get the mail, he would lock the door behind her. He kept saying "they" were after him and tried to poison him, but wouldn't tell her who "they" were or she would be in danger too.

Petitioner got a cat, but kept its food and box locked up in his room where the cat couldn't get to them. She bought the cat toys and he told her she could have the cat because she made it love her more than him.

He began putting Neosporin and bandages on his fingers, saying that he could tell he had been poisoned because his cuticles were messed up. He would go through many tubes of Neosporin and boxes of 500 bandages. He complained he coughed up brown stuff and it was proof he was being poisoned.

He stopped sleeping in his own room, and put a sleeping bag in their computer room. He put 3 or 4 floor length mirrors around the room, strung fishing line with wind chimes on the door, and set cardboard up around the sleeping bag. When asked, he would explain that "they" were after him.

He did not want to return to his high school for his junior year and wouldn't play football because another player was going to get a jersey with his number on it. She met with the school and they decide to have him take correspondence courses.

In November, 1999, he became obsessed with Y2K, and that the world was going to end. He took a debit card from his father and purchased $1700 of survival gear. They never knew where he kept it. The discovered the missing money and asked him about it. He said

he would pay them back if he survived Y2K.

On New Years Day, 2000, he was ecstatic he had survived and said he was ready to go back to school. He seemed to get better for a short time. Then he would return to bizarre behavior, like wearing shower caps on his head, wearing rubber gloves around the house or when he worked in the yard, with work gloves over them. He would wear little knit gloves, and knee high stockings. And then he would stop for a while.

He had always been very popular, had been voted home coming royalty his freshmen and sophomore years, but by March of 1999 had stopped taking calls from friends, and stayed home. He had become childlike and clung to his mother. He would only watch cartoons or the comedy channel. He changed the posters in his room from rap stars to Disney or cartoon characters. He began writing symbols in the ceiling of his room. That began in November, 1999 but had become more so by April thru June, 2000.

He began washing his clothes over and over, using a box of detergent for 30 or 40 loads in three days for his own clothes.

In December, 1999, he told her some rap stars were going to nominate him to be president of the United States and asked her if she would vote for him. He did not seem to understand what he was talking about.

By February, 2000, she had decided that his behaviors were mental illness. In March and April she began to get calls from the school, with teachers complaining that he was laughing inappropriately in class, sitting staring at people with a blank look on his face, flicking a pen at them and wouldn't stop when asked.

He would come to her office and start sobbing. She came to his office on April 19, 2000, and began sobbing, saying he couldn't take it anymore, he was ready to go to heaven, and "they" were after him. She was worried he was going to commit suicide. She made an appointment with a psychologist, but Petitioner said he didn't need to go, but needed to take a test at school. They tried numerous times over the next months to get him to go in. She tried to arrange a home visit by the psychologist, but the psychologist cancelled because her malpractice insurance wouldn't let her go to the home.

Petitioner was arrested on April 24 for DUI and possession of drugs. They begged the juvenile people to keep him because of his mental health issues, but they released him. They had hired attorney Middlebrook to try to get the authorities to keep him and press charges.

Petitioner's condition vacillated between June of 1999 and June of 2000. After his arrest in April, 2000, his condition began to snowball. Around the time of his fight at the party, she was trying to have him committed at places in Cottonwood and Tucson, and afterwards contacted attorney Middlebrook to see if Petitioner could be prosecuted over the fight.

By June, Petitioner was filthy. He claimed to be showering at the athletic club, but did not appear to be using soap or shampoo. He had begun wearing layers of clothes and would wear the same ones for a week at a time.

The Monday before the shooting, Petitioner came to her to complaining about warts on his hands. She said she would take him in if he changed his clothes. Instead of taking off the layers of dirty clothes, he put a clean shirt over the top of them. She told him she was still trying to find a place to take him. He said he didn't believe her, and he knew what she was doing because he had a third eye in the back of his head. He began calling her by her middle name, Maria, and he referred to her as an alien. He began sobbing and said how would you like to be me and never know who your real mother is? He said, I know that you love me because you raised me, but I wish I knew who my real mother was. She followed him to his room and said she was his real mother. He got the blank look on his face and said whatever. She believed he truly thought she was an alien and not his mother. She did not believe Eric could distinguish between what was real and what was not.

He had stopped being able to complete tasks like cleaning chores. He was unable to get good grades, even though he was working at his school work. He had begun throwing his clothes away. At the end of May or beginning of June, she had bought him new shoes. He threw them away, asked for new shoes, and refused to wear the old ones she had taken out of the garbage, but instead began wearing a pair of his father's shoes. He wouldn't eat food served at the house, and would buy prepackaged foods from a gas station. He wouldn't be

able to think or plan ahead. He would ask her to take him to the gas station for food, and then 30 minutes later ask to be taken back to get water, and then later to get something else. He kept his clothes in his backpack or a garbage bag. If he was going to leave without the bag, he would make her promise to stay home and watch the bag.

When his license was taken after the DUI, Petitioner told her he was thankful because he felt he could no longer concentrate to drive, and had almost been in a couple of accidents. He had gotten to where he could not concentrate to read, but could only look at pictures in magazines. Near the beginning of May, he signed up for soccer, but didn't seem able to perform the drills or keep up with the other players, and quit.

The day before the shooting, as she left for work, Petitioner was up, having watched the movie The Matrix all night. He said he believed The Matrix was real, and would not believe it when she told him it was just a movie. They later went to the movie theater, and left him there to call for a ride later if he needed one. (Exhibit DD, R.T. 8/20/03 at 192-243.)

In late April, she met with his teachers and told them she thought he was mentally ill. They talked about his bizarre behaviors. People seemed to assume they resulted from drugs. She tried to explain to the teachers that it was from mental illness, and asked for help getting him through the school year. Some of them cried and they said they were willing to help.

Prior to his arrest in April, he had screwed eye hooks into the walls of his room, strung them with fishing line with craft beads and wind chimes on them, and would arrange glasses of water behind the door after it was shut so the beads would move, the wind chimes would ring, and the glasses would fall if the door was opened. Sometime in February he started urinating and defecating with the bathroom door open. His sister complained, but it didn't seem to matter to him. He eventually stopped flushing the toilet.

In the fall of 1999, she noticed that his CDs were skipping. He had scratched his name into the back of them. He didn't seem to notice that they skipped, and continued to listen to them.

About a month before Petitioner was arrested, he had said he wanted a heater for his room and she took him to Walmart, but told him she thought the heaters were seasonal and

wouldn't be in stock. An employee confirmed that they didn't have any heaters. Petitioner still walked up and down the aisles looking, cussed her out as they left and tried to take the car keys from her. She called her husband who confronted Petitioner about it when Petitioner got home. Petitioner got a blank look on his face and didn't remember what had happened at the Walmart.

After his arrest, he called and said he had been walking down the street and the police started chasing him and he didn't know why. While Petitioner was in custody, he made references to the CIA and the government and that they could release him if they wanted to. His condition seemed to get worse. He would not shower, and when forced to would just stand under the water. He inexplicably poured water over his papers and pictures. When she would call to talk to him he was very suspicious. During one call he started yelling through the phone as though he thought someone were telling her what to say and he wanted them to stop.

On August 20, 2000, Petitioner called home and was frantic to tell them a story, but wanted to tell each of them separately. He kept calling back for a period of an hour and a half. He told them a story about Aaron. He had never told stories like that before. He said it was Aaron's story, but would occasionally say "Eric" instead of Aaron. He said Flagstaff was a mirage and a platinum city for aliens. There were 50,000 aliens and only about 1,000 real people in the city. Aaron was a real person being held hostage because he knows too many things and has the keys to the doors, and they keep saying they will release him, but they don't do it because they are afraid of his powers. They torture and electrocute him to get the answers. Aliens live forever and they can be destroyed only by bullets. As he kept calling back, he kept embellishing on the story, but sometimes they couldn't understand what he was saying.

A couple of days later, Petitioner called back and all he said was Teresa, I don't have anything to say to you but if I get released today will you come pick me up. They got no more phone calls from him and he refused to see them until November, after he had been medicated with anti-psychotic medication.

The night of the shooting, while they were at the movies, Petitioner's behavior was normal for him. (Exhibit EE, R.T. 8/21/03 at 4-60.)

Carden Hakes testified that he met Petitioner through Petitioner's sister. He saw Petitioner at the Harkins theater on June 20th. Petitioner was slumped on a bench, his eyes appeared half closed, and he seemed intoxicated. Petitioner's parents were with him and walked up and said hello. (Exhibit EE, R.T. 8/21/03 at 61-67.)

Aaron Fitzhugh testified that he had known Petitioner since they were in the 4th grade. Up to March and April 2000, he noted that Petitioner had become withdrawn, and his appearance and dress had changed. On June 16 or 17, 2000, he hosted a party, where they were drinking beer. Petitioner arrived and began smoking marijuana. They were in the back yard, and Petitioner went inside and locked them out. He though it odd that Petitioner had come because he had not been invited. His friend Brandon began talking to him about how much Petitioner had changed since junior high. Petitioner was behind Brandon and started yelling at Brandon and then punched Brandon. He pulled Petitioner off of Brandon, and his nose was bleeding. Petitioner then threw Brandon to the ground again, and Aaron pulled him off again. At that point, Petitioner had a blank stare on his face like he didn't know what he was doing. Petitioner seemed confused and went to the side of the house. He came back and fumbled with his ankle and waistband and a dark object, then went through the house, sprayed beer around, yelled to not call the cops, and then ran off. (Exhibit EE, R.T. 8/21/03 at 67-80.)

Carlos Perez testified he met Petitioner when Petitioner was playing freshman football. In the summer of 1999, he began smoking marijuana with Petitioner, and Petitioner seemed to be paranoid. (Exhibit EE, R.T. 8/21/03 at 81.)

Summary re Defense's Lay Witness Evidence of Mental Condition - The foregoing evidence presents the picture of a teenager who became increasingly delusional and paranoid, to the point that he had become convinced that he was surrounded by those intent upon killing him and that even those closest to him, his parents, were aliens. Those delusions and paranoia had, by the time of the shooting, progressed to the point that every aspect of Petitioner's mental and external life were permeated by his irrational fears. And, the evidence suggested

that Petitioner had developed sudden, violent outbursts, which were marked by irrationality.

**__Third__**, there was additional "observation evidence" from the experts from which an inference could be made that Petitioner lacked the requisite *mens rea*. As recognized by the Court in *Clark*, *Mott* did not preclude the consideration of observation testimony by an expert witness that did not go "to mental defect or disease, and its effect on the cognitive or moral capacities on which sanity depends under the Arizona rule. 548 U.S. at 760. Thus, the Arizona Court of Appeals would have found that the trial court should have considered itself free to consider testimony by the experts "such as descriptions of a defendant's tendency to think in a certain way or his behavioral characteristics." *Id.*

In evaluating this testimony, the undersigned does not look through to the various hearsay records, statements, etc. and other non-admissible evidence upon which an expert may normally rely in reaching an expert opinion. *See e.g.* Ariz. R. Evid. 703. The *Clark* court provided no guidance on the handing of testimony which might be impacted by such information, or how to parse out the purely observation based testimony. Where in doubt, the undersigned has shied away from testimony by the experts which had the appearance of deriving from such non-admissible sources rather than from the expert's own personal observations or statements by Petitioner. With regard to statements by Petitioner, where the relation of those statements was not offered to prove the truth of the matter asserted by Petitioner, but to reflect his demeanor or thought processes, the undersigned does include them. *See* Ariz. R. Evid. 801(c) (defining hearsay as statements "offered in evidence to prove the truth of the matter asserted"). Likewise, where the statements were elicited by the prosecution, they are considered as an admission by a party-opponent, and thus not hearsay. *See* Ariz. R. Evid. 801(d)(2).

Finally, in evaluating this evidence, the undersigned considers it comparatively less weighty than testimony concerning Petitioner's conduct and statements prior to his arrest, in light of the potential for Petitioner to be manipulative in an attempt to exonerate himself.

Defense Expert - The defense's expert witness, Dr. Morenz, testified that in his conversation with Petitioner the morning of Morenz's testimony, Petitioner's comments were

fairly bizarre and made no sense. Petitioner continued to profess a belief that his mother was an alien and there were 50,000 aliens in Flagstaff, although he didn't believe they were as malevolent as they used to be. Petitioner continued to profess a belief that he was not mentally ill, and that the medicines being given to him were poisoning him. He continued to profess his innocence of the crime, but proffered no means to prove it. (Exhibit FF, R.T. 8/22/03 at 28-32, 45.) Petitioner never volunteered his belief in aliens, but when questioned directly about it he would at least admit his belief that people are sometimes aliens. (*Id.* at 43.)

He met with Petitioner four times, including an attempt to interview him to determine his competency. Petitioner refused to communicate with him. When he met with Petitioner and defense counsel, Petitioner again refused to communicate. (*Id.* at 63-64.) The third time he met with Petitioner, Petitioner denied any involvement with the shooting. Petitioner claimed he had gone to the movies with his parents, met a girl named Sarah, and went to Lake Powell with her, spent some time there and came back, and shortly after he was arrested. (*Id.* at 65-66.) Petitioner admitted to smoking marijuana most evenings and drinking most weekends in the months leading up to the shooting. (*Id.* at 67-68.) Petitioner admitted to using marijuana and alcohol since the 8th or 9th grade. (*Id.* at 79.) Petitioner claimed that in the weeks or months before the shooting, he had gone to a party and a dance. (*Id.* at 71.) Petitioner denied use of LSD and other drugs. (*Id.* at 72.) Petitioner professed that his family were his best friends but his parents may be aliens. Petitioner denied having hallucinations, mind control or telepathic communications. (*Id.* at 73.) Petitioner never defined what an alien was nor did he refer to the police as aliens. (*Id.* at 75.)

In cross examining Dr. Morenz, the prosecution elicited testimony drawn from his reading of medical records where Petitioner was recorded as referring to the guards at the Coconino County Jail as "aliens." (*Id.* at 77.)

Prosecution Expert - The prosecution's expert, Dr. Moran, testified that during his first interview with Petitioner on June 27, 2003, Petitioner reported that he was not present at the time of the shooting, but had spent a day in Page, Arizona with a girl by the name of Sarah that he had met. When asked about the fishing line in his car and room, Petitioner explained

that he didn't want anyone messing with them.  When asked who he thought would mess with them, Petitioner said aliens, and that he thinks aliens look like people, terrestrial sophisticated people.  He first had the idea of aliens was when he decided to get home schooled and prepared for Y2K.  He thought one of the reasons he was put in jail was because the aliens hated him.  He thought Flagstaff was full of aliens, and that his mother, father, sister and brother were aliens. He thought the aliens were from a different planet, and look like human beings.  He doesn't know why they are here, and didn't know whether the doctors in the room were aliens.  The aliens live like human beings and were possibly expanding to trade for stuff like sugar and broccoli.  He used to think they were trying to kill him, but he didn't think they were any more.  He thought they wanted him dead and were trying to poison him through his clothes and food, and they poisoned him badly at the Coconino County Jail, but he wasn't sure whether they were aliens or humans.  He was very sick for three months and was peeing on himself and going to the infirmary.  He was a little sick for an entire year.  (Exhibit GG, R.T. 8/26/03 at 16-21.)

Petitioner told him that the night of the shooting, his parents had left him at the movie theater and he had gone back in to watch a movie and met a girl there by herself by the name of Sarah.  She asked if he wanted to go to Page for the day.  She left to go home to get her bathing suit.  He went to the Walmart bus stop to wait for her.  She picked him up at 1:30 and they drove to Page and spent the day on the beach and went to McDonald's for lunch.  He didn't know her last name but had her phone number on a piece of paper in his pants when he was arrested, but the police lost it.  The left Page as the sun was going down and she dropped him off around 8:30.  He walked home and then the police arrested him and he didn't know why.  (*Id.* at 21-22.)

In the second interview on July 11, 2003, Petitioner told him that he first experimented with drugs in the 7th grade, and for three months would smoke marijuana on the weekends. In the summer of 9th grade, he began smoking marijuana on a daily basis and to drink to intoxication on the weekends.  His marijuana use increased when he got his car in September of 1998, and he began smoking three or four times per day, sometimes at school, during lunch

and after school. On weekends he of the drank to intoxication, sometimes to the point of vomiting. (*Id.* at 23-24.)

Dr. Moran testified that during questioning, Petitioner provided answers showing his thought patterns were unrealistically virtuous, *i.e.* that he would not admit common foibles, he was extremely angry and suspicious that others were taking advantage of him. He was sensitive to criticism, aloof, detached, and "regularly moralistic." (*Id.* at 24-25.) He reacted to threats by projecting and rationalizing, and took little responsibility for his problems, blaming others and holding grudges. He endorsed a number of bizarre thoughts, such as that he has special mystical powers or a special mission in life that others don't understand. He was rigid in relationships and had a closed attitude towards others' view points. (*Id.* at 25-26.)

On cross-examination, Dr. Moran testified that when he interviewed Petitioner he was cooperative, but under the influence of Haldol, an antipsychotic medication. Petitioner told him that he shook his pen because it was a laser that only aliens could see. He believed one of the reasons he was put in jail was because the aliens hated him. He though Flagstaff was full of aliens, and his family were aliens. Petitioner continued to believe that aliens inhabit the planet to expand their territory and trade for broccoli and sugar. Prior to the shooting the aliens were constantly trying to poison him through his food, his clothes, his food at the jail, and in his car. He had the bird in his car like a coal miner's bird to test for poisoned air. He believed the aliens had at some point replaced the bird with a robotic one so he couldn't tell if he was being poisoned. He believed his parents were aliens, and that they were keeping their identities secret from him. When he decided not to play football in his junior year, he believed the aliens had poisoned him. (*Id.* at 103-109.)

Petitioner never attempted to use his belief in aliens as an excuse for his behaviors. (*Id.* at 135.) Petitioner said when he met Sarah at the movie theater he already has his bathing suit on. (*Id.* at 146.) He thought someone was out to get him because his clothes didn't feel clean and he thought they were poisoned. When he opened the door to his car, the air inside seemed poisoned, so he thought the aliens were trying to get to him. He believed the aliens

could read your thoughts, and know whether you were moving from the right side of your brain to the left side. He believed they were doing research on Jupiter and Mars and could put thoughts in people's heads, but they have not done it to him. (*Id.* at 168-169.)

**Fourth**, there was no direct evidence and little circumstantial evidence to controvert Petitioner's evidence suggesting that he was responding to a paranoid delusion at the time that he shot Officer Moritz. As summarized by the Arizona Court of Appeals the evidence of Petitioner's *mens rea*, included: (1) Petitioner's pre-existing anger at police; (2) actions that indicated an intention to attract a police officer (e.g. repeatedly driving in circles with music blaring); (3) the anti-police music played by Petitioner at the time; (4) the close range of the shot; (5) the angle of the shot (from behind the victim); (6) witness statements indicating the victim's attempt to evade Petitioner's shots; (7) Petitioner's flight from the scene; (8) and the uniform worn by the victim and his marked patrol car, and engaged siren and emergency lights.[26] (Exhibit RR, Mem. Dec. 1/25/05 at 8-10.)

Much of that evidence was not contradictory to evidence of Petitioner's paranoid delusions.

For example, (2) driving in circles in the middle of the night with music blaring was as much indicative of a paranoid and delusional teenager, as it was of one plotting to assassinate a police officer. Petitioner had a track record of irrational behavior while driving, such as leaving his car unattended in the middle of the road in the middle of the night. (Exhibit DD, R.T. 8/20/03 at 202-203.) Moreover, there was testimony that Petitioner had begun to turning up the volume on the TV and on music, and leaving it on. Petitioner's brother testified that Petitioner "[left the TVs on all the time." (Exhibit DD, R.T. 8/20/03 at

_____

[26] The Arizona Court of Appeals did not seem to rely upon the efforts by the prosecution at trial to suggest that Petitioner's behavior was the result of drug usage. The defense made great headway in showing that none of the witnesses ever saw Petitioner using drugs other than marijuana and alcohol. Indeed, Officer Schmidt could not recall having any witness tell him they had actually observed Plaintiff dealing or doing drugs [beyond marijuana]. (Exhibit EE, R.T. 8/21/03 at 110.) Aside from the speculation of heavy drug use by those observing Petitioner's bizarre behaviors, the only connection of Petitioner with drugs other than marijuana was his possession of LSD tablets at the time of his DUI arrest.

65.)  Petitioner's father testified that Petitioner would "leave water running, lights on, TV on loud."  (Exhibit DD,  R.T. 8/20/03 at 124.)

Moreover, the testimony showed that Officer Moritz radioed prior to stopping and leaving his vehicle, that Petitioner had started "running from me."  (Exhibit V, R.T. 8/5/03 at 63.)  Running from the police officer seems not to indicate a plan to trap the officer, as much as surprise and dismay at being pulled over.

Similarly, Petitioner's shooting of the officer, (4) from a close range and (5) behind the officer, (6) even as the officer attempted to evade him, and (7) subsequent flight from the scene are not inconsistent with a paranoid delusion that the officer was an alien intent on killing him.[27]

Nor would (8) the clear identification of Officer Moritz as a police officer be inconsistent with paranoid delusions.  A malevolent alien in a police uniform, driving a squad car with lights and sirens, is still a malevolent alien.  Petitioner's delusions did not sway toward little green men, but instead saw aliens in seemingly ordinary people such as his parents.

For the same reason, Petitioner's antipathy to the police in general would not be inconsistent with the evidence of his paranoid delusions.   The prosecution pointed to essentially two things to suggest that Petitioner had such antipathy: (1) his pre-existent anger towards police; and  (3) his playing of a CD with anti-police lyrics.

To show Petitioner's anger towards police, the prosecution elicited evidence of: (a)

_____

[27]  Nor would Petitioner's having hidden the weapon near his home necessarily be indicative of a plan to shoot a police officer.  Petitioner's parents testified that upon finding Petitioner with a gun prior to the date of the shooting, they had directed Petitioner to keep it out of the house, and he purported to have returned it to its owner.  (Exhibit EE, R.T. 8/21/03 at 46-47.)  Assuming Petitioner was acting in fear of perceived threats to his life, it is reasonable to infer that he had simply hidden the weapon away, somewhere accessible to him, and on the day of the shooting would have again hidden it prior to returning home. Indeed, the fact that he hid the weapon in such an easily discovered manner (e.g. in his hat laying along a fence next to a shed (Exhibit W, R.T. 8/6/03 at 3-6) is more indicative of someone seeking to preserve a source of protection than someone seeking to dispose of incriminating evidence.

anti-police statements by Petitioner; and (b) the occurrence at Thorpe Park when Petitioner indicated he would shoot a police officer.

Anti-Police Statements - Jason Tackett (one of the drug addicts present in the Thorpe Park incident) was a school mate of Petitioner's, testified that one day a month or more prior to the shooting, as Petitioner passed by Tackett heard him mumbling to himself about being upset about how "someone had been arrested unjustly and that he ... wanted to prove his point to the police." (Exhibit Y, R.T. 8/7/03 at 17.)

On the other hand, Petitioner's friend Victor Meza testified that Petitioner was defensive of the police, although he complained that when arrested at his father's insistence Petitioner felt like the police had used "extra force" on him. (Exhibit BB, R.T. 8/12/03 at 38.) Meza explained that Petitioner had always been incredulous at his friends' claims of police brutality, until after his arrest when he became "more open-minded to that they could be - - they could be guilty for things, too." (Exhibit BB, R.T. 8/12/03 at 54.)

Thorpe Park Incident - In his argument on the motion for directed verdict, the prosecution argued that Petitioner had made comments at Thorpe Park about "a plan he had, about how he was going to fire his .22, he was going to go up on a hill and fire his .22 rifle - - I'm sorry - - handgun, and when the police came, he was going to lure them out of their cars and he was going to shoot them in the head with his .22." (Exhibit BB, R.T. 8/12/03 at 26-27.) The closest testimony to this was that by Jason Tackett, when he adopted his original statement to police:

> Q.   And just for clarity's sake, this is the statement that was attributed to you, and this interview was on July 1st of 2000, and on page 3 you were asked, and this is again what Mr. Middlebrook read to you, " Do you remember his exact words?  What was said?"  And your answer was "'If I came up here with my .22 caliber hand pistol - - hand pistol - - hand gun and started firing off, when the police come I will get them out of their cars and start - - I have rifles and I'll start shooting them in the head,' that's what he said."  Then you go on, talk about Don telling him to take off.  Now is that as accurately as you recall exactly what he said to you on that day?
> A.   Yes, sir, it is.

(Exhibit Y, R.T. 8/7/03 at 16-17.)  In contrast, his unaided testimony was quite different:

> Q.   Tell  me  what  happened  when  [the  defendant]  first

approached.  Did he talk to anyone in particular?

        A.  I initiated a conversation with him, I said, "Hey, Eric, how you doing?", and he kind of went off about he wanted to shoot Officer Moritz to get the emergency response out there, and he was going to hide up in the hills with a rifle and start picking them off like a sniper would.

(Exhibit Y, R.T. 8/7/03 at 11.)

      Moreover, Mr. Tackett reported that he had suffered a five year void in his memory as a result of his use of drugs including crystal meth and cocaine, which surrounded the time span of the Thorpe Park incident.  (*See* Exhibit Y, R.T. 8/7/03 at 14-15, 21-24.)  In addition, Tackett was a two time convicted felon on probation at the time of his testimony.  (*Id.* at 22-23.)

      Further, Tackett testified that Petitioner's threats against the police were almost instantaneous upon joining the group and were unprovoked.  (*Id.* at 31.)  In contrast, Mark Fields testified that Petitioner's comments were in response to demands that he put away his beer.  (Exhibit Y, R.T. 8/7/03 at 43-44.)

      Fields was himself a 20 year marijuana user, four year cocaine user, and admitted to smoking marijuana just prior to the Petitioner's arrival at the park.  He was also a convicted felon.  (*Id.* at 47,51.)

      Even if Tackett and Fields' story is wholly believed, the testimony indicated that Petitioner was behaving in an erratic manner consistent with his increasingly paranoid and delusional state, albeit attributed by the witnesses to drug usage.  Tackett testified:

        Q. . . . You were with him for five or ten minutes that day, and you had seen him stoned, I guess, when you smoked marijuana together.  Did you feel he was under the influence of any type of substance at the time?

        A.  I believe he was, but there's no way of telling for certain.  He had the facial expressions and the eyes that kind of stated that he was a little strung out on something.

        Q.  Well, you had seen him stoned on marijuana?

        A.  Yes.

        Q.  Did he have that look?

        A.  No, he did not.  He had the look of either cocaine or methamphetamine in his system.

        Q.  Now, had you seen him under the influence of coke or meth in the past?

        A.  No.  I'm a recovering drug addict myself, and I used both of those, so I know what it looks like on myself and people that I used to

use with, and it's the same look that he had that day, that paranoid look. Eyes kind of shrunk in, black rings around, looking around like he was paranoid.

(Exhibit Y, R.T. 8/7/03 at 13-14.)

Fields testified:

> Q. Well, what was his - - what was he like when he first came up before he pulled out the beer?
> A. Kind of staggering, looked like he had been under the influence already. I smelled some alcohol on him. I was talking to a young lady at the time.
> Q. How would you characterize the smell of alcohol?
> A. Heavy.
> Q. Did you also suspect that he was on something other than alcohol?
> A. Yes, sir. Some kind of narcotic, it wasn't your street marijuana or something, it was - - could have been more hallucinogenic or even cocaine. Didn't seem like it was cocaine, though.
> THE COURT: It did not or did? Did you say it did or did not seem like - -
> THE WITNESS: It didn't seem like he was on cocaine at the time, it was just like, you know, he was, I don't know, in and out, so I came to the conclusion it could have been a hallucinogenic of some sort.

(Exhibit Y, R.T. 8/7/03 at 45 (Fields).)

Anti-Police Lyrics - The Arizona Court relied upon evidence that "Clark was playing a 'rap CD' at the time that contained 'many antisocial attitudes' and included lyrics expressing violent attitudes toward police officers." (Exhibit RR, Mem. Dec. 1/25/05 at 8.) This apparently came from testimony by the state's expert, Dr. Moran, that he had reviewed a CD by "Dr. Dre"[28] identified to him as the one confiscated from the truck driven by Petitioner, and that it "contained many antisocial attitudes" and included "something to the effect of fuck the cops." (Exhibit GG, R.T. 8/26/03 at 15.) The only other located testimony on the contents of Petitioner's music came from officer Dale Young who simply characterized the lyrics of

---

[28] In 1988, the musical artist "Dr. Dre" released an album with the "gangsta" hip hop group "N.W.A." entitled "Straight Out of Compton" which included the track "Fuck tha Police." In the March 28, 1995 obituary of the album's executive producer, Eric "Eazy-E" Wright, the New York Times described a "song that is a fantasy of violent revenge against racist police officers" and reported that "the Federal Bureau of Investigation wrote to N.W.A.'s label, Ruthless Records, protesting it would incite violence against law enforcement personnel." *See* http://query.nytimes.com/gst/fullpage.html?res=990CE 6DB1F3EF93BA15750C0A9 63958260, last accessed 4/14/11.

the CD in the truck as "strange music with strange lyrics." Young testified that he later searched Petitioner's bedroom for "Satanic music or something that might refer to the homicides of a police officer" (Exhibit W, R.T. 8/6/03 at 12-13.) But, the officer testified that no CDs with "lyrics about killing a police officer" was found. (*Id.* at 35.)

The undersigned is not inclined to assign significant weight to Petitioner's possession of a popular rap CD containing anti-police lyrics. The fact that such lyrics were an isolated instance in Petitioner's music library makes it even harder to assign meaning to it. While it certainly has some meaning that it was the CD that was in the vehicle with Petitioner, there was no testimony that the CD actually belonged to Petitioner, or that he had otherwise chosen it as the CD to be in the vehicle, or even that it was actually the music he was playing (let alone the particular song), as opposed to (for example) a radio station. Indeed, Petitioner's mother had testified that in the fall of 1999, Petitioner had ruined all his CDs by scratching his name on them, but continued to play them even though they repeatedly skipped. (Exhibit EE, R.T. 8/21/03 at 7-8.) This would suggest that Petitioner's music listening was not a rational endeavor by one seeking to absorb lyrics or appreciate musical ability as much as simply fill the air with noise.

While the anti-police statements and the Thorpe Park incident (and to whatever extent the Dr. Dre CD might be deemed meaningful) show a growing distrust of and antipathy towards the police, Petitioner's attitudes were consistent with a paranoid delusion of a town full of aliens some of whom were out to get Petitioner. Indeed, who more likely to be a malevolent aliens than those who demonstrated forceful, invasive and coercive behavior against him?

**Fifth**, although the trial judge determined that Petitioner was not legally insane at the time of the shooting, based upon the conclusion that he knew his actions were wrong, that finding would not preclude a determination that Petitioner lacked the requisite *mens rea*, for at least two reasons.

First, the burdens of proof are different in degree and direction. The defense bore the burden of proof of insanity, by clear and convincing evidence. Ariz. Rev. Stat. § 13-502(C).

(Exhibit II, R.T. 9/3/03 at 4.). The prosecution bore the burden of proof of intent beyond a reasonable doubt. Thus a mere reasonable doubt that Petitioner's actions were the result of an intent to kill a police officer, as opposed to his delusions, would have been sufficient for a not guilty verdict, but not sufficient to establish legal insanity.

Second, the insanity determination hinges upon a finding whether the defendant could comprehend that his actions would be deemed morally wrong by the community. Under Ariz. Rev. Stat. § 13-502, "the term 'wrong' for purposes of the insanity defense should be defined by a community standard of morality and not the defendant's personal beliefs." *State v. Tamplin,* 195 Ariz. 246, 248-249, 986 P.2d 914, 917 (Ariz.App. 1999). As noted by the trial court in rendering judgment, there was evidence that suggested Petitioner knew his actions would be considered wrong by the community, *e.g.* his running, hiding, etc. (Exhibit II, R.T. 9/3/03 at 5-6.)

Conversely, however, the prosecution was required to prove not merely that when Petitioner pulled the trigger he knew his conduct to be morally unacceptable to the community, but that Petitioner's subjective belief at that moment was that he was killing a police officer. The trial court could (with benefit of the observation evidence) have concluded that Petitioner believed the officer to be an alien (and thus not a police officer) and yet have simultaneously believed the community would not have accepted that knowledge and would have found his actions morally wrong. Had the trial court done so, it could have rejected the insanity plea, but still have found Petitioner not guilty.

**(5) Summary re Appellate Court's Grant of Relief** - The Arizona Court of Appeals would have been faced with substantial observation evidence[29] that Petitioner was delusional and paranoid at the time of the shooting, and that in his delusions and paranoia he believed himself to be in mortal danger of aliens who appeared to be normal people. A reasonable juror could have readily concluded that rather than laying a trap to catch a police officer, and then

---

[29] Even if the undersigned were to consider only the "observation evidence" provided through lay witnesses (as opposed to the defense's and state's experts), the undersigned would reach the same conclusion.

shooting the captured police officer to act out some rational anger towards the police, Petitioner instead found himself driving in circles, music blaring in an effort to escape the delusions that tormented him, and then when faced with a very real embodiment of his paranoia, he acted to protect himself from what he believed to be an alien impostor. As such, there is at least a reasonable probability that the Arizona Court would have found itself unable to say that, beyond a reasonable doubt, the exclusion of that observation evidence had not affected the verdict.

### (e) Conclusion re Ineffectiveness re Preservation of Claim

For the foregoing reasons, the undersigned concludes that Petitioner was prejudiced as a result of trial counsel's defective performance in failing to make an offer of proof of evidence excluded by the trial court under *Mott*.

Petitioner having established deficient performance, and the Arizona court's rejection of the claim on the lack thereof having been contrary to the holding of *Strickland*, and having established prejudice, this Court must conclude that Petitioner received ineffective assistance of counsel and is entitled to issuance of the writ as a result thereof.

### 7. Summary re Ineffective Assistance of Counsel

Based upon the foregoing, the undersigned concludes that all of Petitioner's properly exhausted claims of ineffective assistance are without merit, except that based upon counsel's failure to properly preserve the "observational evidence" claim for appellate review.

### K. SUMMARY RE PETITION

Petitioner has asserted seven grounds for relief. As to **Ground One** (Substantial Evidence), the portion based upon the defense's "observation evidence" is procedurally defaulted, and the portion based upon the prosecution's evidence is without merit. **Ground Two** (Sanity Determination) is procedurally defaulted. **Ground Three** (Cruel and Unusual Punishment) is without merit. **Ground Four** (Competency) is procedurally barred. As to **Ground Five** (Ineffective Assistance), the portion based on trial counsel's conflict of interest is procedurally defaulted. The portions related to (1) the Parrish report; (2) competency during

trial; (3) waiver of the jury; and (4) limited use of experts are without merit. The portion related to failure to preserve the observational evidence claim has merit. **Ground Six** (Prosecutorial Misconduct) and **Ground Seven** (Ineffectiveness of Appellate Counsel) are procedurally defaulted. Petitioner has failed to excuse his procedural defaults and procedural bar, and those claims should be dismissed with prejudice. The Petition should be granted as to that portion of Ground Five based on trial counsel's failure to preserve the observations evidence claim, and denied as to the balance of the Petition.

Accordingly, the undersigned will recommend that the Court's Writ of Habeas Corpus be granted.

## L. PROPER REMEDY

The undersigned has concluded that Petitioner is held in violation of the United States Constitution, and is entitled to relief under 28 U.S.C. § 2254. Section 2243 of the Judicial Code directs that the Court "dispose of the [petition]...as law and justice require." 28 U.S.C. § 2243.

Habeas remedies generally consist of unconditional release or conditional release, the former being reserved for those situations where the fact of the prosecution and not the manner of the prosecution was illegal, *e.g.* double jeopardy, absence of jurisdiction, etc., or where the violation was egregious, the consequences grave and the term already served makes a retrial unjust. Hertz & Liebman, *Federal Habeas Corpus Pract. & Proced* § 33.1, 33.2 (6th ed.).

"The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner." *Herrera v. Collins*, 506 U.S. 390, 403 (1993). The undersigned finds no reason to depart from the general rule for the instant grant of relief founded upon ineffective assistance of counsel.

Accordingly, the undersigned will recommend that Petitioner be unconditionally released from all custody as a result of his conviction within 30 days of the issuance of the Court's judgment, unless the State of Arizona sooner elects to retry him on the charges, and

within a reasonable time thereafter commences retrial.

## IV. CERTIFICATE OF APPEALABILITY

Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment. The recommendations if accepted will result in Petitioner's Petition being resolved at least partially in favor of Petitioner. Accordingly, the recommended final order will not be "adverse to the applicant," and a decision on a certificate of appealability is not required.

## V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the portion of Ground One founded upon "observation evidence," the portion of Ground Five founded upon trial counsel's conflict of interest; and all of Grounds Two, Four, Six and Seven of Petitioner's First Amended Petition for Writ of Habeas Corpus, filed June 8, 2009 (Doc. 17) be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that balance of Grounds One and Five, with the exception of the portions of Ground Five based upon trial counsel's failure to preserve an observation evidence claim; and all of Ground Three of Petitioner's First Amended Petition for Writ of Habeas Corpus, filed June 8, 2009 (Doc. 17) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that the portion of Ground Five based upon trial counsel's failure to preserve an observation evidence claim of Petitioner's First Amended

Petition for Writ of Habeas Corpus, filed June 8, 2009 (Doc. 17) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that this Court's Writ of Habeas Corpus, directing Petitioner's unconditional release from all custody as a result of his conviction for First Degree Murder in Coconino County Superior Court Case Number CR2000-0538, unless the State of Arizona sooner elects to retry him on the charges, and within a reasonable time thereafter commences retrial, be **ISSUED**.

## VI. EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. Pursuant to *Local Civil Rule 7.2(e)(3)*, unless otherwise permitted by the Court, an objection to a Report and Recommendation shall not exceed ten (10) pages. Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues, *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*), and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

DATED: November 18, 2011

_____

JAY R. IRWIN
United States Magistrate Judge